No. 24-2387

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

*IN RE:* BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
Plaintiff-Appellee
v.
TYSON FOODS, INC., et al.,
Defendants.

APPEAL OF: JOHN ANDREN,
Objector-Appellant.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:16-cv-08637
Judge Thomas M. Durkin

Opening Brief and Required Short Appendix
of Appellant John Andren

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
M. Frank Bednarz
1440 W. Taylor Street, #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Anna St. John
1629 K St. NW, Suite 300
Washington, D.C. 20006
(917) 327-2392
anna.stjohn@hlli.org

*Attorneys for Objector-Appellant John Andren*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2387

Short Caption: In re Broiler Chicken Antitrust Litigation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John Andren

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hamilton Lincoln Law Institute

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Anna St. John    Date: 10/30/2024

Attorney's Printed Name: Anna St. John

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 1629 K St. NW Suite 300, Washington, DC 20006

Phone Number: (917) 327-2392    Fax Number:

E-Mail Address: anna.stjohn@hlli.org

rev. 12/19 AK

# Table of Contents

Circuit Rule 26.1 Disclosure ................................................................. i

Table of Contents .............................................................................. ii

Table of Authorities ........................................................................ iv

Statutes, Regulations, and Rules .................................................... viii

Jurisdictional Statement ................................................................... 1

Statement of the Issues .................................................................... 2

Standard of Review ........................................................................... 4

Statement of the Case ....................................................................... 4

    A.    A direct-purchaser antitrust suit inspires copycat lawsuits by Class Counsel, whom the court appoints to represent the End-User class. ............. 5

    B.    All three class litigations proceed in tandem, and the Antitrust Division intervenes. ................................................................. 6

    C.    Certain defendants settle. ...................................................... 6

    D.    Direct Plaintiffs' counsel move for and receive an interim fee award of 33⅓%. ............................................................................ 7

    E.    John Andren objects and serves limited discovery. ........................ 8

    F.    The district court overrules Andren's objections and awards 33⅓%—more than Class Counsel requested. ................................ 10

    G.    Andren appeals Class Counsel's fee award, and this Court vacates and remands. ...................................................................... 11

    H.    On remand, the district court awards attorneys' fees equal to 30% of the fund. ........................................................................... 13

Summary of the Argument ............................................................... 16

Argument ........................................................................................ 17

I.    The district court misapplied Seventh Circuit law and this Court's mandate by constructing the market with *ex post* fee awards. ................... 17

A.    When actual *ex ante* market data exists, district courts should prioritize it to determine the hypothetical *ex ante* bargain between the class and counsel. ........................................................19

    1.    *Ex post* fee awards are not the market rate. ...............................20

    2.    *Ex post* fee awards generally *exceed* the market rate................................24

B.    The district court improperly weighed *ex post* fee awards five times more heavily than the *ex ante* evidence. .........................................26

C.    Chicago Teachers' *ex ante* agreement is an analogous "comparator." ..........30

II.    The district court erred by failing to evaluate of the stage at which the case settled and again disregarding Hagens Berman's bids. ........................................... 33

A.    The district court disregarded the stage at which this case settled and the follow-on nature of the suit. ...............................................36

B.    The district court erred in again disregarding Hagens Berman's bids.........37

    1.    Class counsel's own past fee bids and requests show that a 30% award substantially over-compensates lawyers at the expense of the class.........................................................................38

    2.    Likewise, class counsel rarely compete on fees because they often depend on the goodwill of rival plaintiffs' counsel. ................................40

    3.    Litigation in California demonstrates that class counsel agree to accept cases for fees less than 30% of a $100 million fund—frequently. ........................................................41

III.    This Court may set a reasonable fee in lieu of remand. ........................................... 43

Conclusion .............................................................................................................. 44

Statement Regarding Oral Argument .................................................................. 46

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d).......... 47

Proof of Service...................................................................................................... 48

**Table of Authorities**

Cases

*Alcarez v. Akorn,*
    99 F.4th 368 (7th Cir. 2024) ..........................................................................40

*In re Amino Acid Lysine Antitrust Litig.,*
    918 F. Supp. 1190 (N.D. Ill. 1996) ..............................................................38

*Barrow v. Falck,*
    11 F.3d 729 (7th Cir. 1993) ..........................................................................44

*In re Broiler Chicken Antitrust Litig. End User Consumer,*
    80 F.4th 797 (7th Cir. 2023) ("*Broiler I*")............................ 2, 4, 16-20, 24, 28, 33, 37, 38

*Budinich v. Becton Dickinson & Co.,*
    486 U.S. 196 (1988)......................................................................................1

*In re Capital One TCPA Litig.,*
    80 F. Supp. 3d 781 (N.D. Ill. 2015).........................................................25, 40

*In re Comdisco Sec. Litig.,*
    150 F. Supp. 2d 943 (N.D. Ill. 2001).......................................................26, 38

*In re Continental Ill. Sec. Litig.,*
    962 F.2d 566 (7th Cir. 1992) ........................................................................25

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
    662 F.3d 913 (7th Cir. 2011) ........................................................................25

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002)..........................................................................................2

*Edwards v. Nat'l Milk Producers Fed'n,*
No. 11-cv-04766-JSW, 2017 U.S. Dist. LEXIS 145214
(N.D. Cal. June 26, 2017) ...........................................................43

*Eubank v. Pella Corp.,*
753 F.3d 718 (7th Cir. 2014) .......................................................25

*Fujiwara v. Sushi Yasuda Ltd.,*
58 F. Supp. 3d 424 (S.D.N.Y. 2014) .............................................25

*Gaskill v. Gordon,*
160 F.3d 361 (7th Cir. 1998) .......................................................19

*In re Cont'l Ill. Sec. Litig.,*
962 F.2d 566 (1992) ....................................................................21

*Laffitte v. Robert Half Internat. Inc.,*
376 P.3d 672 (Cal. 2016) .............................................................26

*Nitsch v. DreamWorks Animation SKG Inc.,*
No. 14-CV-4062-LHK, 2017 WL 2423161, 2017 U.S. Dist. LEXIS 86124
(N.D. Cal. June 5, 2017) .........................................................42, 43

*In re Optical Disk Drive Prods. Antitrust Litig.,* No. 10-md-2143,
2010 U.S. Dist. LEXIS 146768 (N.D. Cal. June 4, 2010) ...............39

*In re Optical Disk Drive Prods. Antitrust Litig.,*
959 F.3d 922 (9th Cir. 2020) ..........................................22, 36, 38

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ...........................29, 31, 32, 35, 36

*Pearson v. Target Corp.,*
968 F.3d 827 (7th Cir. 2020) ......................................................2, 4

*Silverman v. Motorola Sols., Inc.,*
    739 F.3d 956 (7th Cir. 2013) ....................................................................7, 38

*In re Stericycle Sec. Litig.,*
    35 F.4th 555 (7th Cir. 2022)............................................3, 4, 20, 24, 27, 34, 35, 36, 39, 46

*In re Synthroid Mktg. Litig.,*
    110 F. Supp. 2d 676 (N.D. Ill. 2000) ..........................................................35

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ("*Synthroid I*")....2, 3, 12, 18, 19, 24, 32-34, 36, 38, 41, 42

*In re Synthroid Mktg. Litig.,*
    325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*") ...................................7, 23, 24, 29, 34, 43

*Williams v. Rohm & Haas Pension Plan,*
    658 F.3d 629 (7th Cir. 2011) ...................................................................19, 23, 38, 42

<u>Rules and Statutes</u>

15 U.S.C. § 15(a) ......................................................................................1

15 U.S.C. § 26 ..........................................................................................1

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1332(d)(2)..............................................................................1

28 U.S.C. § 1337 ......................................................................................1

Cir. R. 34(f) ............................................................................................46

Fed. R. App. Proc. 4(a)(1)(A) ....................................................................1

Fed. R. Civ. Proc. 23(h) .........................................................................4, 46

Fed. R. Civ. Proc. 54(b) ................................................................1

Other Authorities

Baker, Lynn A., et al.
    *Is The Price Right? An Empirical Study of Fee-Setting in Securities Class
    Actions,*
    115 COLUM L. REV. 1371 (2015) ...............................................24

Burch, Elizabeth Chamblee,
    *Monopolies in Multidistrict Litigation,*
    70 VAND. L. REV. 67 (2017)......................................................41

Editorial Board,
    *The Anthem Class-Action Con,*
    WALL ST. J. (Feb. 11, 2018) .....................................................46

Eisenberg, Theodore, et al.,
    *Attorneys' Fees in Class Actions: 2009-2013,*
    92 N.Y.U. L. REV. 937 (2017) ...................................................21

Eisenberg, Theodore & Miller, Geoffrey,
    *Attorney Fees in Class Action Settlements: 1993-2008,*
    7 J. EMPIRICAL L. STUD. 248 (2010) ..........................................26

*FTC Workshop—Protecting Consumer Interests in Class Actions,*
    18 GEO. J. L. ETHICS 1243 (2005) ..............................................38

Liptak, Adam,
    *When Lawyers Cut Their Clients Out of the Deal,*
    N.Y. TIMES (Aug. 13, 2013) .....................................................46

Ostoyich, Joseph, and William Lavery,
    *Looks Like Price-Fixing Among Class Action Plaintiffs Firms,*
    LAW360 (Feb. 12, 2014) .........................................................40

# Statutes, Regulations, and Rules

Federal Rule of Civil Procedure 23. Class Actions.

**(g)      Class Counsel.**

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

…

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); …

…

**(h)      Attorney's Fees and Nontaxable Costs.**

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

## Jurisdictional Statement

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action controversy exceeding the sum or value of $5,000,000, exclusive of interest and costs, and members of the class are citizens of a State different than at least one of the defendants. Dkt. 3747 ¶¶ 15.[1] For example, named plaintiff Linda Cheslow is a citizen of California, and defendant Tyson Foods, Inc., is a Delaware corporation headquartered in Arkansas. *Id.* ¶¶ 20, 50. Plaintiffs also asserted federal-question jurisdiction for their putative federal antitrust claims under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15(a) and 26. *Id.* ¶ 15.

On remand from John Andren's first appeal of an order granting class counsel's motion for attorneys' fees, the district court issued a superseding order awarding attorneys' fees on July 3, 2024. SA1. John Andren filed a notice of appeal on August 2, 2024. A241. This appeal is timely under Fed. R. App. Proc. 4(a)(1)(A).

This Court has jurisdiction under 28 U.S.C. § 1291, which provides jurisdiction over appeals from all final decisions of district courts. The post-settlement approval fee decision is an independently appealable collateral order. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200-01 (1988). (Notwithstanding continued litigation against non-settling defendants, final judgment issued under Rule 54(b). A27).

John Andren, a class member who filed a claim for recovery from the common fund, timely objected to the fee request, filed a claim, appeared at the fairness hearing through counsel, and appealed the initial fee award that this Court then vacated and remanded. A1, Dkt. 5315. Thus, Andren is a "party" entitled to appeal adverse rulings without the need to formally intervene; he has standing to appeal the fee award and

---

[1] "Axyz" refers to page xyz of Andren's Appendix in this appeal. "Dkt." refers to docket entries in Case No. 16-cv-8637 (N.D. Ill.) below.

related orders. *Devlin v. Scardelletti*, 536 U.S. 1 (2002); *Pearson v. Target Corp.*, 968 F.3d 827, 835 (7th Cir. 2020).

## Statement of the Issues

This is an appeal from an order awarding $51.66 million to class counsel, equal to 30% of the settlement fund of $181 million, after deducting expenses and incentive awards, issued on remand from this Court's decision vacating the original fee of $57.4 million, over appellant John Andren's continued objection.

1. The Seventh Circuit requires a "market-mimicking approach." When setting attorneys' fees in a common-fund class-action settlement, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market" that would have been negotiated at the outset of litigation. *E.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001) ("*Synthroid I*"). This Court holds that when determining the market rate, data about *ex post* fees awarded to class counsel in other cases are "less probative" in assessing the bargain that would have been struck *ex ante* and therefore "should receive less weight." *In re Broiler Chicken Antitrust Litig. End User Consumer*, 80 F.4th 797, 804 (7th Cir. 2023) ("*Broiler I*"); *accord Synthroid I*, 264 F.3d at 719. Did the district court err by giving nearly four times as much arithmetic weight to *ex post* awards given the availability of *ex ante* market evidence, namely the fee agreement that an institutional client reached *ex ante* in an antitrust case filed by co-lead Class Counsel?

2. Was it an abuse of discretion for the district court to pool seventeen *ex post* fee awards cited by another plaintiffs' expert that Andren had no opportunity to rebut, cherry-picked because they were "33 percent or greater," while omitting low "outlier" fee awards, in a spreadsheet including all of Class Counsel's antitrust fee awards, when it calculated the alleged market rate?

3.      Bids made by plaintiffs' counsel in other litigation show "what levels of compensation attorneys are willing to accept in competition." *Synthroid I*, 264 F.3d at 721. Because such bids often "compensate lawyers based on how far the litigation progresses," it is error for a district court "not [to] give sufficient weight" to the stage at which the case settled. *In re Stericycle Sec. Litig.*, 35 F.4th 555, 566 (7th Cir. 2022). Did the district court err by failing to consider the stage of litigation as actual market rates do?

4.      Did the district court err in determining that *ex ante* bids in cases involving prior government investigations merely set a "floor" of the market price range, without further analyzing their structure or weighing them along with *ex post* fee awards, where class counsel here were similarly following a lead action that reduced the risk and amount of work necessary to litigate the case?

## Standard of Review

This Court reviews fee awards for abuse of discretion. *Stericycle*, 35 F.4th at 559. A district court abuses its discretion if it "reaches an erroneous conclusion of law" or "reaches a conclusion that no evidence in the record supports as rational." *Id.* (internal quotations and citations omitted); *Broiler I*, 80 F.4th at 802. Or if it fails to consider an essential factor by "leav[ing] something important out of the analysis." *Pearson*, 893 F.3d at 984 (cleaned up).

This Court "review[s] de novo whether the district court's legal analysis and method conformed to circuit law" for Rule 23(h) awards. *Stericycle*, 35 F.4th at 559.

## Statement of the Case

The district court appointed counsel for three sets of private plaintiffs—Direct Purchasers, Commercial Indirect Purchasers, and End-User Consumers—who allege price fixing in the market for chicken meat, called "broiler chicken."[2] Objector John Andren is an End-User class member. His appeal challenges a fee award of $51,660,000, or 30% of the net $172.2 million settlement common fund, to End-User class counsel— the co-lead firms Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC ("Class Counsel"). The district court awarded this fee on remand, after this Court vacated the district court's initial fee award of $57.4 million, or one-third of the net common fund. *Broiler I*, 80 F.4th 797. All three sets of plaintiffs settled with some defendants, and all three continue litigation against non-settling defendants.

---

[2] The district court and parties generally refer to these plaintiffs as DPPs, CIIPPs (for "Commercial and Institutional Independent Purchaser Plaintiffs"), and EUCPs, but this brief will use short English terms instead.

**A.    A direct-purchaser antitrust suit inspires copycat lawsuits by Class Counsel, whom the court appoints to represent the End-User class.**

On September 2, 2016, Maplevale Farms, Inc., represented by other counsel, filed a 113-page antitrust complaint against chicken producers. Dkt. 1. Maplevale, seeking to represent a class of direct purchasers, alleged coordinated price increases that emerged around 2008-2009 from throttling production. *Id.* at 36-72.

Another firm, Wolf Haldenstein, filed the first indirect consumer purchaser antitrust complaint on September 13, 2016. *Drucker v. Koch Foods*, No. 16-cv-8874 (N.D. Ill.). Hagens Berman followed on September 14, copying factual allegations of the *Maplevale* complaint nearly verbatim, even erroneously referencing "members of the Class who directly purchased Broilers from Defendant[s]." *Percy v. Koch Foods*, No. 16-cv-8931 (N.D. Ill.), Dkt. 1 at 111. Cohen Milstein filed its first indirect purchaser complaint two days later. *Gilber v. Tyson Foods*, No. 16-cv-9007 (N.D. Ill.). Altogether, ten putative class actions were filed by nine different groups of firms seeking to represent purchasers (the others including Nos. 16-cv-8737, 16-cv-8851, 16-cv-9421, 16-cv-9490 (Hagens), and 16-cv-9589, 16-cv-9684).

Class Counsel moved for appointment as interim class counsel for indirect purchaser consumers. Dkt. 117, 218. Another group also sought appointment on behalf of *all* indirect purchasers. Dkt. 116. At first, the district court denied Class Counsel's applications without prejudice, instead appointing a different counsel to represent all indirect purchasers, expressing concern that "[m]ore lead counsel means higher attorneys' fees, as sure as night follows day." Dkt. 144 at 4-5.

In late 2016,  Hagens Berman renewed its motion for appointment, arguing that duplication would make no difference to the ultimate fee award:

> At the end of the day, there's a certain amount of damages that defendants are going to be liable for. This Court may or may not award a fee—a percentage award fee that might be 25 percent. It's only a matter of how

much they've put in versus how much we've put in. The cost to the class does not go up.

Dkt. 245 at 25-26. The district court decided that the conflict between end-users and large commercial purchasers was real (*id.* at 38), but required new appointment filings. Dkt. 243. Class Counsel and Wolf Haldenstein filed competing motions for appointment as End-Users' counsel. Dkts. 247 & 246. The district court created separate indirect-purchaser classes and appointed Class Counsel for the End-User Consumer Plaintiffs. Dkt. 248.

**B.    All three class litigations proceed in tandem, and the Antitrust Division intervenes.**

Throughout the litigation, dozens of corporations opted out of the proposed classes to file their own actions. By February 2021, purchasers representing about 61% of direct sales from Pilgrim's Pride and Tyson Foods—by far the largest two chicken producers—had filed individual opt-out actions. Dkt. 4387 at 10.

In June 2019, the Department of Justice's Antitrust Division intervened in the class actions, seeking a stay of discovery to protect the grand jury's investigation in Colorado. Dkt. 2268, 3637.

On February 23, 2021, Pilgrim's Pride pleaded guilty to engaging in a conspiracy to fix broiler chicken prices. *United States v. Pilgrim's Pride Corp.*, 20-cr-0330-RM, Dkt. 58 (D. Colo.). After some mistrials and acquittals, the Department dismissed remaining criminal cases in October 2022.

**C.    Certain defendants settle.**

Direct and Commercial Indirect Plaintiffs reached several small settlements between 2017 and 2020. Direct Plaintiffs reached settlements with Pilgrim's Pride and Tyson in January 2021. Dkt. 4259.

End-User Plaintiffs reached settlements with Pilgrim's Pride, Tyson, and four smaller defendants for a total of $181 million and moved in March 2021 for preliminary approval of these settlements. Dkt. 4377, 4920. The court approved class notice for all six settlements in August 2021. Dkt. 5165.

End-Users moved for attorneys' fees of 33.0% of the *gross* common fund, $59.73 million. Dkt. 5160. The motion and accompanying brief (Dkt. 5161) did not proffer expert evidence.

## D. Direct Plaintiffs' counsel move for and receive an interim fee award of 33⅓%.

Meanwhile, in April 2021, Direct Plaintiffs made their first fee request, moving for an interim payment of attorneys' fees of 33⅓% of the fund for all settlements reached, net expenses. Dkt. 4551.

On August 4, 2021, the district court issued a minute order in response to the Direct Purchaser Plaintiffs' motion. "At least twice, the Seventh Circuit has suggested that district courts apply a sliding scale in awarding class counsel fees." Dkt. 4915 (citing *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 978 (7th Cir. 2003) and *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 959 (7th Cir. 2013)). "The Court's current intent is to apply such a scale" and it requested briefing on the appropriateness and terms it should use for a fee scale. *Id*. All three sets of plaintiffs filed briefs in response.

Counsel for Direct and Commercial Indirect Plaintiffs argued against a declining scale award under Seventh Circuit law. Dkts. 5048, 5050. Each attached declarations by law professors endorsing fee awards of 33⅓% even for sizable common funds. Dkt. 5050-1. Without an expert declaration End-User Plaintiffs argued the same. Dkt. 5049-1.

No Direct Purchaser objected to the 33⅓% fee request for that settlement class. (Again, purchasers representing the majority of the class's purchases already opted out, leaving about 8000 smaller direct purchasers in the class. Dkt. 4387 at 10.) The district court granted Direct Purchasers' fee request in full, crediting both law-professor

declarations for the proposition that this Circuit disfavors employing a declining scale for successively larger tranches of recovery. Dkt. 5225.

### E. John Andren objects and serves limited discovery.

On November 10, 2021, John Andren objected to the attorneys' fee request. A1. Andren is an End-User class member and settlement claimant. A3. Andren is also an attorney with the nonprofit Center for Class Action Fairness, which represents him. *Id*.

Andren argued the fee request exceeds the hypothetical *ex ante* market rates that the Seventh Circuit requires courts to follow. A5. He observed that *ex post* fee awards from other cases are not "market rates"; they often reflect uncontested proposed orders written by plaintiffs' firms. A8. He pointed the court to better market data in Hagens Berman's bids trying to secure appointment as lead counsel in two other antitrust cases. A9-A13. Each Hagens Berman bid provides substantially lower percentage awards for settlements before class certification, and smaller percentages for larger recoveries. A10. For example, the *Optical Disk Drive* proposal used this grid:

| | Pleading through Decision on Motion to Dismiss | After Motion to Dismiss through Adjudication of Class Certification | After Adjudication of Summary Judgment | Through Trial Verdict and Appeal |
|---|---|---|---|---|
| First $5,000,000 | 0% | 0% | 0% | 0% |
| $5,000,001 - $25,000,000 | 5% | 14% | 14% | 14% |
| $25,000,001 - $50,000,000 | 4% | 13% | 13.25% | 14% |
| $50,000,001 - $75,000,000 | 3% | 12% | 13% | 14% |
| $75,000,001 - $100,000,000 | 2.5% | 11.5% | 12.5% | 13.5% |

|  | Pleading through Decision on Motion to Dismiss | After Motion to Dismiss through Adjudication of Class Certification | After Adjudication of Summary Judgment | Through Trial Verdict and Appeal |
|---|---|---|---|---|
| $100,000,001 - $200,000,000 | 2% | 10% | 11% | 12% |
| $200,000,001 - $400,000,000 | 1.5% | 7% | 8% | 9% |
| $400,000,001 and above | 1% | 5% | 6% | 7% |

A10; A51.

Class Counsel's response argued that the *Optical Disk* and *Lithium Batteries* bids were "below market" because they were offered within the Ninth Circuit, which employs a 25% "benchmark" for presumptively reasonable attorneys' fees. Dkt. 5249 at 6. Hagens Berman's founder Steve W. Berman asserted that "Hagens Berman has learned that [competitive bids] are not in the best interests of the class and are not reflective of what the market will bear." *Id*. Andren served discovery to test Berman's *ipse dixit* assertions about market rates, risk, and bidding. Dkts. 5294-6; 5294-1 at 10-11.

Andren moved on December 17 to compel responses after counsel declined to provide substantive responses. *Id*. at 3; Dkt. 5294. Andren's counsel also filed a declaration and offer of proof of what the discovery would show: that 33% exceeds the competitive market rate. Dkt. 5294-1 at 9-10.

Andren also noted that the Berman declaration contradicts the record in other cases, and that interrogatory response would prove this. *Id*. at 5-9. Hagens Berman never argued in *Optical Disk* or *Batteries* litigation over attorneys' fees that its bids were below-market, only that courts should not consider unaccepted bids. *Id*. at 8-9. Andren further noted that, though Berman claimed that the Ninth Circuit regularly awards fees

below the "market rates" of other jurisdictions, his firm as recently as May 2021 had sought co-lead counsel status in an antitrust case there. *Id*. at 5.

Andren also addressed the purported expert declarations the district court relied on to grant the Direct Purchaser fee award. Andren objected to reliance on experts proffered by other counsel without the opportunity to conduct discovery and because "they ignore the best evidence of market rate as the Seventh Circuit defines it." *Id*. at 11.

Class Counsel disputed none of the characterizations in the offer of proof, arguing instead about burden and timeliness. Dkt. 5316. They did not dispute that it would be unfair for the court to rely on declarations Andren had no notice of or opportunity to rebut. *Id*.

### F. The district court overrules Andren's objections and awards 33⅓%—more than Class Counsel requested.

On December 20, the district court approved the settlements but reserved ruling on fees and discovery. Dkt. 5303. While those two motions were pending, the court certified all three classes in May 2022. Dkt. 5644.

On August 30, 3022 the district court ruled on Andren's discovery motion. A71. It required Class Counsel to disclose under seal (1) any bids made by counsel in an antitrust case; (2) the actual fee award in every antitrust case; and (3) the lodestar and percentage of the awards sought—but only in cases since September 2, 2016. A72-A73. It denied discovery on Berman's representations about risk and earlier bids and market rates and did not mention the purported expert declarations. A72.

Class Counsel's disclosures confirmed that both firms engage in substantial Ninth Circuit litigation, notwithstanding Berman's claim that the Ninth Circuit benchmark is below-market. A259-A262. Most of those cases awarded 25% fees, and often substantially less. The disclosure also revealed another Hagens Berman bid, submitted November 20, 2015, that capped attorneys' fees at 20%. A257.

Following briefing, the district court awarded Class Counsel 33⅓% of the net common fund. A74.[3] The district court did "not put much stock" in bids submitted by Hagens Berman because (1) the "most recent is more than seven years old"; (2) the Seventh Circuit supposedly found the declining percentages "do not reflect market realities and impose a perverse incentive"; and (3) citing the non-tendered declaration of Prof. Klonoff, "cases within the Seventh Circuit have similarly recognized that the auction concept is flawed." A79.

Having discounted the bids, the court concluded that "the only available evidence of the 'market rate' is past awards." A83. But the district court also discounted past awards from other circuits as "infected by default rules recommending smaller" fees in megafund cases (A81) and "relatively unpersuasive." A82. The court also declined to consider those fee awards that were lesser in percentage terms but "greater in absolute amount." A83.

## G. Andren appeals Class Counsel's fee award, and this Court vacates and remands.

On Andren's appeal, this Court vacated and remanded for further evaluation of the *ex ante* market rate. A95. Reaffirming *Stericycle*, this Court found that the district court had not followed the appropriate methodology in determining the fee award, thus abusing its discretion. A89. Even under that deferential standard of review, this Court concluded "that its evaluation fell short in two areas: consideration of bids made by class counsel in auctions, and the weight assigned to out-of-circuit decisions." *Id.*

As to the bids in auctions, the Court held that although it has previously rejected the idea that district courts must conduct auctions to set fees at the beginning of the

---

[3] Class Counsel had moved for 33.0% of the gross common fund. Dkt. 5160. The district court limited the fee award to a percentage of the net common fund, but in the process increased the percentage to 33⅓%, while calling it 33%.

case, "auction bids are appropriately considered when deciding what bargain the parties would have struck *ex ante*. A90 (citing *Synthroid*, 264 F.3d at 721). Accordingly, "[b]ids that class counsel made in auctions around the time this litigation began in September 2016"—*i.e.,* those the district court discounted in awarding fees—would ordinarily be good predictors of what *ex ante* bargain would have been negotiated." *Id.* This Court also rejected the district court's discounting those bids because they had declining fee scale award structures. "[T]his court has never categorically rejected consideration of bids with declining fee scale award structures," and, in fact, *Synthroid* involved a declining fee scale. A91. Under circuit law, "the appropriateness of a declining fee scale award structure may depend on the particulars of the case." *Id.* Accordingly, "[i]t was an abuse of discretion to rule that bids with declining fee structures should categorically be given little weight in assessing fees." *Id.* Further, this Court held, it was "not dispositive that the bids here were not ultimately successful or that they were made by only one of the two firms appointed in the case." A92. Rather, "the bids were made in pursuit of appointment and reflect the price of co-counsel's legal services in antitrust litigation." *Id.* The Court instructed that on remand, "the district court may accord appropriate weight to these bids, recognizing that they may be probative of the price of only one firm's legal services." A93.

As to out-of-circuit fee awards, the Court held that "the district court should not have categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule." A93. The Court reasoned that firms' "continued participation in the Ninth Circuit is an economic choice that informs the price of class counsel's legal services and the bargain they may have struck." *Id.* Although district courts in the Ninth Circuit award *ex post* fees, "as rational actors, class counsel assess the risk of being awarded fees below the market rate of their legal services when they seek to represent plaintiffs" in other circuits. A94. Accordingly, "[t]he district court

should have considered where class counsel's economic behavior falls on this spectrum and assigned appropriate weight to fees awarded in out-of-circuit litigation." *Id.*

On the issue of relying on experts untested by discovery, this Court remanded for further consideration, given the lack of "rationale for declining to order additional discovery." A94.

## H. On remand, the district court awards attorneys' fees equal to 30% of the fund.

On remand, for the first time, Class Counsel disclosed another declining fee schedule they negotiated with their client in a complex antitrust case in the Southern District of New York—*In re Interest Rate Swaps Antitrust Litigation*—a fee schedule taken from a prior complex antitrust case in the Second Circuit, *In re Payment Card Interchange Fee Litigation*. SA2. Application of this declining fee schedule evidently results here in an award of 26.6% of the settlement recovery, or approximately $47.2 million. *Id.*

Andren moved to strike, or in the alternative for discovery concerning other plaintiffs' expert declarations that the district court had relied on. Dkt. 6932. Class Counsel disclaimed any reliance on the declarations. Dkt. 6967 at 1. In its fee order, the district court denied Andren's motion as moot "[b]ecause this opinion and order is not based on those expert opinions." SA15. But the fee order relies on a spreadsheet of cases, including tables drawn from non-representative fee awards listed in one of the declarations, that made a significant mathematical difference on the results, as discussed below.

In its second fee order, the district court awarded $51,660,000, equal to 30% of the net settlement—a reduction of approximately $5.7 million.

The district court discounted the relevance of the three bids that Class Counsel made in the six years preceding the filing of this case in complex antitrust cases. Two of the bids were declining fee schedules with maximum rates of 13.5% and 17%, and the third was a flat rate of 20%. SA3. The district court found more relevant the fact that all

three cases had been filed "in the wake of criminal investigations by the government," which made the case "lower risk" and likely "less work" *Id.* Thus, the district court found, it was "not surprising" that the bids in those three cases "were much lower than the vast majority of awards in similarly complex cases" and merely "establish the floor of the market price range." SA3-SA4.

Reconsidering the Ninth Circuit fee comparators, the district court reaffirmed that "the existence of, or need for, the Ninth Circuit's megafund rule is evidence that 25% is likely *not* the market rate" but rather an "artificial[] control" of the price. SA5. Attorneys' willingness to continue to work in the Ninth Circuit "does not reflect supply and demand in a free market," as evidenced by the majority of fee awards outside the Ninth Circuit that are at least 30% of recovery. *Id.* Instead, "class counsel would likely demand at least 30% from prospective clients in cases outside the Ninth Circuit." *Id.* Accordingly, Ninth Circuit awards "are not particularly good indicators of what the market would bear." *Id.*

As for the *Interest Rate Swaps* fee agreement, which apparently recommends a 26.6% fee award, the district court found the two cases "good comparators" and that "the declining fee schedule" is relevant to the market price. SA7-SA8. Yet the court speculated that the potential settlement value of *Interest Rate Swaps* was not comparable, based "likely" on the defendants being in the food industry rather than financial institutions, which "generally have greater assets than food producers to pay larger settlements." SA8-SA9. Accordingly, the court found it "unlikely" that Class Counsel would have negotiated the *Interest Rate Swaps* fee schedule in this case but included it as a data point in its analysis. SA9.

The district court ultimately awarded fees equal to 30% of the net fund. To reach this figure, the court created a spreadsheet, sorted by total recovery, of awards to Class Counsel; awards in "other antitrust cases around the country" (which were taken from

the Klonoff declaration that End-User Plaintiffs and the court had earlier disclaimed, and which were presented in the declaration as "examples of antitrust cases…with percentages of 33 percent or greater," and did not represent them as a representative sample, Dkt. 5051-1 at 45-47); the *Interest Rate Swaps* fee agreement percentage (including it ten times as an "arbitrary weight" because it was an *ex ante* agreement rather than an *ex post* award); and awards in *Payment Card*, and three other cases. The court then considered the awards on recoveries between $100 million and $1 billion, but first disregarded three awards of 9%, 11%, and 11% because they were "outliers from the Ninth Circuit" that did not reflect an "*ex ante* agreement the parties would have reached here." SA10. After excluding the three lowest Ninth Circuit awards and having already excluded Class Counsel's bids, the court considered the 39 *ex post* awards and "ten" *ex ante* awards (*Interest Rate Swaps* x10). The average rate was 28.995% and the median rate was 31%. *Id.* The court did not consider the stage of litigation or even list that information in its spreadsheet. If the non-representative samples of 33% awards from the Klonoff declaration had been excluded, the average would have been 27.05% without the "outliers," or 26.08% including them, with the median landing on the 26.6% *Interest Rate Swaps* award in either case.

The district court rejected the empirical studies cited by Andren to show that an award greater than 26.6% (the rate from *Interest Rate Swaps*) is excessive. The court acknowledged that the studies show: (i) settlements from the years 2006-2007 ranging from $100 million to $250 million had a median award of 16.9% and a mean award of 17.9%; (ii) average fee awards equaled 15.1% where recovery exceeded $100 million; (iii) the mean percentage fee award in 68 class action settlements with recovery above $175.5 million was 12% and the median award was 10.2%; and (iv) the mean percentage for antitrust fee awards from 2006 through 2013 was 22%, 25.4%, and 25.2% in three additional empirical studies. SA11-SA12. Despite stating that "this information is

certainly relevant," the district court found that it "carries less weight … because the averages produced by the studies are not apples-to-apples comparisons with the average the Court has calculated from its spread-sheet data." SA12. The court pointed out that one treatise showed the fee award rate for recoveries in the *Seventh Circuit* from 2006-2011 was 31.6% and a more recent study from 2009 to 2022 found the median award rate to be 30% for recoveries between $100 and $249 million. The district court concluded that the empirical studies "do not undermine the Court's calculated range of an award between 29% (the average) and 31% (the median)." SA13.

The district court further rejected Andren's objection to the court's reliance on *ex post* awards. SA13. The district court instead found it "undeniable that the sheer volume of *ex post* awards, relative to the minimal number of *ex ante* agreements, has a substantial impact on the expectations of class counsel and their clients," which formed "the foundation of supply and demand, and hence the market price." SA13-SA14. In the court's view, *ex ante* bargains relied on the market rate "shaped by *ex post* awards," and Andren had not presented the court with examples of *ex post* awards to support a market rate between 20% and 26.6%. Ax14.

## Summary of the Argument

This Court issued a clear mandate consistent with Circuit precedent that called for the district court to conduct "another evaluation of the bargain the parties would have struck *ex ante*," appropriately weighing "the available market evidence," without artificially excluding cases from an entire circuit or discounting bids made by class counsel in auctions as it had. *Broiler I*, 80 F.4th at 802, 805. On remand, Class Counsel revealed more real market evidence—an *ex ante* fee agreement that one of their firms had entered into with a sophisticated plaintiff about a year before this case was filed. Yet, the district court erred again in fundamental respects.

The district court gave the actual market evidence comparatively little weight, diluting the *Interest Rates* Swaps agreement with dozens of *ex post* awards, excluding Class Counsel's bids entirely, and reasoning that the "sheer volume of *ex post* awards" made those awards substantially important to the market rate. Those awards, set by courts *ex post*, are helpful only in the absence of the market signals present here and should be assigned less weight in the overall calculation. As to the *ex post* awards themselves, nearly half in the district court's spreadsheet were cherry-picked examples of awards of 33% from another plaintiff's expert that Andren had moved to strike, skewing the average upward. *See* Section I.

Evaluation of the *ex post* awards entirely failed to consider the stage at which the case was settled and the court again disregarded bids that co-class counsel had submitted in other cases. Both are essential factors to account for in determining a market-approximating fee under circuit precedent. *See* Section II.

Finally, to maximize judicial efficiency where the district court has made similar errors in successive attempts to set an attorneys' fee, this Court may set a reasonable attorneys' fee rather than remanding the case for a third attempt. *See* Section III.

## Argument

## I. The district court misapplied Seventh Circuit law and this Court's mandate by constructing the market with *ex post* fee awards.

This Court vacated and remanded the original fee award to Class Counsel "for another evaluation of the bargain the parties would have struck *ex ante*." *Broiler I*, 80 F.4th at 805. The district court improperly assigned "little weight" to bids offered by co-lead class counsel because "[b]ids that class counsel made in auctions around the time this litigation began in September 2016 would ordinarily be good predictors of what *ex ante* bargain would have been negotiated." *Id*. at 802. And the district court "should not

have categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule." *Id*. at 804. It recommitted both errors on remand.

On remand, co-lead class counsel disclosed for the first time they were retained by a sophisticated plaintiff who negotiated fees *ex ante*—the Public School Teacher's Pension and Retirement Fund of Chicago ("Chicago Teachers")—for the *Interest Rate Swaps* antitrust action in New York. *Interest Rate Swaps* was filed just over one year before *Broiler Chicken*, so before the pre-remand order had required disclosed. A139. The *ex ante* fee agreement, submitted *in camera*, but not provided to Andren, apparently would have recommended a fee of 26.6% for the first wave of *Broiler Chicken* settlements at issue.

This datum, unknown to Andren and the *Broiler I* panel, is much more probative than *ex post* fee awards in constructing a hypothetical *ex ante* market. Instead, the district court again misapplied Circuit law by assigning "more weight" to the "large number" of *ex post* fee awards, conflating these with the "market rate." *Broiler I*, 80 F.4th at 801. "When determining the market rate, data about *ex post* fees awarded to class counsel in other cases should receive less weight, as those prices are set at the end of the litigation." *Id*. at 804 (*citing Synthroid I*).

The district court dismissed considerations of the bids for spurious reasons and provided minimal weight to the Chicago Teachers' *ex ante* fee agreement by arithmetically pooling it with dozens of *ex post* awards. Doing so, the district court gave four times as much weight to a collection of *ex post* awards. Worse, 43% of these *ex post* awards were provided by an expert in a different track of litigation as a non-representative sample of fees of "33 percent or greater." The court further gerrymandered the already-skewed pool of *ex post* fee awards to exclude "outliers" that would have driven down the average because they originated from Ninth Circuit courts. SA10; *contra Broiler I*, 787 F.4th at 804.

Rather than seek the *ex ante* rate that would have been struck by knowledgeable fiduciaries for the class, the district court found that "*ex post* awards actually serve to set the market rate." SA14. The remand fee order contravenes Seventh Circuit precedent and violates the law of the case. For the same reasons as before, it should be vacated.

## A.     When actual *ex ante* market data exists, district courts should prioritize it to determine the hypothetical *ex ante* bargain between the class and counsel.

"As a matter of method, 'courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Broiler I*, 80 F.4th at 801 (quoting *Synthroid I*, 264 F.3d at 718). "That is, a district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case." *Broiler I*, 80 F.4th at 801-02 (cleaned up) (quoting *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011)). "It should recognize that its task was to assign fees in accord with a hypothetical ex ante bargain, weigh the available market evidence, and assess the amount of work involved, the risks of nonpayment, and the quality of representation." *Id.* "The judge, in other words, is trying to mimic the market in legal services." *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (cleaned up).

This Court consistently finds *ex post* fee awards helpful only absent market signals.  Because no *ex ante* market usually exists, the Circuit recommends "benchmarks" to help district courts estimate the market fee. None of these are *ex post* fee awards, but instead: (1) actual fee contracts between (sophisticated) plaintiffs and their attorneys; (2) data from similar common fund cases when fees were privately negotiated; and (3) information from class-counsel auctions. *Synthroid I*, 264 F.3d at 719-20. While the retention agreements of the unsophisticated consumer plaintiffs in this case included no limitations on fees, the other two benchmarks were available, but the

district court discounted the bids entirely and improperly gave more total weight to *ex post* awards than the *ex ante* Chicago Teachers' agreement. Courts lack discretion to conduct an "incomplete" analysis or to consider an improper factor. *Stericycle*, 35 F.4th at 560.

### 1. *Ex post* fee awards are <u>not</u> the market rate.

The district court made a fundamental error in its analysis by identifying *ex post* awards as more indicative of the market rate than actual *ex ante* bids and agreements. This upside-down premise animated all of its reasoning.

For example, the district court assumed that "the existence of, or need for, the Ninth Circuit's megafund rule is evidence that 25% is likely *not* the market rate." SA5. But the fact that certain courts cabin awards *ex post* does not indicate that the market rate is higher. If anything, "continued participation in the [Ninth Circuit] market may reveal something about the price for class counsel's legal services, and therefore counsel's bargaining position." *Broiler I*, 80 F.4th at 804. The district court misread *Broiler I* as determining that 25% awards were in fact below the market rate, that "class counsel that 'seek to represent plaintiffs in the Ninth Circuit,' must 'assess the risk of being awarded fees *below the market rate*.'" SA5 (quoting *Broiler I*, 80 F.4th at 804) (emphasis added by district court). But counsel in *every* suit must assess the risk of securing fees below their market rate, so the fact that class counsel gravitate toward the Ninth Circuit suggest that they do not find the risk as significant as other considerations. Were it otherwise, skillful plaintiffs' firms would avoid the Ninth Circuit with its "below market" rates, ceding those venues to "below market" firms willing to work for allegedly pitiful fees of 25% on $100+ million recoveries. This does not occur: Class Counsel includes some of the most skillful antitrust attorneys in the country, and they settle more distinct antitrust lawsuits in Ninth Circuit courts than any other circuit's. SA16-SA18.

According to the court, "[i]f 25% was the market rate, there would not be a need for the Ninth Circuit to artificially control the price by setting that rate by fiat." SA5. Andren finds this remark illuminating for several reasons.

*First*, the statement only ***makes sense*** because the district court assumes, contrary to this Court's caselaw, that district courts' fee orders ***are*** the effective market rate. Thus, attorneys' largely-unopposed requests, paid fully 78% of the time,[4] set the market rate. This does not follow because the *ex ante* market is almost universally *hypothetical*—with the notable exception of Chicago Teachers' agreement. If there were a market, no court would need to set rates; courts rarely know what private parties pay for civil litigation counsel. Whatever benchmarks courts impose on attorneys' fees at the end of litigation—whether they are generous or miserly—they do not categorically exceed the *ex ante* market rate. Counsel's continued work in the Ninth Circuit confirms this. *See* Section II.B.3.

*Second*, the district court's understanding of judicial "fiat" removes an essential party from the equation: the *ex ante* value of absent class members' claims. Every court, by "fiat" must set a fee award to "play surrogate client" to protect non-consenting absent class members. *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (1992). Because the district court conflates *ex post* awards with the market rate, it misunderstands that in a hypothetical *ex ante* bargain *the class has leverage*. Only class members have standing to bring claims against the corporations that wronged them. Thus, the district court errs when it says "class counsel would likely demand at least 30% from prospective clients in cases outside the Ninth Circuit." SA6. This is wrong. We ***know*** class counsel agreed to lower rates so that it could represent Chicago Teachers. Perplexed, the order asks,

---

[4] Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rᴇᴠ. 937, 953 (2017).

"why did counsel and their client agree to a declining fee schedule that would result in a fee percentage below 30% on substantial recovery when the majority of other awards are for at least 30%?" SA8. The answer is easy: because 30% is ***not*** the market rate as the district court assumes, but *above* the market rate when the client has a valuable claim that likely results in hundreds of millions of dollars of recovery.[5] In real *ex ante* agreements, clients bring something to the table: the expected value of their claims. If there were a cakewalk lawsuit ripe to produce a billion dollar settlement, in a functioning *ex ante* market, attorneys would bid down the cost of representation so that they could secure the profitable opportunity no matter what fees a judge might later permit. The district court ignores this possibility because it conflates *ex post* awards with market rates and ignores the value of class members' claims.

*Finally*, the reference to the Ninth Circuit's "fiat" exaggerates the difference between the circuits. While the Ninth Circuit employs a 25% benchmark, courts may deviate from the benchmark for case-specific considerations. The tendency of Ninth Circuit courts to award attorneys' fees no greater than 25% in large settlements reflects that circuit's effort to address the economies of scale in large settlements. *See, e.g.*, *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 932-33 (9th Cir. 2020) (noting that "other circuits have made the same general observation"). While the Ninth Circuit rejects the market-mimicking approach, the "benchmark" derives from similar class-protective considerations as those that caused this Court to adopt a graduated

---

[5] The district court assumes that the only explanation is differences in potential recovery between *Broiler Chicken* and *Interest Rate Swaps*, even though it agreed that the "two cases are good comparators" (SA7) with "comparable" potential damages as estimated by plaintiffs' experts in each case. SA8. As discussed below in section I.C, the cases present comparable *ex ante* risks and indeed *Broiler End-Users* recovered over $110 million more *so far*.

attorneys' fee scale in *Synthroid*. The "market rate, as a percentage of recovery, likely falls as the stakes increase." *Synthroid II*, 325 F.3d at 975.

The fee order conflates *ex post* fee awards with the "market rate" repeatedly. It finds that class counsel's bids "are not particularly good indicators of what the market would bear in this case when Co-Counsel and their clients filed the case in a jurisdiction not bound by the Ninth Circuit's megafund rule." SA6. But ***no market normally exists***, let alone one where the clients "bear" *ex post* fee awards. The bids reflect offers by class counsel in order to secure sole appointments, suggesting that class counsel found rates of 20% or less to be adequate compensation for the opportunity to work in those cases. The bids are offers by some of the most knowledgeable antitrust litigators in the country who sought to be exclusive counsel, much like attorneys in a hypothetical *ex ante* bargain. The district court repeats this mistake when finding it "unlikely" counsel "would have negotiated the *Interest Rate Swaps* fee schedule in this case, in the face of a market that generally pays at least 30% of the recovery in a case like this." SA9. Again, the order wrongly assumes that *ex post* awards *are* the market—and further that plaintiffs bring nothing to the table *ex ante*. Both propositions are false.

The district court rationalizes its conflation of *ex ante* negotiation and *ex post* fee awards through the familiar idea that parties negotiate in the shadow the law. It found "undeniable…that the sheer volume of *ex post* awards, relative to the minimal number of *ex ante* agreements, has a substantial impact on the expectations of class counsel." SA13. From this it figures "*ex post* awards actually serve to set the market rate, and clients and counsel, to the extent they bargain *ex ante*, do so in the context of the market shaped by *ex post* awards." SA14. So saying, the district court vitiates this Circuit's approach. Clients and attorneys do *not* set fees based on judicially-awarded fees in unrelated cases with unique factual circumstances, but on the value of the underlying claims, required attorney investment, and risk of failure. *Williams*, 658 F.3d at 636.

Riskier cases, those that pass risk-bearing litigation milestones such as class certification, and those with smaller potential recoveries ought to garner higher percentages. The fee order suggests "it is possible that at some point there will be enough *ex ante* agreements that there will be a shift in the market." SA14. This proposition violates *Synthroid I&II*, *Stericycle*, and the law of the case. ***Zero*** examples of *ex ante* fee agreements involving the same firms were known to the *Synthroid II* court in 2003, yet this Court extrapolated from market-approximating benchmarks to award 19.9% of a $88 million fund. 325 F.3d at 980. The proposition also ignores that the market for consumer class actions cannot exist unless and until judges start soliciting bids at the outset of litigation attracting multiple firms.

This Court criticized the prior fee order, for taking *ex post* awards as a "strong indication" that 1/3 "should be considered the 'market rate.'" *Broiler I*, 80 F.4th at 801. Repeatedly violating this Court's mandate, the district court again concludes that "*ex post* awards actually serve to set the market rate" (SA14), and further suggests that *ex ante* fee agreements can only be given their due when "enough" of them are known to exist. Four *ex ante* fee offers and agreements by these very firms exist, and Andren cited examples by other firms. A172, A231. The judge had infinitely more examples involving the *same firms* than in *Synthroid*. This Court should again reverse.

### 2. *Ex post* **fee awards generally** *exceed* **the market rate.**

The district court goes to extraordinary lengths to discount market evidence and the fact that *ex post* fee awards systematically *overstate* true market rates. A8; A191-A192.

*Ex post* awards overshoot the market because courts typically grant them without adversarial presentation. *See* Lynn A. Baker, Michael Perino & Charles Silver, *Is The Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM L. REV. 1371, 1389 (2015) (only objectors to fees in 23% of securities settlements). For example, in this litigation's other settlements no fee objector appeared. Consumers with

modest potential damages simply have no incentive to challenge those fee requests, because their "gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). Nor do defendants, who have already agreed to an all-inclusive common fund. *Id.* Consumer class representatives generally have especially little incentive because their service awards—under effective control of class counsel—almost always dwarf their individual claims by orders of magnitude. *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). For example, If the attorney's fees were reduced to match the Chicago Teachers' scale a consumer claimant would get perhaps $90 instead of $80. But every named representative stands to earn $2,000 from their incentive award. A73. Consumer class actions typically involve claims by thousands or millions of Americans, so class counsel can simply recruit different representatives if they encounter a potential client with unusual zeal for scrutiny. "The selection of the class representatives by class counsel inevitably dilutes their fiduciary commitment." *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014).

Meanwhile, counsel often submit "proposed orders masquerading as judicial opinions," which are adopted without any opposition, and "then cit[e] to them in fee applications, [such that] the class action bar is in fact creating its own caselaw on the fees it is entitled to... No wonder that 'caselaw' is so generous to Class attorneys." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014). The major force that exerts downward pressure *ex ante*—the threat of losing the representation to another firm—dissipates long before settlement.

Empirical evidence bears this out. "[S]electing competent counsel using a competitive process generates a lower percentage-of-the-fund fee arrangement than Eisenberg and Miller's mean and median percentages, which mostly reflect awards granted ex post." *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 803 (N.D. Ill. 2015)

(citing Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL L. STUD. 248, 250 (2010)); *see also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 947 n.7 (N.D. Ill. 2001). "Empirical evidence suggests that *ex ante* fee negotiation is a key mechanism for reducing agency costs between counsel and the class they represent." *Laffitte v. Robert Half Internat. Inc.*, 376 P.3d 672, 690 (Cal. 2016) (Liu, J., concurring). By contrast, *ex post* fee evaluation is "likely to be distorted by hindsight bias." *Id.*

Relying mostly on *ex post* awards, as the district court did, simply entrenches hindsight bias, and further disconnects attorneys' fee awards from the sort of *ex ante* arrangements that would benefit class members.

**B.     The district court improperly weighed *ex post* fee awards five times more heavily than the *ex ante* evidence.**

The *Interest Rate Swaps* agreement provides a rare window into a competitive *ex ante* market. District courts have a duty under controlling Seventh Circuit law to sus out what a knowledgeable fiduciary **would have** negotiated *ex ante*, which virtually no private clients have both the knowledge and leverage to do except for a savvy investment firm like Chicago Teachers. A172 & n.2.

Rather than reasoning from this *ex ante* fee agreement, the district court spliced it into a spreadsheet of class counsel's antitrust fee awards, including also "awards in other antitrust cases around the country," which were drawn exclusively from citations of 33% fee awards cherry-picked by another plaintiffs' expert, and fee awards in three published cases. SA9. The district court claimed that the spreadsheet "fairly accounts for the greater weight that the Seventh Circuit instructs *ex ante* agreements should be given relative to *ex post* awards" by including the Chicago Teachers' fee, thought to recommend 26.6% in this case "ten times in the spreadsheet." SA10. But including the only *ex ante* fee agreement into a spreadsheet with 83 fee awards does not give the

agreement greater weight—it dilutes it in favor of *ex post* fee awards. A feather on the scales is not the "substantial weight" this Circuit demands. *Stericycle*, 35 F.4th at 563.

The district court focused on fee awards between $100 million and $1 billion, which amounted to 42 *ex post* fee awards, 17 of which had been cherry-picked by an expert for Commercial Indirect Plaintiffs as "examples" (not a representative sample) of "antitrust cases… with percentages of 33 percent or greater." SA16-SA18 (entries sourced to Dkt. 5050-1, specifically the tables at 45-48). The inclusion of these non-representative awards is peculiar because Andren moved to strike or alternatively sought discovery from the other plaintiffs' experts if they were relied upon as they were in the original fee order. On remand, Class Counsel chose to *not* rely on the other plaintiffs' expert declarations. Dkt. 6967 at 1. Yet after denying the motion as moot because the order was purported "not based on those expert opinions" (SA15), the order simultaneously relies on the Klonoff declaration's tables.

The inclusion of these seventeen cases cherry-picked by other plaintiffs' expert warped the court's arithmetic, to produce an average fee award of 29% and median of 31%. Using identical methodology (while still omitting the "outliers" discussed below), and simply removing these seventeen awards yields a mean of 27% and a median of 26.6%—Chicago Teachers' *ex ante* fee agreement.

Having included a mass of 33% awards presented by an expert that was purportedly not relied on, the order faults Andren for not presenting "his own examples of *ex post* awards to his support his contention that a rate between 20% and 26.6% would be appropriate here." SA14. Andren expected, in view of the mandate and Circuit law, that the lower court would weigh more heavily *ex ante* evidence—not pool it with dozens of *ex post* awards including those which Class Counsel had not even cited. Market rates cannot be ascertained from a spreadsheet including cherry-picked fee awards, but Andren certainly could have cited examples had he known the district

court would, unannounced, pool a non-representative sample of 33% fee awards submitted by an expert whose report Andren sought to strike!

The order further skews the spreadsheet average by omitting three "outliers" of 9-11% awarded by Ninth Circuit courts for settlement funds between $150 and $450 million. These allegedly did "not reflect the circumstances relevant to what *ex ante* agreement the parties would have reached here." SA10.[6] This adjustment elided the Court's instruction to not "categorically assign[] less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule." *Broiler I*, 80 F.4th at 804.

Even if the sample had been representative, the main problem with the district court's methodology is watering down 10 entries for the Chicago Teachers' fee scale with ***39 ex post* awards**. That inappropriately gives ***four times*** as much weight to *ex post* fee awards from a gerrymandered and cherry-picked pool compared to an actual *ex ante* fee agreement struck by co-lead class counsel. The spreadsheet gives no weight at all to bids submitted by Hagens Berman except that the ultimate 20% award in *Resistors* counted as a single datapoint. SA17. The other two *ex ante* bids were not accepted, and only the higher amounts awarded are reflected in the spreadsheet. Again, Circuit law holds otherwise: bids made around the time the litigation began are "ordinarily…good predictors of what *ex ante* bargain would have been negotiated" regardless of whether they are "ultimately successful" or "made by only one of the two firms appointed." *Broiler I*, 80 F.4th at 802-03.

---

[6] To be fair, two of the "outliers" were the same case, where both firms represented the same class in *Animation Workers*. SA17. While the district court mostly "combined these awards into single entries" (SA9), the spreadsheet is inconsistent about combining awards. This has minor mathematical effects—some resulting in lower datapoints and others higher.

The Chicago Teacher agreement would not result in a poverty rate. A rote application of the *Payment Card Interchange* scale here would yield a $45.85 million fee award, or about 26.6% of the net $172.2 million fund.[7] Assuming this rate, the scale greatly exceeds all of Hagens' fee bids, exceeds the Ninth Circuit's 25% benchmark (where class counsel voluntarily litigates), and also exceeds the scale devised by the Seventh Circuit in *Synthroid II*, which would recommend a fee of $30.15 million (about 17.5%) for a $172.2 million fund. 325 F.3d at 980.

Stating that additional *ex ante* fee agreements might eventually cause a "shift in the market" in favor of weighing *ex ante* data more heavily (SA14), the district court fundamentally misunderstands why so few agreements exist. Consumer plaintiffs have no leverage to manage their case as individual plaintiffs do, so such agreements will remain rare. This reasoning inverts Circuit law.

---

[7] The Chicago Teachers' fee agreement "specifically references the graduated scale set forth in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014)," which by co-lead Class Counsel's own representation "was the result of considerable empirical research and an analysis of fee awards in other cases,… and has been endorsed by a number of other courts." Dkt. 6911-10 at 15 (filing from *Interest Rate Swaps*). This scale recommends 33% fees for the first $10 million, 30% for the next $40 million, 25% for the next $50 million, and 20% on recovery above $100 million, but less than $500 million. *Payment Card Interchange*, 991 F. Supp. 2d at 445. However, Andren raised concerns that the actual agreement with Chicago Teachers might have recommended lower fees for early settlements, as *Payment Card Interchange* itself suggested. *Id*. at 446; A232. Objector requested a copy of the fee terms of agreement if there was "any ambiguity." A232 n.4; *see also* A213-A214. In response to this concern, the district court requested a copy of the Chicago Teachers' retention *in camera* to "confirm that there's nothing else in there." A214. While the fee order does not expressly confirm this, for the purpose of this appeal, Objector assumes the Chicago Teachers' *ex ante* fee agreement would result in a fee of 26.6% for this wave of settlements, and a marginal rate of 20% for future recovery up to $500 million.

**C.    Chicago Teachers'** *ex ante* **agreement is an analogous "comparator."**

Operating upside down, the order assumes *Interest Rate Swaps* litigation must have been atypical for Chicago Teachers to have negotiated an allegedly below-market rate. As discussed above, it *exceeds* other market-approximating fee indicators. Class Counsel's rationalization the case was unusually "big and certain" is belied by the filings of that litigation, though notable as perhaps the very first ever admission that a plaintiffs' attorney's own case was unusually easy, lucrative, or straightforward. Class attorneys typically describe cases like the children of Lake Wobegon—every one is above-average.

The district court appropriately found that this litigation and *Interest Rate Swaps* were "good comparators" (SA7), but then relegates the Chicago Teacher's agreement to a small corner of a spreadsheet dominated by *ex post* fee awards skewed toward 33%. Despite finding enough relevance between the cases that "the declining fee schedule negotiated by the client in *Interest Rate Swaps* is relevant to the market price," SA7-SA8, the court declares that "*Interest Rate Swaps* is only a single case" and arrives at the mistaken explanation "that while the potential damages in both…are comparable, the potential settlement values are not." *Id.*

This conclusion mangles Circuit law, because it posits that *any* fee agreement to accept less than allegedly awarded by other courts can be assigned less weight because the "simplest answer" is that such agreements only exist in litigation with greater expected value than cases without fee agreements. No. The simplest answer is that real *ex ante* plaintiffs have leverage to negotiate on fees because individual plaintiffs *control the case*, while dispersed class members do not. *Interest Rate Swaps* cannot be viewed as an outlier in need of justification simply because it deviates from *ex post* fees.

The fee order simply assumes that *Interest Rate Swaps* had more *ex ante* settlement value **because a fee agreement exists**. While the district court frames its thinking in *faux*

economic reasoning (SA13-SA14), it's analogous to an economist denying there could be a $20 bill on the ground because the market would surely collect it. But it's worse than that, because the market is composed entirely of people ignorant that there might be a $20 bill on the ground at all; people who have no rational reason to even know about class litigation on their behalf. People who, even if they knew there was a free $20 on the ground, would have no way to pick it up because only named representatives have a relationship with counsel.

As Andren argued, evidence belies the district court's assumption that *Interest Rate Swaps* was unusually valuable *ex ante*. Class counsel retained experts before filing each complaint,[8] and expert reports filed in the two cases reflect very similar damage estimates—$4.5 billion in *Interest Rate Swaps* compared to $3.916 billion here, only 15% higher. A176-A177. At the time of suit, class counsel would have known that the maximum damages for End-Users in *Broiler* were only slightly smaller than in *Interest Rate Swaps*, and this difference would have not altered the fee structure.

The fee scale evidently agreed by Chicago Teachers' contemplates a broad range of potential recoveries, including brackets for under $10 million *and* over $4 billion. Contrary to the order below, the *Payment Card* scale was never limited to gargantuan prospective recoveries, but was crafted "for the benefit of counsel in future cases" so that attorneys can "make reasonable decisions *ex ante* in those future cases." *Payment Card*, 991 F. Supp. 2d at 446. "A graduated schedule ensures that the greater the settlement, the greater the fee, and it therefore avoids certain incentive problems that come from simply scaling an overall percentage down as the size of the fund increases."

---

[8] Dkt. 7202 at 16; *Interest Rate Swaps*, No. 16-md-2704-PAE, Dkt. 51 at 11 (S.D.N.Y. Jul. 8, 2016) (pre-suit investigation entailed "working with the leading experts in the field," retaining one, and engaging a firm to "demonstrate and quantify the class's damages").

*Id.* (citing *Synthroid I*, 264 F.3d at 721). The court "tailored it to the unique facts and circumstances of the settlement I have approved here," *Id*. at 447, but nothing *confines* the scale to "financial" antitrust cases. Courts have applied it to small settlements on subject matters as diverse as parking heaters and air cargo shipping. A176.

While *ex post* results don't necessarily bear out *ex ante* expectations, *Interest Rate Swaps* was no cakewalk. The *IRS* defendants fought for seven hard years before even one of them, Credit Suisse, settled for a modest $25 million. They conducted "extensive discovery, reviewing millions of documents, analyzing more than 150,000 individual transactions, and completing more than 150 depositions in three countries…." *IRS*, No. 16-md-2704, Dkt. 978 (S.D.N.Y. Feb. 11, 2022). The remaining defendants *defeated* certification in 2023 and recently agreed to settle remaining claims for $46 million, bringing total recovery to just $71 million—less than half the recovery achieved pre-certification in *Broiler* with defendants yet to settle post-certification.

These disparate results undermine Class Counsel's argument pointing to the superior capitalization of *Interest Rate Swaps* defendants. The large banks continue to have hundreds of billions in assets and could hypothetically buy everyone reading this brief a private island. It turns out that money can also be used to resist plaintiffs' demands.

Class Counsel's additional distinctions wen unaccepted by the district court and do not withstand scrutiny. Direct purchasers sued in *Interest Rate Swaps*. Indirect purchasers only have claims for only about half the hypothetical price premium within *Illinois Brick* repealer states, but experts accounted for this. While indirect purchaser have unique certification challenges, so do direct purchasers, who each independently contract with the defendants. Direct purchasers must worry about pass-through price premium arguments. A184-A185. Classes of large corporate plaintiffs also face risk from opt-outs reducing the size of class (and attorney) recovery as in *Broiler Chicken*.

Chicago Teachers enters similar fee agreements in securities cases as a matter of course. The PSLRA uniquely encourages such sophistication because a client with large potential losses presumptively controls securities litigation, and gives such clients real leverage. But in consumer cases, plaintiffs' lawyers can select their clients, which prevents *ex ante* leverage.

Precisely for this reason, this Circuit requires the Court to determine the fee bargain class and counsel "would have struck" *if they could*. *Broiler Chicken I*, 80 F.4th at 802. The district court does not satisfy this mandate by recounting the fact that such agreements normally don't exist. We know that already. The question is what agreements would look like if they *did*. We have one "good comparator" for such an agreement ***involving the same counsel***. But the district court instead focused on the "large number" of *ex post* fee awards. *Broiler I*, 80 F.4th at 801.

The district court's first instinct was correct: different cases have different strengths and weaknesses, but *Interest Rate Swaps* remains a "good comparator" to this litigation. It erred by diluting the *ex ante* agreement with *ex post* awards, and especially with awards cherry-picked to be "33 percent and above."

## II. The district court erred by failing to evaluate of the stage at which the case settled and again disregarding Hagens Berman's bids.

Seventh Circuit law requires that courts determining fee awards in common-fund cases must to try to approximate "the market price rate for legal services in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718. Several markers guide courts in determining the market fee, including actual fee contracts between sophisticated plaintiffs and their attorneys and data from similar common fund cases where fees were privately negotiated. *Id.* at 719-20. Because of the strong relevance of the stage at which a case settlements to the market

rate, awards that fail to "give sufficient weight" to that market-based factor cannot withstand appellate scrutiny. *See Stericycle*, 35 F.4th at 560.

Market evidence shows that "[s]ystems where fees rise based on the stage of litigation rather than the calendar are more common in private agreements." *Synthroid I*, 264 F.3d at 722. That is, private fee arrangements increase as the case passes key milestones and the risk to attorneys increases; the Chicago Teachers agreement and *ex ante* bids confirm this. The reason percentages increase for later stages of litigation is two-fold. First, advanced cases take more hours to prosecute, and rational attorneys and understanding clients will bargain over that expense. Fee payments that factor in the stage of litigation "tie the incentives of lawyers to those of the class by linking increased compensation to extra work." At the same time, it avoids the problem of "calendar-based bids," which "tempt lawyers to delay settlement talks unnecessarily." *Synthroid I*, 296 F.3d at 722. Second, as the case clears each hurdle of litigation—motion to dismiss, summary judgment, certification, and trial—plaintiffs and their counsel bear more risk of complete failure. By settling *before* resolution of the certification motion, plaintiffs' counsel reduce the chance they walk away with nothing. If plaintiffs clear these hurdles, the reward to counsel *must* be higher because if the case had been dismissed, they would earn nothing.

So, sophisticated private agreements consider both the percentage of the fund and the stage of proceeding. As an "earlier settlement" of above-average size, this case arguably warrants lower fees than in *Synthroid II*, where late-stage risk was "significant." 325 F.3d at 978; *see also Stericycle*, 35 F.4th at 566 ("…a case that settled before the motion-to-dismiss stage…would be expected to result in a lower fee than a case that proceeded all the way to trial or beyond."); *see also id.* at 560-62 & 566 n.8 (describing fee tables by sophisticated plaintiffs in securities litigation). End-Users reached these settlements before certification, while the *Synthroid* settlements arose after

voluminous antitrust litigation including successful certification. *In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d 676, 683 (N.D. Ill. 2000).

Chicago Teachers generally requires its attorneys to contemplate "the point in the case where settlement negotiations are completed or a final judgment is obtained" in its fee agreements. A157; *see also Stericycle*, 35 F.4th at 566 n.8 (discussing Chicago Teachers' agreement for 15% fee in a case "if a settlement was reached after a ruling on a motion to dismiss and before a ruling on summary judgment"). *Ex post* fee awards often corroborate this phenomenon. The court in *Payment Card* court recognized that "[p]rivately negotiated fees in complex cases (including PSLRA cases) often include a higher fee for cases that proceed past a motion to dismiss, discovery, summary judgment, or other benchmarks….***An earlier settlement reached through less work would surely warrant a smaller fee***." *Payment Card*, 991 F. Supp. 2d at 446 (emphasis added).

All of Hagens Berman's bids confirm fees depend on the *stage of settlement*, consistent with Chicago Teachers' agreement and *Stericycle*. In 2015, shortly before the first complaint here, Hagens Berman agreed to limit its fees in the *Resistors* antitrust matter to 20% of recovery, with the amount depending on "the timing, amount, and nature of any settlement or judgment." A257. In 2013, Hagens Berman proposed a declining scale for appointment in *Lithium Ion Batteries* that would award lower percentages for earlier stages of litigation and larger recoveries, with the largest fee bracket assigned to post-trial recoveries below $75 million, topping out at 17%. A68. Hagen Berman's bid also capped costs at $3.5 million. Again, in 2010, Hagens Berman proposed a similar declining scale topping out at 14% in *ODD*. A51. The fee award in *ODD* was the subject of significant litigation, and the Ninth Circuit determined that "when class counsel secures appointment as interim lead counsel by proposing a fee

structure in a competitive bidding process, that bid becomes the starting point for determining a reasonable fee." *ODD*, 959 F.3d at 934.

The *Interest Rates Swap* agreement recognizes that larger fee percentages for the first million dollars of recovery are appropriate to incentivize attorneys to pursue claims whether comparatively small or multi-billion. That *Payment Card* scale was crafted "for the benefit of counsel in future cases" so that they can "make reasonable decisions *ex ante* in those future cases." *Payment Card*, 991 F. Supp. 2d at 446. A declining scale approach, based on timing and amount of a settlement, recognizes that much of the value of the settlement, particularly one achieved with very little litigation, is due more to the strength of class claims or size of the class than attorney effort. *Stericycle*, 35 F.4th at 561-62; *Synthroid I*, 264 F.3d at 721. "A graduated schedule ensures that the greater the settlement, the greater the fee, and it therefore avoids certain incentive problems that come from simply scaling an overall percentage down as the size of the fund increases." *Payment Card*, 991 F. Supp. 2d at 446 (citing *Synthroid I*). Market evidence thus confirms declining percentages appropriate in early-settled and large recoveries.

A lower fee should have been awarded not just because of the early timing of the settlement but the fact that class counsel had filed a complaint that was a follow-on, and virtually identical to the work of counsel representing a different plaintiff.

**A.    The district court disregarded the stage at which this case settled and the follow-on nature of the suit.**

On remand, the district court created a "spreadsheet" that was devoid of information about the stage at which the case settled, and the court did not otherwise consider the stage of the case in its analysis at all. This crucial omission was legal error under *Stericycle* and *Synthroid*.

Had the court considered this factor, it likely would have found that a discount to the awarded fee was appropriate to account for the pre-certification stage at which

most of the settlements were reached in the first wave of End-User settlements. Because the case here settled before a class certification motion, a lower percentage award is appropriate. The history of this case indicates that class counsel settled when the risk of nonpayment was still high and had not undertaken the risks and burdens of filing an original, first in time complaint. The district court's analysis improperly omitted a necessary consideration and resulted in the award of fees significantly greater than counsel was entitled to at the expense of the class.

**B.     The district court erred in again disregarding Hagens Berman's bids.**

While this Court remanded the case for "the consideration of bids made by class counsel in auctions" (*Broiler I*, 80 F.4th at 802), the district court again disregarded fee bids that Hagen Berman submitted in three cases. The district court simply changed its rationale. Rather than disregard the bids because they included declining fee scales, or failed (*id*. at 803), it disregarded them because the bids were "filed in the wake of criminal investigations by the government." SA3. The court instead pooled dozens of *ex post* awards with the *Interest Rate Swaps* scale, giving no weight at all to the unaccepted bids in its final analysis.

This strayed from the mandate, which asked the court to consider bids that would "ordinarily be good predictors of what ex ante bargain would have been negotiated." *Broiler I*, 80 F.4th at 803. After all, "the bids were made in pursuit of appointment and reflect the price of co-class counsel's legal services in antitrust litigation." *Id*.

Government investigations may make a case seem less risky *ex ante*, but risk exists on a spectrum, not a binary, and *Broiler Chicken* falls within a similar spectrum. This case and the litigation underlying all three bids involved several plaintiffs' firms independently filing actions to seek appointment as interim class counsel. Attorneys at the best antitrust plaintiffs firms all adjudged *Broiler* to be good investments of their

firms' time and vied for an opportunity to work on it. In this case, Class Counsel filed *after* the lead complaint filed on behalf of direct purchasers.[9] Courts should infer valuable or low-risk litigation when multiple firms clamor for appointment. *Cf. Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 959 (7th Cir. 2013) ("Lack of competition…implies a higher fee" and "suggests that most [attorneys] saw this litigation as too risky for their practices").

While the district court could properly infer that rates would be higher without a government investigation, affording them *no* weight, and disregarding the structure of the bids (declining scales for large recovery and discounted rates for earlier settlements) contradicts *Broiler I*'s reasoning.

Every suit poses unique challenges, and we *know* the rate class counsel would accept is lower than 33%, because, through "continued participation," class counsel accepts *de facto* fee limits in every Ninth Circuit action. *Broiler I*, 80 F.4th at 804.

### 1. Class counsel's own past fee bids and requests show that a 30% award substantially over-compensates lawyers at the expense of the class.

Competitive bids benchmark *ex ante* market rates because they show what an attorney would accept as compensation. *Synthroid I*, 264 F.3d at 720; *see also ODD*, 959 F.3d at 934-35 (competitive bid is starting point to determine reasonable fee). Using actual bids submitted by class counsel in other similar antitrust cases is a more reliable way to "mimic [the] bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. Putative lead counsel assess their risk and price their services accordingly based on their time investment in similar class actions and their broader litigation experience. *See, e.g.*, *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190, 1196 (N.D. Ill. 1996); *Comdisco*, 150 F. Supp. 2d at 948 n.9 ("any sensible lawyer will have pegged his or her

---

[9] *See* Statement of Facts, Section A (other firms filed direct and indirect purchaser complaints before Class Counsel filed a virtually identical complaint).

proposal high enough to take into account the possibility of ending up with no recovery"). "If you're going to award lawyers for the risk that they undertake in litigation, the best time to measure that risk, and in fact the only time that you can do so effectively, is at the outset of the case." *FTC Workshop—Protecting Consumer Interests in Class Actions,* 18 GEO. J. L. ETHICS 1243, 1261 (2005).

Hagens Berman's bids, past auctions, and private fee agreements all confirm that an unvaried 30% fee dwarfs the market rate. None of the three bids approached 30%, and the two with detailed scales reserved the highest rates for circumstances that do not apply here: modest recoveries obtained after a trial on the merits. A51; A68. Additionally, the bids for *Lithium Batteries* and *Resistors* likely *overestimate* true market rates because Hagens Berman submitted those bids unsolicited, so it could be certain *any* bid would be the lowest. Ordinarily, in a competitive market—as when a judge solicits competing bids—a firm proposing a rate that would result in an above-market return would find itself underbid by competitors willing to accept a smaller above-market returns. In ideal competition, firms would completely bid away all above-market rates. Hagens Berman only faced price competition in *Optical Disk Drive Products*, where the district court had ordered the submission of leadership proposals including fee terms. *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-2143, 2010 U.S. Dist. LEXIS 146768, at *27 (N.D. Cal. June 4, 2010). Perhaps not coincidentally, the fee scale in *Optical Disk* is the thriftiest of the three, topping out at only 14% (A51), less than half of the 30% that the district court found to be the global "market rate" regardless of recovery or progress of the litigation.

*Stericycle* reversed for a similar error: the "district court did not give sufficient weight to evidence of *ex ante* fee agreements, all the work that class counsel inherited from earlier litigation against *Stericycle,* and the early stage at which the settlement was reached." 35 F.4th at 558.

2. **Likewise, class counsel rarely compete on fees because they often depend on the goodwill of rival plaintiffs' counsel.**

Oddly, Class Counsel asserted below that "[i]f the *IRS* schedule or other bids had been the market rate, one of the firms vying for leadership would have offered that rate in an attempt to differentiate themselves from the competition." Dkt. 7202 at 3. Imagine if cartel defendants responded to the argument that they charged supra-competitive prices by saying that's impossible, because if the lower competitive price was correct, one of them would have charged it to gain market share. With class counsel often able to generate their own fee orders, the market for class attorneys' fees behaves like a cartel. *See In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 808 (N.D. Ill. 2015) (citing Joseph Ostoyich and William Lavery, *Looks Like Price-Fixing Among Class Action Plaintiffs Firms*, Law360 (Feb. 12, 2014)[10]); *see also Alcarez v. Akorn*, 99 F.4th 368 (7th Cir. 2024) (six firms colluding to divide $322,500 in "mootness fees" for litigation that produced no benefit for the class action principal—Akorn shareholders).

The belief that firms would spontaneously bid for leadership contradicts the sworn testimony of Steve Berman who averred that the three bids were the *first and only* examples of such bids among scores of cases. Ex. 5250, ¶ 19. They were a rare effort to compete on price, however dubiously described by Berman (whose firm co-led the mammoth *Visa Check/Mastermoney Antitrust Litigation*, No. 96-cv-05238 (E.D.N.Y.) a decade earlier) as an effort to "get [a] foot in the door." *Id.* In fact, class attorneys virtually *never* offer to compete on price without a court first prompting them to do so. Class Counsel do not cite a single example of other class attorneys submitting unsolicited bids—not even when firms later voluntarily apply for less than 30%, and not

---

[10] Available at: http://www.law360.com/articles/542260/looks-like-price-fixing-among-class-action-plaintiffs-firms.

even in financial cases with gargantuan potential recovery that ripens into billion-dollar settlements.

The *response* by other firms and courts to Hagens' bids illustrates why it abandoned the strategy. In *Resistors*, one firm accused Hagens of improperly bidding under seal even though defendants might have gained a litigation advantage by knowing its details. No. 3:15-cv-3820, Dkt. 74 at 2-3 (Dec. 4, 2015). None of the bids were "successful" because Hagens Berman never won the sole appointment it sought— judges being almost as unimpressed with the offers as rival plaintiffs' firms. Instead, Hagens found itself forced to team up with rivals it had tried to out-compete. In multi-firm class action litigation, it does not pay to compete on price, but it may make your future co-counsel unhappy you ever tried. *See generally* Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 VAND. L. REV. 67, 122 (2017) (documenting repeat players in MDL mass-tort litigation and their resemblance to cartels that "punish defectors by imposing costs on them and denying them access."). That Hagens Berman ceased making bids shows no more than that they found it more lucrative to ask for *ex post* fee awards—as happened here.

The district court erred in again dismissing these bids rather than extrapolate them (and their structures) to the circumstances of this case. "[A]ny method other than looking to prevailing market rates assures random and potentially perverse results." *Synthroid I*, 264 F.3d at 719. That's what happened here.

### 3.      Litigation in California demonstrates that class counsel agree to accept cases for fees less than 30% of a $100 million fund—frequently.

As further excuse to disregard the bids, the district court asserts that "though attorneys are willing to continue to work in the Ninth Circuit despite the megafund rule, that willingness does not reflect supply and demand in a free market, unfettered by a megafund rule." SA5. Again, *ex post* **awards do not constitute the hypothetical *ex***

*ante* **market**, but top-notch counsel *do* freely undertake litigation in that circuit. Were the expected value of fees within the Ninth Circuit "below market" (SA5), counsel bringing nationwide cases would institute litigation elsewhere. "Below market" does not mean "below windfall."

District courts must "assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys." *Williams*, 658 F.3d at 635. A bid represents one side of that bargain: an offer. A "court can examine the bids and the results to see what levels of compensation attorneys are willing to accept in competition." *Synthroid I*, 264 F.3d at 721.

For example, when Hagens Berman and other firms represented animators alleging anticompetitive wage suppression in the Northern District of California, they neither bid nor agreed *ex ante* to any particular fee rate.[11] However, by virtue of the venue, they knew fees would unlikely exceed 25%, likely *less* if recovery exceeded $100 million. We know this because when they moved for fees from a pair of settlements totaling $150 million, they sought only 21%—*less* than the Ninth Circuit benchmark— likely out of concern the district court would want to reduce fees from a "megafund" recovery below the benchmark. *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-4062-LHK, 2017 WL 2423161, 2017 U.S. Dist. LEXIS 86124, at *24 (N.D. Cal. June 5, 2017). Counsel were right to be concerned: the district court found the requested fee would "would yield windfall profits," so elected to employ the lodestar multiplier, resulting in an overall fee award of 10.5%. *Id*. at *25, *38. Andren does not contend that *this* is the market rate; it's not. But it illustrates the error in the district court's belief that counsel would "demand" 30% when not constrained by a megafund rule or benchmark ceiling.

---

[11] The district court removed this litigation from its spreadsheet as an "outlier."

Plaintiffs' attorneys agree to voluntarily work for less, and often request less—without any agreement requiring it.[12]

Class Counsel would not categorically reject *ex ante* fee limits below 30% in antitrust litigation concerning many subjects, not just "financial" ones. These include myriad industries ranging from app development fees (*Cameron v. Apple, Inc.*), pharmaceutical "pay-to-delay" (*Lidoderm*), and yes, even food. *See Edwards v. Nat'l Milk Producers Fed'n*, No. 11-cv-04766-JSW, 2017 U.S. Dist. LEXIS 145214, at *34-35 (N.D. Cal. June 26, 2017) (granting only a 25% benchmark fee rather than requested 33⅓% even though $52 million settlement did not quite constitute a "megafund").

Every Ninth Circuit case implicitly includes such a limit, albeit a flexible one—yet Class Counsel continues to file cases and seek interim appointment in those courts. The Court should not credit the district court's finding that counsel would refuse to work for fees less than 30%. They voluntarily do it every day.

### III. This Court may set a reasonable fee in lieu of remand.

In view of the district court repeating essentially the same mistakes that made vacatur necessary, this Court may set the fee award. "Instead of remanding for still a third calculation, we think it best to set the fees ourselves, as we have done in other class actions that have necessitated multiple appeals, so that the class members may at last receive their awards (something that is not possible until the attorneys' stakes have

---

[12] *Nitsch* is different (animation does not resemble chicken production, and *Broiler*'s unexamined lodestar results in a smaller multiplier here), but the point remains. Counsel volunteers to work within the Ninth Circuit with no reasonable expectation of receiving more than 25%, sometimes *voluntarily requests less*—and may be awarded less still—yet Class Counsel persists in seeking appointment in these cases.

been determined)." *Synthroid II*, 325 F.3d at 980; *see also Barrow v. Falck*, 11 F.3d 729, 730 (7th Cir. 1993) (setting the fee itself when district court "flout[ed]…instructions").

This Court should approximate a market rate, as suggested by the Chicago Teachers' fee agreement, Hagens Berman's bids, and class counsel's continued practice within Ninth Circuit courts. This would result in a fee award between $25.4 million (based on the *Batteries* bid) and approximately $47.2 million or 26.6% of the net common fund (based on an undiscounted *Payment Card* scale presumably negotiated by Chicago Teachers). This range encompasses the Ninth Circuit benchmark of 25%, and the scale employed by the Seventh Circuit in the heavily-litigated *Synthroid case:* $31.5 million. To the extent this Court finds the Chicago Teachers' agreement conclusive, it should remand with instructions to permit confirmation of that agreement's fee terms and direct that awards for future *Broiler* settlements conform with this agreement.

## Conclusion

For the foregoing reasons, Andren asks the Court to vacate the district court's fee award to Class Counsel and, rather than remand for a third attempt at setting fees by the district court, award Class Counsel fees of a figure between $25.4 million and $47.2 million, consistent with the market rate evidenced by Class Counsel's past fee bids and *ex ante* fee agreement.

Dated: October 30, 2024

Respectfully submitted,

HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS

/s/ *Anna St. John*

M. Frank Bednarz
1440 W. Taylor Street, #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

Anna St. John
1629 K Street, NW, Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*Attorneys for Objector-Appellant*
  *John Andren*

**Statement Regarding Oral Argument**

Andren requests under Cir. R. 34(f) that the Court hear oral argument in his case because it presents significant issues of attorney's fees in class-action settlements. Exploration at oral argument would aid this Court's decisional process and benefit the judicial system.

Andren is working with the *pro bono* assistance of the nonprofit Hamilton Lincoln Law Institute's Center for Class Action Fairness. This Court and the national press have repeatedly recognized the Center's good faith in raising these public-policy issues. *See, e.g.*, *In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 & n.11 (7th Cir. 2022) (citing cases); Editorial Board, *The Anthem Class-Action Con*, WALL ST. J. (Feb. 11, 2018); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013). Neither Andren nor the Center has ever settled an appeal or objection for a *quid pro quo* payment to themselves at the expense of the class; they bring this appeal in good faith.

A favorable resolution in this appeal would provide guidance to district courts in Rule 23(h) requests, and reduce the windfalls achieved by class counsel at the expense of absent class members.

**Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 30(d)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, Type Style Requirements, and Appendix Requirements:

1.      This brief complies with the type-volume limitation of Cir. R. 32(c) because:

This brief contains 13,897 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 12-point Palatino Linotype font.

3.      All materials required by Cir. R. 30(a) & (b) are included in the appendix.

Executed on October 30, 2024.

                                        */s/ Anna St. John*                    
                                        Anna St. John

**Proof of Service**

I hereby certify that on October 30, 2024, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system pursuant to Cir. R. 25(a), thereby effecting service on all counsel of record, who are registered for electronic filing.

*/s/ Anna St. John*
Anna St. John

# APPENDIX

**SHORT APPENDIX**

**TABLE OF CONTENTS**

Memorandum Opinion and Order
     filed July 3, 2024 (Dkt. No. 7309).............................................................. SA-1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637 |
|  | Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

On appeal by Objector John Andren, the Seventh Circuit vacated and remanded this Court's attorneys' fee award of one-third of certain settlement recoveries (a $57.4 million award) achieved by co-lead counsel for the End User Class ("Co-Counsel"). *See In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797 (7th Cir. 2023). Specifically, the Seventh Circuit provided the following directions to this Court: (1) "bids that class counsel made in auctions around the time this litigation began in September 2016 would ordinarily be good predictors of what ex ante bargain would have been negotiated," *id.* at 802; (2) "it was an abuse of discretion to rule that bids with declining fee structures should categorically be given little weight in assessing fees" and "it was error to suggest that [the Seventh Circuit] has cast doubt on the consideration of declining fee scale bids in all cases," *id.* at 803; and (3) "the district court should not have categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule. . . . [because] continued participation in litigation in the Ninth Circuit is an economic choice that informs the price of class counsel's legal services and the bargain they may have struck," *id.* at 804.

SA1

Additionally, in briefing on remand, Co-Counsel revealed that in a complex antitrust case in the Southern District of New York—*In re Interest Rate Swaps Antitrust Litigation*—they negotiated a declining fee schedule with their client, a pension fund. *See* R. 7202. This fee schedule was taken from a prior complex antitrust case in the Eastern District of New York—*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litigation*—where it was imposed by the district judge. *See* 991 F. Supp. 2d 437 (E.D.N.Y. 2014). Co-Counsel and Andren agree that application of the declining fee schedule used in *Interest Rate Swaps* and *Payment Card* would result in an award in this case of 26.6% of the settlement recovery, or approximately $47.2 million. The Court was not aware of the *Payment Card* award or the *Interest Rate Swaps* agreement when it issued the original award in this case, but it is appropriate to account for them now.

The Court originally awarded one-third of the settlement amount (minus costs) for two primary reasons: (1) nearly 47% of the awards to Co-Counsel in antitrust class actions since September 2016 were for one-third of recovery, with nearly 85% being for at least 30% of the recovery, *see* R. 5819; R. 5820; and (2) the significant number of cases in this Circuit and around the country awarding one-third of recovery, *see* R. 5050-1 at 47-50. In the context of the complexity of the case and Co-Counsel's exemplary performance (described in greater detail in the Court's prior order, *see* R. 5855), the Court found that the frequency with which courts award one-third of recovery indicates that this is the market rate for cases like this. The Court's task on

SA2

remand is to determine how the Seventh Circuit's instructions, and the *Payment Card* fee award and *Interest Rate Swaps* fee agreement, change the Court's calculus.

## A. Co-Counsel Bids

In the six years preceding the filing of this case, Co-Counsel made bids to become lead counsel in three complex antitrust cases. Two of the bids were declining fee schedules with maximum rates of 13.5% and 17% respectively. The third was a flat rate of 20%. Andren argues that these bids are highly suggestive of the market rate and that the Court should impose a 20% rate in this case. And as noted, the Seventh Circuit found that these bids, which were made more or less contemporaneously with the filing of this case, "would ordinarily be good predictors of what ex ante bargain would have been negotiated." *In re Broiler Chicken*, 80 F.4th at 802.

More relevant than the time period, however, is that fact that the three cases in which the bids were made were filed in the wake of criminal investigations by the government. *See* 6911 at 15 n.58 (Co-Counsel's brief citing complaints in the three cases referencing the investigations). Many courts, including this one, recognize that filing a complex antitrust action without the benefit of a prior government investigation increases the amount of work necessary to litigate the case and decreases the chance of success. Facing lower risk and the prospect of less work, it is not surprising that that Co-Counsel's bids to lead cases with prior government investigations were much lower than the vast majority of awards in similarly complex cases.

3

Andren argues that the government's criminal investigations were not always materially helpful to the civil litigation. To the extent this turned out to be true, it does not change the fact that from an *ex ante* perspective, an existing criminal investigation suggests an easier road for a related civil case. And this factor is likely to incentivize potential class counsel to make a lower bid in seeking appointment.

While the bids are certainly relevant to what Co-Counsel is willing to be paid for their work, the difference in the amount of work necessary indicates that those bids can do no more than establish the floor of the market price range, as suggested by Andren. But if the appropriate market price is somewhere in a range, the floor of the range is not necessarily a good indicator of what the award should be in this case.

### B.    Ninth Circuit Awards

In deciding the fee award prior to remand, the Court ordered Co-Counsel to prepare charts of every fee award made by either of them in an antitrust case between September 2, 2016 (the date this case was filed) and August 30, 2022 (the date of the order). Of the 92 awards, 29 were awarded by courts in the Ninth Circuit, which imposes a "megafund" rule that generally caps fee awards on large recoveries at 25%. In the prior order, this Court "discounted awards from the Ninth Circuit due to its megafund rule," because the Seventh Circuit "has expressly rejected a megafund rule [as imposing] a perverse incentive." R. 5855 at 9-10 (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (holding that "[m]arkets would not tolerate [the megafund] effect")). Nevertheless, on appeal the Seventh Circuit held that this Court "should not have categorically assigned less weight to Ninth Circuit cases in

4

which counsel was awarded fees under a megafund rule. . . . [because] continued participation in litigation in the Ninth Circuit is an economic choice that informs the price of class counsel's legal services and the bargain they may have struck." *In re Broiler Chicken*, 80 F.4th at 804.

The Seventh Circuit is, of course, correct that Co-Counsel's decision to continue practicing in the Ninth Circuit, despite the megafund rule, provides some information about the supply-side of the legal services market at issue here. But the existence of, or need for, the Ninth Circuit's megafund rule is evidence that 25% is likely *not* the market rate. Indeed, as the Seventh Circuit noted, class counsel that "seek to represent plaintiffs in the Ninth Circuit," must "assess the risk of being awarded fees *below the market rate*." *See id.* (emphasis added). If 25% was the market rate, there would not be a need for the Ninth Circuit to artificially control the price by setting that rate by fiat.

As the Court noted in its previous order, the majority of attorneys' fee awards in antitrust class actions outside the Ninth Circuit are at least 30%. Even though attorneys are willing to continue to work in the Ninth Circuit despite the megafund rule, that willingness does not reflect supply and demand in a free market, unfettered by a megafund rule. The data available to the Court demonstrates that without a megafund rule, awards in the rest of the country tend to be at least 30% of recovery. So while the Court acknowledges that counsel is able to profitably perform the work of a case like this with an award of 25% of recovery (or a lower rate imposed according to a megafund rule), they would likely not bargain for such a rate outside the Ninth

5

Circuit, because they know that judges outside the Ninth Circuit are not bound by a megafund rule and it appears that the market is able to bear a higher price.

The Seventh Circuit is certainly correct that "as rational actors, class counsel assess the risk of being awarded fees below the market rate of their legal services when they seek to represent plaintiffs in the Ninth Circuit." *Id.* But the reverse must also be true. In other words, class counsel understand that outside the Ninth Circuit there is a high likelihood a judge will award them at least 30% of recovery. With that knowledge, class counsel would likely demand at least 30% from prospective clients in cases outside the Ninth Circuit.

Thus, the Court finds that while awards in the Ninth Circuit are relevant data regarding the functioning of the market for this kind of legal services, such that the Court will consider them on this renewed motion, they are not particularly good indicators of what the market would bear in this case when Co-Counsel and their clients filed the case in a jurisdiction that is not bound by the Ninth Circuit's megafund rule.

### C.    The *Interest Rate Swaps* Retainer

Andren argues that the declining fee schedule Co-Counsel agreed to in the *Interest Rate Swaps* case is highly probative of the market rate for legal services in complex antitrust class actions because it is one of few retainer agreements negotiated by a sophisticated client known to the parties on this motion. According to Andren, it is this kind of *ex ante* negotiation by a sophisticated client that the Seventh Circuit instructs district courts to mimic in deciding attorneys' fee awards.

In opposition, Co-Counsel argues that the *Interest Rate Swaps* fee schedule is not indicative of the market for this case because the two cases are substantively different. Co-Counsel contends that the risk of loss in *Interest Rate Swaps* was much lower because the potential damages were much higher and the defendants were financial institutions "too big to fail," whereas the defendants here existed perpetually on the brink of bankruptcy. Co-Counsel also argues that the legal issues in this case were more complex than *Interest Rate Swaps* because Co-Counsel represent indirect purchaser consumers of a food product (broilers) that has a more unpredictable market involving live animals (chickens) and varying demand for different parts of the animal.

While this may be true, Andren contends that *Interest Rate Swaps* would be a more difficult case because of the greater assets available to financial institutions to defend themselves, and the international nature of the finance industry makes it more complex than a domestic food industry like broiler chickens. Andren also argues that the estimated potential damages in both cases were comparable and points out that settlements have been more frequent and lucrative in this case than in *Interest Rate Swaps*.

Taking all these facts into account, the Court agrees with Andren that, despite some differences, the two cases are good comparators. Both are complex antitrust actions against defendants with sufficient assets to hire the best and most expensive corporate defense firms in the country. Both cases had the potential to result in billions of dollars of damages. For these reasons, the Court finds the declining fee

schedule negotiated by the client in *Interest Rate Swaps* is relevant to the market price for legal services in antitrust class actions.

Nevertheless, *Interest Rate Swaps* is only a single case. And because it is single case, it is difficult to know for certain why the client insisted on that rate schedule and why counsel was willing to accept it, and whether that would have been true in this case. Absent other cases with similarly negotiated fee schedules or court ordered award amounts, the Court cannot identify with certainty an overarching principle according to which the *Interest Rate Swaps* fee schedule should be applied, and whether this case meets that description. In other words, why did counsel and their client agree to a declining fee schedule that would result in a fee percentage below 30% on a substantial recovery, when the majority of other awards are for at least 30%?

The simplest answer, and therefore the most likely explanation, is that while the potential damages in both *Interest Rate Swaps* and this case are comparable, the potential settlement values are not. As Co-Counsel in this case points out, two similar antitrust cases brought against financial institutions settled immediately prior to the *Interest Rate Swaps* fee agreement for $1.8 billion and $2 billion respectively. According to Co-Counsel, the largest settlement of an antitrust case against food industry defendants to that point was $303 million in the *Southeastern Milk Antitrust Litigation* in the Eastern District of Tennessee. *See* R. 6911-1 at 72. Potential damages in large Sherman Act cases can often be in the multi-billions due to the Act's provision of treble damages. But because these cases rarely go to trial where treble

8

SA8

damages are awarded—in no small part because the threat of treble damages incentivizes defendants to settle short of trial—a defendant's ability to pay a settlement is a much stronger indicator of the value of case than are the potential damages available from a trial verdict. And financial institutions generally have greater assets than food producers to pay larger settlements. This likely explains counsel's willingness to negotiate a declining fee schedule in *Interest Rate Swaps*. With those circumstances absent in this case, it is unlikely that Co-Counsel would have negotiated the *Interest Rate Swaps* fee schedule in this case, in the face of a market that generally pays a least 30% of the recovery in cases like this.

### D. The Market Rate

Although the Court finds that Co-Counsel would not have agreed to the *Interest Rate Swaps* declining fee schedule in this case, it is nevertheless a relevant data point that should be incorporated into the other data that has been presented to the Court. That data consists primarily of *ex post* fee awards, both to Co-Counsel and others.

The Court compiled the following data in a single spread-sheet table, which is attached as an appendix to this opinion: (1) awards to Co-Counsel (R. 5819; R. 5820); (2) awards in other antitrust cases around the country (R. 5050-1 at 47-50); (3) the *Interest Rate Swaps* fee agreement percentage; and (4) awards in (i) *Payment Card*; (ii) *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *1 (S.D.N.Y. Apr. 26, 2016); and (iii) *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003). Some of the awards to Co-Counsel were from the same case at the same percentage. The Court combined those awards into single entries on

the spread sheet so as not to over-count the frequency of that particular award percentage. The Court also weighted the 26.6% effective rate that the *Interest Rate Swaps* schedule would result in for this case by including it ten times in the spread sheet. Although ten times is a somewhat arbitrary weight, the Court believes this fairly accounts for the greater weight that the Seventh Circuit instructs *ex ante* agreements should be given relative to *ex post* awards.

Having created this spread-sheet, the Court sorted it according to total recovery. The Court considers awards on recoveries between $100 million and $1 billion to be most relevant here because the settlement recoveries at issue on this motion are $181 million, and total recovery by the End User Class is not likely to exceed $1 billion. (This range is in grey in the attached spread-sheet.) From the awards that fall within this range, the Court disregards three awards of 9%, 11%, and 11%, finding them to be outliers from the Ninth Circuit that, for the reasons discussed above, do not reflect the circumstances relevant to what *ex ante* agreement the parties would have reached here. Nevertheless, the Court's sample includes twelve awards from the Ninth Circuit, so the impact of awards from that Circuit is accounted for in the Court's analysis. Sorting this way identifies 49 "awards" (ten of which are the weight the Court has given to the 26.6% rate assumed from the *Interest Rate Swaps* agreement). Of these 49 awards, the average rate is 28.995% (rounded to 29%) and the median is 31%.

The Court finds that this result suggests a downward departure from the one-third fee the Court previously awarded. In the prior order, "most persuasive" to the

10

Court were "the large number of antitrust cases in this Circuit that have awarded one-third of the common fund as attorneys' fees." R. 5855 at 9. While this was an accurate observation, the Seventh Circuit has ordered this Court to give "appropriate weight" to awards from outside this Circuit, including the Ninth. Additionally, on remand, the Court learned of the *Interest Rate Swaps* agreement, which the Court could not have accounted for in the prior order, but which cannot now be ignored.

Taking account of this additional data, the average rate is calculated just below 30%, with the median just above 30%. This is the best evidence of the market rate that is before the Court.

### 1. Empirical Studies

Andren argues that an award greater than 26.6% (the rate if the *Interest Rate Swaps* schedule is imposed here) is contrary to what empirical studies have found to be the average fee award rate in antitrust class actions. He cites one study finding that in settlements from the years 2006-2007 ranging from $100 million to $250 million, the median award was 16.9% and the mean is 17.9%. *See* R. 5182 at 14 (citing Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 Empirical L. Stud. 811, 838 (2010)). He cites another study showing average fee awards of 15.1% where recovery exceeded $100 million. *See* R. 5182 at 14 (citing Logan, Stuart, et al., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Reports (March-April 2003)). A third found that the mean percentage fee awards in 68 class action settlements with recovery above $175.5 million was 12% and median award was 10.2%. *See* R. 5182 at 14 (citing Eisenberg & Miller, 7 J.

Empirical Legal Stud. at 265 tbl. 7). Lastly, he cites a treatise that cites three additional empirical studies showing that the mean percentage for antitrust fee awards from 2006 through 2013 was 22%, 25.4%, and 25.2%, respectively. *See* R. 6990 at 22 (citing 5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 15:83, tbl. 3 (2018)).

While this information is certainly relevant, it carries less weight with the Court because the averages produced by the studies are not apples-to-apples comparisons with the average the Court has calculated from its spread-sheet data. For instance, the first study cited above (Fitzpatrick) reviewed cases over only a two-year period, whereas as the cases in the Court's table are from a much longer time period, including more recent awards. The second study (Logan) included any recovery greater than $100 million, presumably including recoveries greater than $1 billion, which are greater in magnitude than the recovery at issue here, and which the Court has excluded from its calculation. The third study (Eisenberg) has a similar problem of over inclusiveness. Finally, in addition to the data cited by Andren, the treatise he cites shows that the fee award rate for recoveries in the Seventh Circuit from 2006-2011 was 31.6%, which is above the range of the Court's calculation, and thus is contrary to Andren's argument that the Court's calculated range is too high. Notably, a more recent study cited by Co-Counsel, which examined awards from 2009-2022 (a period longer and more recent than any cited by Andren), found the median award rate to be 30% for recoveries between $100 and $249 million, which is the range this case falls into. *See* R. 6911-1 at 77 (Center for Litigation and Court,

12

SA12

UC Law SF, "2022 Antitrust Annual Report: Class Actions in Federal Court," (Sept. 2023), at 32).

In sum, the empirical studies produced by Andren and Co-Counsel do not undermine the Court's calculated range of an award between 29% (the average) and 31% (the median). Furthermore, the studies indicate that 33% (or one-third) is generally the ceiling for awards, whereas a range of 29-31% is supported both by the Court's calculation and the study identified by Co-Counsel. The fact that the study cited by Co-Counsel has a longer and more recent range is most persuasive to the Court.

### 2. *Ex Post* Awards

Andren takes issue with the Court's reliance on *ex post* awards, pointing out that the Seventh Circuit has explained that ex post awards "should receive less weight." *In re Broiler Chicken*, 80 F.4th at 804. The Seventh Circuit has explained that less weight is due because it is much more difficult for courts making awards at the end of a case to "intelligently" assess "the costs and benefits of particular systems and risk multipliers." *Synthroid*, 264 F.3d at 719.

It is certainly true that a single *ex post* award should be accorded less weight than a single *ex ante* agreement like *Interest Rate Swaps*. But also undeniable is that the sheer volume of *ex post* awards, relative to the minimal number of *ex ante* agreements, has a substantial impact on the expectations of class counsel and their clients. And the expectations of counsel and clients impacts what they are willing to

offer and accept, which is the foundation of supply and demand, and hence the market price.

For instance, the Court presumes that a sophisticated client like the pension fund in *Interest Rate Swaps* would have been informed by its in-house counsel of what was then a recent award in *Payment Card* as well as the prevalence of awards of at least 30%. The pension fund was also likely aware of the recent settlements against financial institutions of more than $1 billion. In these circumstances, it is not surprising that Co-Counsel and the pension fund bargained for a fee agreement mimicking the fee award in *Payment Card*.

Assuming this characterization of the circumstances is relatively accurate, it demonstrates that *ex post* awards actually serve to set the market rate, and clients and counsel, to the extent they bargain *ex ante*, do so in the context of the market shaped by *ex post* awards. Of course, it is possible that at some point there will be enough *ex ante* agreements that there will be a shift in the market. But the Court has not been presented with evidence to that effect. Notably, Andren did not present the Court with his own examples of *ex post* awards to support his contention that a rate between 20% and 26.6% would be appropriate here.

14

**Conclusion**

Therefore, having reconsidered the prior attorneys' fee award in light of the Seventh Circuit's instructions and the additional examples of awards provided by Co-Counsel, the Court grants Co-Counsel's renewed motion for attorneys' fees [6910] but decreases the award to $51,660,000.00, which is 30% of the settlement fund after deducting the expenses and incentive awards.

Andren also sought discovery from experts the Court cited in the prior order to the extent the Court continued to rely on those opinions, and in the alternative moved to strike the opinions. Because this opinion and order is not based on those expert opinions, no discovery is warranted, and the motion to strike [6931] is denied as moot.

ENTERED:

_Thomas M. Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: July 3, 2024

15

SA15

**SA16**

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|---|---|---|---|---|---|
| Westlaw | Payment Card | Second | $554,800,000 | 9.56 | $5,803,347,280 |
| Westlaw | VISA | Second | $220,300,000 | 6.5 | $3,389,230,769 |
| R. 5050-1 | Urethane | Tenth | $835,000,000 | 33 | $2,530,303,030 |
| R. 5820 | Foreign Exchange | Second | $300,335,750 | 13 | $2,310,275,000 |
| 2016 WL 2731524 | Credit Default Swaps | Second | $253,758,000 | 13.61 | $1,864,496,694 |
| R. 5050-1 | Dahl v. Bain | First | $590,500,000 | 33 | $1,789,393,939 |
| R. 5050-1 | Vitamins | D.C. | $359,000,000 | 33 | $1,087,878,788 |
| R. 5820 | Urethane | Tenth | $324,766,666 | 33 | $984,141,412 |
| R. 5050-1 | U.S. Foodservice | Second | $297,000,000 | 33 | $900,000,000 |
| R. 5050-1 | Tricor Direct | Third | $250,000,000 | 33 | $757,575,758 |
| R. 5050-1 | Buspirone Antitrust | Second | $220,000,000 | 33 | $666,666,667 |
| R. 5050-1 | First Impressions Salon | Seventh | $220,000,000 | 33 | $666,666,667 |
| R. 5820 | Capacitors | Ninth | $187,490,000 | 31.01315 | $604,550,005 |
| R. 5050-1 | Neurontin Antitrust | Third | $190,420,000 | 33 | $577,030,303 |
| R. 5050-1 | La. Wholesale Drug | Third | $190,416,438 | 33 | $577,019,509 |
| R. 5820 | UFCW Trust v. Sutter | California State | $152,375,000 | 27 | $564,351,852 |
| R. 5050-1 | Relafen Antitrust | First | $175,000,000 | 33 | $530,303,030 |
| R. 5050-1 | Standard Iron Works | Seventh | $163,900,000 | 33 | $496,666,667 |
| R. 5050-1 | Titanium Dioxide | Fourth | $163,500,000 | 33 | $495,454,545 |
| R. 5820; R. 5050-1 | Aggrenox | Second | $162,743,064 | 33 | $493,160,800 |
| R. 5050-1 | Southeastern Milk | Sixth | $158,600,000 | 33 | $480,606,061 |
| R. 5050-1 | Flonase Antitrust | Third | $150,000,000 | 33 | $454,545,455 |
| R. 5819 | Glumetza | Ninth | $49,689,567 | 11 | $451,723,336 |
| R. 5819 | NCAA | Ninth | $78,135,810 | 20 | $390,679,050 |
| R. 5820 | Air Cargo | Second | $96,962,500 | 25 | $387,850,000 |
| R. 5819 | Automotive Parts | Sixth | $75,691,877 | 20 | $378,459,385 |
| R. 5050-1 | In re Potash | Seventh | $110,250,000 | 33 | $334,090,909 |
| R. 5820 | Automotive Parts | Sixth | $99,295,308 | 29.768127 | $333,562,498 |
| R. 5050-1 | Auto. Refinishing Paint | Third | $105,750,000 | 33 | $320,454,545 |
| R. 5050-1 | Plasma-Derivative | Seventh | $64,000,000 | 33 | $193,939,394 |
| R. 5820 | Steel | Seventh | $63,986,991 | 33 | $193,899,973 |
| R. 5820 | Domestic Drywall | Third | $63,353,019 | 33 | $191,978,845 |

**SA17**

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|---|---|---|---|---|---|
| R. 5820 | Cathode Ray | Ninth | $38,235,000 | 20 | $191,175,000 |
| R. 5820 | LIBOR | Second | $45,346,605 | 25 | $181,386,420 |
| R. 5050-1 | Ready-Mixed Concrete | Seventh | $59,158,000 | 33 | $179,266,667 |
| R. 5819 | Lidoderm | Ninth | $45,000,070 | 27 | $166,666,926 |
| R. 5819 | Animation Workers | Ninth | $13,800,658 | 9 | $153,340,644 |
| R. 5820 | Animation Workers | Ninth | $13,800,658 | 9 | $153,340,644 |
| R. 5819 | Aggrenox | Second | $29,200,000 | 20 | $146,000,000 |
| R. 5050-1 | Dairy Farmers | Seventh | $46,000,000 | 33 | $139,393,939 |
| R. 5819 | Cameron v. Apple | Ninth | $26,000,000 | 19 | $136,842,105 |
| R. 5819 | Optical Disk | Ninth | $26,646,000 | 20 | $133,230,000 |
| R. 5820 | Liquid Aluminum | Third | $42,864,004 | 33 | $129,890,921 |
| R. 5819 | Loestrin | First | $38,678,147 | 30 | $128,927,157 |
| R. 5819; R. 5820 | Solodyn | First | $38,499,999 | 33 | $116,666,664 |
| R. 5819 | Lithium Ion | Ninth | $33,829,176 | 30 | $112,763,920 |
| R. 5820 | Lidoderm | Ninth | $34,916,000 | 33 | $105,806,061 |
| R. 5820 | Municipal Derivatives | Second | $33,000,000 | 32 | $103,125,000 |
| R. 5819; R. 5820 | Resistors | Ninth | $20,100,000 | 20 | $100,500,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 6911 at 21; R. 7208 at 7 | Interest Rate Swaps | Second | n/a | 26.6 | $100,000,000 |
| R. 5819 | Celebrex | Fourth | $30,723,777 | 33 | $93,102,355 |
| R. 5820 | Cathode Ray | Ninth | $25,425,000 | 30 | $84,750,000 |
| R. 5820 | Municipal Derivatives | Second | $23,316,150 | 28 | $83,271,964 |
| R. 5820 | Dental Supplies | Second | $26,670,000 | 33 | $80,818,182 |
| R. 5819 | Mackmin v. Visa | D.C. | $20,022,000 | 30 | $66,740,000 |

**SA18**

| Source | Case | Circuit | Fee Award Total | Fee Award % | Recovery Amount |
|---|---|---|---|---|---|
| R. 5820 | Loestrin | First | $20,833,333 | 33 | $63,131,312 |
| R. 5820 | Interior Molded Doors | Fourth | $20,533,333 | 33 | $62,222,221 |
| R. 5820 | Castro v. Sanofi | Third | $20,500,000 | 33 | $62,121,212 |
| R. 5819; R. 5820 | Animation Workers | Ninth | $14,212,500 | 25 | $56,850,000 |
| R. 5820 | TransPacific Passenger | Ninth | $14,126,576 | 25 | $56,506,304 |
| R. 5819 | Edwards v. National Milk | Ninth | $13,000,000 | 25 | $52,000,000 |
| R. 5819 | Restasis | Second | $16,423,921 | 32 | $51,324,753 |
| R. 5820 | TransPacific Passenger | Ninth | $11,038,071 | 22 | $50,173,050 |
| R. 5050-1 | Propane Indirect | Seventh | $15,250,000 | 33 | $46,212,121 |
| R. 5819 | Lithium Ion | Ninth | $11,240,000 | 25 | $44,960,000 |
| R. 5820 | Blood Reagents | Third | $13,833,333 | 33 | $41,919,191 |
| R. 5820 | Municipal Derivatives | Second | $11,475,000 | 30 | $38,250,000 |
| R. 5820 | London Silver | Second | $11,400,000 | 30 | $38,000,000 |
| R. 5819; R. 5820 | Intuniv | First | $11,823,004 | 33 | $35,827,285 |
| R. 5820 | TransPacific Passenger | Ninth | $9,000,000 | 29 | $31,034,483 |
| R. 5820 | Cast Iron Soil Pipe | Sixth | $10,000,000 | 33 | $30,303,030 |
| R. 5820 | Shane Group v. Blue Cross | Sixth | $8,631,628 | 29 | $29,764,234 |
| R. 5050-1 | Pearson v. Target | Seventh | $7,500,000 | 33 | $22,727,273 |
| R. 5819 | LIBOR | Second | $6,097,000 | 28 | $21,775,000 |
| R. 5050-1 | Aftermarket Filters | Seventh | $7,162,500 | 33 | $21,704,545 |
| R. 5819 | Pork | Eighth | $6,600,000 | 33 | $20,000,000 |
| R. 5819; R. 5820 | Pre-Filled Propane | Tenth | $6,312,075 | 33 | $19,127,500 |
| R. 5819 | Asacol | First | $5,000,000 | 33 | $15,151,515 |
| R. 5050-1 | Kitson | Seventh | $3,415,000 | 33 | $10,348,485 |
| R. 5050-1 | Fond du Lac | Seventh | $3,250,000 | 33 | $9,848,485 |
| R. 5820 | Ductile Iron | Third | $2,929,166 | 33 | $8,876,261 |
| R. 5820 | Anadarko Basin | Tenth | $2,316,666 | 33 | $7,020,200 |
| R. 5050-1 | Swift v. DirectBuy | Seventh | $1,900,000 | 33 | $5,757,576 |
| R. 5050-1 | Lithotripsy | Seventh | $1,300,000 | 33 | $3,939,394 |