No. 24-2387

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

IN RE: BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
*Plaintiff-Appellee*

v.

TYSON FOODS, INC.,
*Defendants*

APPEAL OF: JOHN ANDREN, *Objector*

U.S. District Court for the Northern District of Illinois, Eastern Division
The Honorable Thomas M. Durkin / No. 1:16-cv-08637

## BRIEF OF PLAINTIFF-APPELLEE END USER CONSUMER PLAINTIFF CLASS

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue
Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Brent W. Johnson
COHEN MILSTEIN SELLERS &
TOLL, PLLC
1100 New York Avenue NW
Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com

*Counsel for Plaintiff-Appellee End User Consumer Plaintiff Class*

[Additional counsel on signature block]

| Save As | | Clear Form |
|---|---|---|

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2387

Short Caption: In Re: Broiler Chicken Antitrust Litigation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff-Appellee End User Consumer Plaintiff Class

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll, PLLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Steve W. Berman     Date: November 14. 2024

Attorney's Printed Name: Steve W. Berman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☑     No ☐

Address: 1301 Second Avenue, Suite 2000

Seattle, Washington 98101

Phone Number: 206-623-7292     Fax Number: 206-623-0594

E-Mail Address: steve@hbsslaw.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2387

Short Caption: In Re: Broiler Chicken Antitrust Litigation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Plaintiff-Appellee End User Consumer Plaintiff Class

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll, PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Shana E. Scarlett      Date: November 14, 2024

Attorney's Printed Name: Shana E. Scarlett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ✓

Address: 715 Hearst Avenue, Suite 300

    Berkeley, California 94710

Phone Number: 510-725-3000      Fax Number: 510-725-3001

E-Mail Address: shanas@hbsslaw.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2387</u>

Short Caption: <u>In Re: Broiler Chicken Antitrust Litigation</u>

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Plaintiff-Appellee End User Consumer Plaintiff Class</u>

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll, PLLC</u>

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and
<u>N/A</u>

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
<u>N/A</u>

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

Attorney's Signature: <u>/s/ Kevin K. Green</u>　　Date: <u>November 14, 2024</u>

Attorney's Printed Name: <u>Kevin K. Green</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　　Yes ☐　　No ☑

Address: <u>533 F Street, Suite 207</u>

<u>San Diego, California 92101</u>

Phone Number: <u>619-929-3340</u>　　Fax Number: <u>N/A</u>

E-Mail Address: <u>keving@hbsslaw.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2387

Short Caption: In Re: Broiler Chicken Antitrust Litigation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Plaintiff-Appellee End User Consumer Plaintiff Class

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll, PLLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Breanna Van Engelen     Date: November 14, 2024

Attorney's Printed Name: Breanna Van Engelen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: 1301 Second Avenue, Suite 2000

Seattle, Washington 98101

Phone Number: 206-623-7292     Fax Number: 206-623-0594

E-Mail Address: breannav@hbsslaw.com

rev. 12/19 AK

- iv -

| Save As | Clear Form |

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2387

Short Caption: In Re: Broiler Chicken Antitrust Litigation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff-Appellee End User Consumer Plaintiff Class

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cohen Milstein Sellers & Toll PLLC and Hagens Berman Sobol Shapiro LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Brent W. Johnson      Date: January 16, 2025

Attorney's Printed Name: Brent W. Johnson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: 1100 New York Avenue NW, Suite 800 (New Suite No.)

Washington, DC 20005

Phone Number: 202-408-4600      Fax Number: N/A

E-Mail Address: bjohnson@cohenmilstein.com

rev. 12/19 AK

- v -

# TABLE OF CONTENTS

I.     JURISDICTION ...................................................................1

II.    ISSUES PRESENTED ........................................................1

III.   STATEMENT OF THE CASE................................................ 2

     A.    The End Users filed an antitrust lawsuit with known risks that would have been considered at the outset of an *ex ante* bargain. .................................. 3

     B.    The End Users settled with several defendants for $181 million only after significant work overcoming some of these risks...................................................... 7

     C.    In the first appeal, this Court vacated the District Court's $57.4 million fee award and remanded for further proceedings on specific issues. ..................................... 10

     D.    After thorough consideration, the District Court awarded a reduced fee of $51.66 million. .................................12

IV.   SUMMARY OF ARGUMENT................................................13

V.    ARGUMENT .....................................................................16

     A.    Acting within its discretion, the District Court gave appropriate weight to the few bids in hundreds of antitrust actions and one negotiated fee agreement. ................17

          1.    The District Court soundly distinguished the bids in *Resistors*, *Lithium Batteries*, and *Optical Disk* because each followed a government criminal investigation. ................................. 18

          2.    As Andren requested, the District Court accorded *Interest Rate Swaps* significant, just not dispositive, effect. ..................................... 24

B.     Acting within its discretion, the District Court gave appropriate weight to Ninth Circuit decisions bearing on the *ex ante* fee determination...............................28

C.     The District Court properly considered other evidence bearing on the market rate. ...........................................31

     1.     The District Court correctly assessed *ex post* fee orders...........................................................................31

     2.     A quick look at the lodestar, and additional Seventh Circuit law, fortify the award................................36

D.     Andren disregards the limited scope of the remand. ................38

E.     Andren's additional challenges to the District Court's process are groundless. .....................................................41

     1.     The District Court did not improperly rely on expert declarations...........................................................41

     2.     The spreadsheet was not required to break down all 49 fee awards based on the stage of the litigation. .....................................................................42

F.     This Court may set the fee but it should affirm. ........................45

VI.     CONCLUSION ...................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
No. 06-md-1775 ...................................................................................... 28

*Batt v. Micro Warehouse, Inc.,*
241 F.3d 891 (7th Cir. 2001) ............................................................ 17, 36

*In re Broiler Chicken Antitrust Litig. ("Broiler II"),*
290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................................ 8

*In re Broiler Chicken Antitrust Litig. ("Broiler I"),*
80 F.4th 797 (7th Cir. 2023) ............................................................ *passim*

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) .................................................................................... 6

*Matter of Continental Illinois Secs. Litig.,*
962 F.2d 566 (7th Cir. 1992) ................................................. 37, 39, 43, 44

*Creek v. Village of Westhaven,*
144 F.3d 441 (7th Cir. 1998) .................................................................. 40

*Dole v. Local 427,*
894 F.2d 607 (3d Cir. 1990) ........................................................ 19, 20, 21

*Fast v. Cash Depot, Ltd.,*
931 F.3d 636 (7th Cir. 2019) .................................................................... 7

*Federal Trade Commission v. Day Pacer LLC,*
2025 WL 25217 (7th Cir. Jan. 3, 2025) ...................................... 33, 34, 38

*In re Folding Carton Antitrust Litig.,*
84 F.R.D. 245 (N.D. Ill. 1979) ................................................................ 21

*Fox v. Vice,*
563 U.S. 826 (2011) ........................................................................ 36, 43

*Greenlaw v. United States,*
554 U.S. 237 (2008) ............................................................................... 46

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) .................................................................. 5

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................................. 6

*Jarrard v. CDI Telecommunications, Inc.*,
  408 F.3d 905 (7th Cir. 2005) ............................................... 39

*Jones Motor Co., Inc. v. Holtkamp, Liese, Beckemeier &*
  *Childress, P.C.*,
  197 F.3d 1190 (7th Cir. 1999) ............................................... 45

*Norfleet v. Walker*,
  684 F.3d 688 (7th Cir. 2012) ............................................... 28

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) .................................................. 4

*Roberts v. Cooper*,
  61 U.S. 467 (1857) ................................................................ 39

*In re Stericycle Sec. Litig.*,
  35 F.4th 555 (7th Cir. 2022) ........................................... 31, 45

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ................................ 2, 21, 31, 32

*Taubenfeld v. AON Corp.*,
  415 F.3d 597 (7th Cir. 2005) ........................................... 37, 38

*U.S. v. Husband*,
  312 F.3d 247 (7th Cir. 2002) ............................................... 39

*U.S. v. Parker*,
  101 F.3d 527 (7th Cir. 1996) ............................................... 38

*In re Wawa, Inc. Data Security Litig.*,
  2024 WL 1557366 (E.D. Pa. Apr. 9, 2024) ........................... 40

*Webb v. Board of Educ.*,
  471 U.S. 234 (1985) .............................................................. 44

*Williams v. Rohm & Haas Pension Plan,*
 658 F.3d 629 (7th Cir. 2011) .................................................. 36

## STATUTES

28 U.S.C. § 2106 ........................................................................ 45

Sherman Act ............................................................................... 6

## OTHER AUTHORITIES

*Black's Law Dictionary* (12th ed. 2024) ..................................... 18

C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741,
 445 (1993) ............................................................................... 19

Circuit Rule 28(b) ....................................................................... 1

Fed. R. App. P. 28(a)(8)(A) ....................................................... 45

Fed. R. Civ. P. 61 ...................................................................... 42

*Garner's Dictionary of Legal Usage* (3d ed. 2011) ..................... 18

# I.    JURISDICTION

Pursuant to Circuit Rule 28(b), Plaintiff-Appellee End User Consumer Plaintiff Class ("End User Class") states explicitly that the jurisdictional summary in Objector-Appellant John Andren's opening brief is complete and correct.[1]

# II.    ISSUES PRESENTED

Without stating any "preference as to the amount or structure" of fees, this Court vacated and remanded for "another evaluation of the bargain the parties would have struck *ex ante*" taking into account bids and out-of-circuit fee awards. *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 804–05 (7th Cir. 2023) ("*Broiler I*"). The District Court did so, and awarded 30%. Despite the District Court's careful analysis, Andren urges this Court to set aside the District Court's award and set the fee itself. Yet Andren concedes that a reasonable award could be as high as $47.2 million, or 26.6%.

---

[1] Opening Brief and Required Short Appendix of Appellant John Andren ("AOB") at 1–2, Dkt. 26. Other materials are cited as follows:

"SA____" for Andren's Short Appendix (Dkt. 26)
"A-____" for Andren's Public & Sealed Appendices (Dkt. 27 & 28)
"SuppA____" Appellees' Supplemental Appendix, filed concurrently
"R. ____" for District Court docket entries not included in appendices
"Dkt. ____" for other Seventh Circuit filings

Given this Court's instructions in the first fee appeal, the issues are better stated as follows:

1.    When determining the hypothetical *ex ante* bargain, did the District Court give "appropriate weight" to "bids made by class counsel in auctions in other cases?" *Id.* at 800, 804.

2.    When determining the hypothetical *ex ante* bargain, did the District Court give "appropriate weight" to "out-of-circuit fee awards?" *Id.*

3.    Did the District Court exceed its discretion in the weight given to other "market evidence" bearing on the *ex ante* fee inquiry? *Id.* at 802.

## III.   STATEMENT OF THE CASE

This Court instructs district courts to undertake a "market-mimicking approach" before awarding fees. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). This market rate "depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Id.* at 721. Without repeating its brief from the first appeal, Class Counsel distills the background facts found by the District Court and supported by the record, relevant to this analysis.[2]

---

[2] Brief of Plaintiff-Appellee End User Consumer Plaintiff Class at 3–12, Dkt. 37, No. 22-2889 (7th Cir. Feb. 1, 2023), available at 2023 WL 1881409.

Class Counsel are Hagens Berman Sobol Shapiro LLP and Cohen Milstein Sellers & Toll PLLC. A71. Shortly after suit was filed in 2016, the District Court appointed Hagens Berman as interim Class Counsel for what came to be called the End User Class. SuppA2 (commending Hagens Berman's "aggressive and independent advocacy" identifying initial conflict of interest). Cohen Milstein was appointed later as settlement co-lead counsel for the End User Class and, when the class was certified, interim co-lead counsel. A-22, 71; R. 5644.

## A. The End Users filed an antitrust lawsuit with known risks that would have been considered at the outset of an *ex ante* bargain.

This was an antitrust case brought by private plaintiffs without the benefit of a prior government investigation. SA at 3–4. As discussed further below, large-scale antitrust actions like this one are so risky that many are filed only after government regulators have laid the prosecutorial groundwork. In this case, however, the opposite occurred. Class Counsel invested their own resources into investigating the alleged misconduct—including by retaining multiple experts—before they were appointed to lead the case. R. 117 at 13–14; R. 247 at 9–10.

This antitrust case also involved many individual defendants—more than similar antitrust cases, including the three that Andren devotes special

attention to in his appeal. The initial End User complaint named 14 defendant families, and more than 27 individual entities. R. 1 at 10–18. From the start, Class Counsel anticipated that additional defendants may be added as the case progressed; one of these defendants, Agri Stats was named as a non-defendant coconspirator in the initial complaint. *Id.* at 19.

By comparison, many other antitrust cases name fewer defendants. For the reasons explained below, in antitrust litigation, as the number of named defendants increases, so do the risks at the outset. Plaintiffs must develop evidence showing that each defendant consciously committed to the collusive scheme, and the part that each played. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011). That requires collecting and reviewing evidence from each defendant, deposing witnesses from each defendant, and responding to each defendant's fact-specific defenses.

This increases the time that experienced attorneys—those who can lead depositions and draft dispositive motions—must expend litigating the case, forgoing other opportunities.

Andren glosses over these risks and insists that a lower fee award should have been awarded because the "complaint was a follow-on." AOB at 5, 36. But unlike cases that follow on a government investigation, there was

no discovery that End Users could use to bolster their chance at winning motions to dismiss against all 14 defendant families. Rather, the End Users filed their first complaint 12 days after the direct purchaser class, before any discovery began. AOB at 5.

Andren's insistence that End Users deserve a lower fee award for bringing "copycat lawsuits" also fails to account for the risks End Users faced alone, because of their status as indirect purchasers. AOB at 5.

One example of that risk is passthrough. To prevail at class certification and summary judgment, End Users must demonstrate the overcharge passed through the stream of commerce and injured their class. R. 121 at 2–3. This is not an issue that direct purchasers ever face; defendants cannot raise pass-on as a defense to direct purchasers' antitrust damages. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). While proving that each defendant joined an agreement, End Users had to also conduct downstream discovery on third-party wholesalers and retailers. R. 121 at 2–3. Defendants also attack these analyses with their own expert testimony; more defendants making these attacks only heightens the challenges that End Users—but not direct purchasers—faced at the outset.

Not only do indirect purchasers face challenges that direct purchasers do not, but they do so on behalf of a smaller damages class. Direct purchasers pursue damages under federal antitrust law. But the Sherman Act does not allow indirect purchasers to recover damages. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). Instead, indirect purchasers must prove their claims under a patchwork of state laws that recognize indirect purchasers' standing. *California v. ARC Am. Corp.*, 490 U.S. 93, 101, (1989). Here, End Users brought claims on behalf of 32 state laws, approximately 50 percent of the U.S. population and the direct purchaser class. R. 255. Of the 32 states where End Users brought claims, 25 claims survived until class certification—demonstrating that for End Users, the amount of damages is often uncertain at the outset. R. 255, 5644.

Class Counsel anticipated at the outset that they would be collecting more data and presenting additional expert analyses for the indirect purchaser class; they raised this issue in their leadership motions. R. 121 at 2–3. And without the benefit of *any* discovery—from the government or direct purchasers—they retained an expert to review the market allegations and brought forward these claims. This was more than a mere copycat litigation; the End Users litigated these claims while facing down hurdles that direct purchasers did not.

**B.     The End Users settled with several defendants for $181 million only after significant work overcoming some of these risks.**

In 2021, the District Court gave final approval to settlements with six defendant groups totaling $181 million for the End User Class. A-20–24. By that time, over 1.2 million class members had filed claims. A-25. There were only three objections to the settlements—0.0008% percent of all claimants—and Andren was not among them. *Id.*

Andren suggests the settlements occurred early in this case, and in his opinion, they are "due more to the strength of class claims or size of the class than attorney effort." AOB at 36. Andren's description of the facts, in addition to rehashing what has already been litigated, flouts the standard of review. *See Fast v. Cash Depot, Ltd.*, 931 F.3d 636, 639 (7th Cir. 2019) (reviewing "underlying factual matters" in fee appeal for clear error).

Before these settlements were approved, Class Counsel advanced over $40 million in lodestar and expenses, wholly on contingency, in an effort that also benefited the government's criminal prosecution. SuppA9–11. And contrary to Andren's claim otherwise, the End User Class prevailed on the key dispositive motions. AOB at 36. It defeated multiple joint and individual motions to dismiss and one motion to reconsider. SuppA5; R. 292; *see also* R. 274, 276, 282, 284, 286, 287, 290, 292, 294, 296 (10

additional motions). In a published order, the End User Class also defeated defendants' renewed challenge to the operative complaint. SuppA5; *see In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ("*Broiler II*").

Discovery, likewise, was daunting and labor-intensive. As to depositions alone:

- Class Counsel coordinated with other plaintiffs' counsel to take more than 180 depositions, with over 40o occurring to date.

- Plaintiff representatives of the End User Class sat for nearly 100 hours of depositions.

- The End User Class also took the lead in questioning more than 40 defense employees and several third-party depositions.

- Class Counsel participated in more than 100 depositions of opt-out distributors and retailers, and then used these defendant-noticed depositions to solidify the indirect purchaser claims.

SuppA6–9.

Document review was also a sprawling effort. The classes' joint review team analyzed more than 13 million documents. SuppA5–6. Much of this discovery was obtained over strident resistance, as the District Court observed, by "some of the most prominent and sophisticated law firms in

the United States" representing the many defendants. A-77.[3]

Class Counsel's success in the discovery battles benefited all three classes (the End User Class, the direct purchaser class, and the commercial class). For example, declining to limit defendant Agri Stats' document production, the Magistrate Judge adopted the rationale proposed by the End User Class and denied a protective order. *Compare* R. 941 *with* R. 1090. As a result, each class was able to use highly relevant Agri Stats documents to support their motions for class certification. SuppA7.

By 2019, when the Department of Justice announced its investigation, the End User Class had spent over two years litigating its claims and obtaining a wealth of discovery. SuppA7. The government wanted this evidence. It subpoenaed defendants' document productions from Class Counsel and used some documents at its criminal trial. SuppA7–8. As the District Court found, "[Class] Counsel's work appears to have prompted the government investigations that led to those indictments, rather than the reverse." A-78. Andren therefore disregards the record when he downplays

---

[3] *See, e.g.*, R. 864 (denying Tyson protective order); R. 1090 (denying Agri Stats protective order); R. 1254 (granting motion to serve interrogatories); R. 1832 (ordering third-party Porky Products to produce downstream data); R. 2010 (granting motion to compel production of documents claimed to be privileged); R. 3622 (granting in part motion for production of structured data).

the federal government as intervening in this case "to protect the grand jury's investigation." AOB at 6.

The facts do not support Andren's conclusion that these settlements occurred early in the litigation, nor his suggestion that Class Counsel clung onto direct purchasers' litigation efforts. AOB at 5, 36. And in any event, much of Andren's framing of these facts is an *ex post* view of this litigation; as discussed below, the District Court correctly evaluated the *ex ante* market rate.

**C.     In the first appeal, this Court vacated the District Court's $57.4 million fee award and remanded for further proceedings on specific issue**s.

In its first order on fees, the District Court awarded $57.4 million as attorney fees, $8.75 million for expenses, and service awards to the class representatives. A-82. Andren does not challenge the expenses or service awards. AOB at 2–3. The District Court's findings when approving the settlements emphasized the caliber of Class Counsel's work and the result:

- The End User Class "proposed a shorter class period that covered fewer products than the direct purchasers' proposed class or the commercial class," but the "$181 million recovery [was] higher than any other class recovery" at that time.

- Class Counsel "adequately represented the class" by devoting over "67,500 hours" to the litigation.

- The "risks of non-recovery have been significant," with denial of defendants' motions to dismiss "a relatively close call."

A-22–24.

Andren incorrectly asserts that "this Court found that the district court had *not* followed the appropriate methodology in determining the fee award." AOB at 11 (emphasis added). Just the opposite. This Court held that "the district court followed the appropriate methodology in determining the fee award." *Broiler I*, 80 F.4th at 802. This made its order *reviewable* for abuse of discretion. *Id.*

In the first appeal, this Court clarified "admittedly intricate" Seventh Circuit law and remanded for "greater explanation and consideration" of certain evidence bearing on the award. *Broiler I*, 80 F.4th at 805. It expressed "no preference as to the amount or structure of the award"—a point restated in the separate final judgment. *Id.*[4] Emphasizing that Seventh Circuit fee jurisprudence is "complicated," this Court remanded only because the District Court "fell short in two areas: the consideration of bids made by class counsel in auctions, and the weight assigned to out-of-circuit decisions." *Id.*

---

[4] Final Judgment, Dkt. 59, No. 22-2889 (7th Cir. Aug. 30, 2023).

**D.    After thorough consideration, the District Court awarded a reduced fee of $51.66 million.**

On remand, the District Court followed a comprehensive process for redetermining the fee award. As before, it "was correct to invite briefing on close questions." *Broiler I*, 80 F.4th at 805. Class Counsel and Andren filed supplemental briefs addressing this Court's opinion. R. 6849; A-115, 168; SuppA17. Class Counsel's brief explained that, between 2013 and 2019, Class Counsel together filed 196 antitrust cases and submitted over 50 leadership applications. A-120, 128; SuppA46. During that period, *Resistors* was the only case where either firm made a bid. A-120. Class Counsel also noted a retainer it signed with a plaintiff in *Interest Rate Swaps* ("*IRS*"), which showed one fee structure Class Counsel had negotiated in the past. Class counsel then explained why *IRS* presented different risks and benefits *ex ante* than many other cases.

At the motion hearing on the new fee award, the District Court ordered a second round of supplemental briefing to address the *ex ante* fee agreement in *IRS*, discussed further below. A-212, 219–20, 222; SuppA43, 57. As Class Counsel explained in the District Court, and Andren does not contest, Class Counsel did not identify *IRS* before the first appeal because it was outside the scope of information the District Court initially asked to examine. A-208. As Andren acknowledged on remand, Class Counsel did

not breach any disclosure obligation: "The Objector agrees that the *IRS* agreement fell just outside the date range that the Court ordered disclosed." A-235 n.5; *see* AOB at 18 (reiterating concession).

After thoroughly examining available data bearing on the *ex ante* fee determination, the District Court awarded $51.66 million or 30% of the settlement fund. SA15. Although this Court did not order the award to be reduced, this reflects a cut of $5.74 million (10% reduction) from the original award. A-82. The Fee Order is discussed further below.[5]

## IV.   SUMMARY OF ARGUMENT

Andren concedes that a reasonable award could have been as high as $47.2 million, and so there is less to his appeal than meets the eye. The key question is whether this Court should second-guess a 30% award because one class member believes it should not have exceeded 26.6%. AOB at 44. Andren identifies no reason to do so.

Andren's issues for review rest on the erroneous foundational premise that the District Court has not followed "the appropriate methodology in determining the fee award." *Id.* at 11. But *Broiler* clarified

---

[5] As in the first appeal, Andren makes policy-based assertions irrelevant to the issues this Court needs to review, untethered to the record, and calling for no response. *E.g.*, AOB at 40 ("the market for class attorneys' fees behaves like a cartel"). The Court need not consider these unfounded claims.

that bids and out-of-circuit fee awards are not second-class citizens in the *ex ante* fee inquiry, and on remand, the District Court did not treat them that way. Andren's arguments thus fall short.

**Section V.A.** As directed by this Court, the District Court gave appropriate weight to Class Counsel's few bids in *Resistors*, *Lithium Batteries*, and *Optical Disk*, as well as the negotiated fee agreement in *IRS*. The probative value of those cases as comparators hinges on not just the similarities, but the differences. Each case involving a bid was preceded by a government criminal investigation paving the way for a private antitrust case. So the bid percentages were lower than the award here. *IRS* involved much higher settlement values at the time of filing, also justifying lower percentages in the agreement negotiated. None of this is cause to reverse.

**Section V.B.** The District Court also gave appropriate weight to Ninth Circuit fee awards. Andren's main grievance is that the District Court supposedly misunderstood the meaning of "market rate" and how a megafund cap impacts it. The District Court properly followed this Court's decision recognizing that the Ninth Circuit's megafund rule results in awards *below* the market rate. So, in the hypothetical *ex ante* bargain, the absence of price control outside the Ninth Circuit would cause Class

Counsel in this case to seek a fee above 25% and closer to market. Here too, there was no abuse of discretion.

**Section V.C.** The District Court's reduced 30% award is supported by additional evidence. Andren asks this Court to disregard *ex post* fee awards entirely because *ex ante* evidence is available, but this is not the law. Instead, the District Court soundly gave enhanced weight to *IRS*—a 10x multiplier in its spreadsheet. There was no error in its conclusion that Class Counsel, again hypothetically, would have started this case by negotiating a fee that took into account the overwhelming number of *ex post* fee awards suggesting that the market rate of counsel's services was approximately 30% of a recovery. Further confirming reasonableness, a lodestar comparison yields a multiplier of 1.8 for Class Counsel's exemplary work recovering $181 million in settlements.

**Section V.D.** The District Court properly considered the issues within the scope of remand. Apart from two limited issues, this Court did not disagree with the factors that the District Court considered when awarding fees the first time. Yet Andren tries to reanimate some of these resolved issues, such as whether Class Counsel expended effort on this case or simply rode the direct purchasers' coattails during discovery. But Andren cannot revisit the basic background facts bearing on Class Counsel's

performance, because these issues were not within the scope of the remand.

**Section V.E.** Andren shows no reversible error in the District Court's spreadsheet. It did not rely on expert declarations that he had no opportunity to rebut. He does not dispute that neither Class Counsel nor the new Fee Order relied on any expert opinions. The spreadsheet collecting the awards draws on entirely public information. Likewise, Andren is mistaken that the District Court's spreadsheet must be redone to specify, for 49 awards, the stage of litigation *in each case* when the fee was awarded. Seventh Circuit law does not require this. When holistically determining the fee in connection with other evidence, as here, the benefits of Andren's exercise would be speculative at best.

**Section V.F.** Andren's bold invitation to set a new fee on appeal finds no support in the equities or history of this case. Discretion means the District Court had more than one choice, whether a 30% award or, as Andren prefers, slightly lower. The reduced 30% award falls well within the range of reasonableness and should be affirmed.

## V. ARGUMENT

Andren does not dispute that Class Counsel were entitled to a fee award, but he contends once more that the End User Class is overpaying its attorneys. Because the District Court, as before, "followed the appropriate

methodology in determining the fee award," the Fee Order is reviewed for "abuse of discretion." *Broiler I*, 80 F.4th at 802. The "appropriate weight" to give specific evidence—the focus of the remand—necessarily falls within this "zone of discretion." *Id.* at 804–05. "Appropriate weight" is best understood to mean that the court below, subject to appellate review, "is entitled to determine the probative value of each submission and must arrive at its own determination as to a proper fee." *Batt v. Micro Warehouse, Inc.*, 241 F.3d 891, 895 (7th Cir. 2001).[6]

## A. Acting within its discretion, the District Court gave appropriate weight to the few bids in hundreds of antitrust actions and one negotiated fee agreement.

In the first appeal, this Court reiterated the proper focus of the *ex ante* fee inquiry. District courts "must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)." *Broiler I*, 80 F.4th at 801–02. Ultimately, this Court remanded for "another evaluation of the bargain the parties would have struck *ex ante*" based on further consideration of two factors: (1) "bids made by class counsel in auctions in other cases;" and (2) "out-of-circuit fee awards." *Id.* at 800, 805.

---

[6] Unless otherwise specified, quotations are cleaned up.

On the issues remanded, Andren fails to show any abuse of discretion or legal error. His additional criticisms of the Fee Order are also no basis for further litigating the fee amount.

**1. The District Court soundly distinguished the bids in *Resistors*, *Lithium Batteries*, and *Optical Disk* because each followed a government criminal investigation.**

In its carefully crafted opinion, this Court held that "[i]t was an abuse of discretion to rule that bids with declining fee structures should *categorically* be given little weight in assessing fees." *Broiler I*, 80 F.4th at 804 (emphasis added). The same term, as discussed later, was used as to Ninth Circuit awards: "[T]he district court should not have *categorically* assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule." *Id.* (emphasis added).

Before considering the bids in *Resistors*, *Lithium Batteries*, and *Optical Disk*, it is helpful to pin down the meaning of "categorically" as used in *Broiler*. Under a common definition, reflecting common understanding, it means "without qualification." *Garner's Dictionary of Legal Usage* (3d ed. 2011). A "categorical approach" is "[a]n across-the-board treatment of things considered alike, with no exceptions, esp. when this seems arbitrarily to ignore nuances and subtleties." *Black's Law Dictionary* (12th ed. 2024).

Just as categorical conclusions about evidence are eschewed under *Broiler*, it is vital to be precise when reasoning by analogy. Case comparisons are central to determining many fee awards, including the award here. Contrary to Andren's approach, however, the process of analogy calls for a fine-point pen, not a broad brush: "The major challenge facing analogical reasoners is to decide *when differences are relevant*. To make this decision, they must investigate cases with care in order to develop governing principles." C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 445 (1993) (emphasis added). Stated another way, "[t]he *degree of similarity* is always the crucial inquiry in analogies. Clearly, you cannot conclude that a partial resemblance between two entities is equal to an entire and exact correspondence." *Dole v. Local 427*, 894 F.2d 607, 612 n.11 (3d Cir. 1990) (emphasis added).

In the first appeal, this Court recognized that similarity is a continuum generating few absolute comparisons. When there are differences, some may be, within the bounds of discretion, entitled to greater heft than others. The appropriate weight to give the bids turns on not just the similarities, but the differences and the relevance of those differences. As this Court phrased the proper comparison:

- **Similarities:** "Bids that class counsel made in auctions around the time this litigation began in September 2016 would

ordinarily be good predictors of what *ex ante* bargain would have been negotiated."

- **Differences:** "Other aspects of the cases in which the bids were made may show the bids to be poor indicators of what bargain would have been struck *ex ante*."

*Broiler I*, 80 F.4th at 802–03.

Here, Andren seeks to morph a "partial resemblance" into an "exact correspondence" dictating the fee award—as though there are no differences. *Dole*, 894 F.2d at 612 n.11. The shoe does not fit.

While there are some parallels between this case and the bids, those parallels are far from overwhelming: The same Class Counsel sought a leadership role in a large-scale antitrust class action. And at least some bids have a "degree of similarity" on timing. *Id. Resistors* was in 2015, one year before suit here; *Lithium Batteries* was in 2013; and *Optical Disk* was in 2010. A-120; SuppA22.

But one difference is key to determining the appropriate weight to give the bids. "More relevant than the time period," the District Court found, is the "fact that the three cases in which the bids were made were filed in the wake of criminal investigations by the government." SA3.

A government investigation (or not, as here) preceding an antitrust action bears directly on the most crucial risk factors at the *ex ante* stage of litigation. In the District Court's words, "filing a complex antitrust action

without the benefit of a prior government investigation increases the amount of work necessary to litigate the case and decreases the chance of success." *Id.* The bids in the three cases, as economic logic alone suggests, proposed lower percentage fees because of "lower risk and the prospect of less work" for the claims to succeed. *Id.* For instance, in *Resistors*, the defendant admitted to criminal wrongdoing before the civil complaint was filed. A-133. Nothing of the sort happened at the outset of this litigation.

Andren says the District Court overplayed the significance of prior government investigations, but, again, the fee inquiry is *ex ante*. So the relevant time is "the outset of the case." *Broiler I*, 80 F.4th at 802. The focus is how Class Counsel, *at that time* and viewed through the lens of their experience and judgment, would have hazarded the risks and, hypothetically, bargained accordingly. *Id.* at 801–02. As the District Court found, "from an *ex ante* perspective, an existing criminal investigation suggests an easier road for a related civil case." SA4. The parties would have bargained accordingly. *See also In re Synthroid Marketing Litig.*, 264 F.3d 712, 718–19 (7th Cir. 2001) ("*Synthroid I*"). Courts have long recognized that private antitrust plaintiffs will be "undoubtedly helped considerably by some of the evidence developed by the government." *In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245, 251 (N.D. Ill. 1979).

Andren does not entirely disagree. "Government investigations," he admits, "may make a case seem less risky *ex ante*." AOB at 37. So the District Court "could properly infer that rates would be higher without a government investigation." *Id.* at 38. In light of Andren's concession, all agree that the existence of government investigations is a relevant difference when analogizing to the bids.

Andren's argument that this data point should have counted for less—while acknowledging its significance—confirms that the weight was a discretionary decision for the District Court. It did not exceed its "zone of discretion" on fees by giving this factor greater credence than Andren would give it. *Broiler I*, 80 F.4th at 805.

Andren also criticizes the District Court's use of a spreadsheet. R. 7309 at 16–18. With so much evidence to consider, however, along with its appropriate weight, there is no faulting the use of an organizational tool to keep the data straight. This was for the parties, so they understood the reasons for the award, and to facilitate review if Andren appealed again. This is exactly what a diligent trial judge, continuing to do a "fine job" shepherding this complex litigation, should do. *Broiler I*, 80 F.4th at 802.

Andren fails to show any abuse of discretion in the District Court's use of the spreadsheet. He challenges the weight given the three bids. AOB

at 17, 19. But Andren does so based only on the similarities, while ignoring the differences making those bids not the "'good predictors'" he would prefer. *Id.* at 28 (quoting *Broiler I*, 80 F.4th at 802). Under *Broiler*, it would be an erroneously categorical analysis to do as Andren invites, simply extrapolating the bids "to the circumstances of this case" while pretending there are no differences. *Id.* at 41.

Moreover, given Andren's request for relief, his arguments concerning the bids are largely academic. Emphasizing the *IRS* agreement providing for higher percentages than the bids, he says a reasonable award (under his view of the law) could have been as high as $47.2 million. AOB at 44. And he arrives at this figure only by urging "rote" or "conclusive" application of the *Payment Card* scale used in *IRS. Id.* at 29, 44. As discussed next, however, extending *IRS* categorically to this case would also improperly elevate similarities over differences when both must be considered. *See Broiler I*, 80 F.4th at 802–03.[7]

---

[7] Andren implies the District Court denied him access to the terms of the *IRS* fee agreement. AOB at 18, 29 n.7. Not so. As Class Counsel explained in open court, and as the District Court verified through an *in camera* inspection of the *IRS* retainer, the *IRS* fee scale was "exactly the same as in Payment Card[.]" A-213; *see* A-214 (court ordering in camera review of the IRS retainer); A-215 (court asking Andren's counsel whether this approach was satisfactory, and Andren's counsel replying, "Yes, that's great, Your Honor.").

**2. As Andren requested, the District Court accorded *Interest Rate Swaps* significant, just not dispositive, effect.**

Other than colorful comparisons to the "children of Lake Wobegon" and a "$20 bill on the ground," the opening brief is fuzzy on how the District Court abused its discretion when considering the *IRS* fee agreement. AOB at 30–33. Andren appears to contend that the District Court erroneously discounted *IRS* "simply because it deviates from *ex post* fees" while giving excessive attention to the "large number" of *ex post* awards. *Id.* That is incorrect.

The District Court followed this Court's mandate. It gave appropriate weight to *IRS* within the guidelines this Court elaborated for bids or agreements with declining fee structures. *Broiler I*, 80 F.4th at 803–04. Contrary to Andren's description, the District Court did not tilt the scales against the only *ex ante* fee agreement identified by any party. Again, just the opposite. The District Court found that "Co-Counsel would not have agreed to the *Interest Rate Swaps* declining fee schedule in this case," but it nonetheless gave *IRS* a 10x multiplier (tenfold effect) in the spreadsheet. SA9–10. This resulted in *IRS* alone constituting more than 20% of the relevant fee awards considered to arrive at a reasonable award here. R. 7309 at 16–18.

To the extent Andren challenges the weight given *IRS*, he does not show the District Court strayed outside the zone of discretion. He identifies nothing undermining the sound rationale that a 10x multiplier on *IRS* "fairly accounts for the greater weight that the Seventh Circuit instructs *ex ante* agreements should be given relative to *ex post* awards." SA10.

Considering both the similarities and the differences, the District Court was fair-minded, not categorical, in its treatment of *IRS*. "[D]espite some differences," the District Court found, "the two cases are good comparators. Both are complex antitrust actions against defendants with sufficient assets to hire the best and most expensive corporate defense firms in the country. Both cases had the potential to result in billions of dollars of damages." SA7.

Those were the similarities. Again, though, the relevant differences, and the weight to give them, are where the rubber meets the road when determining the strength of an analogy. In discerning why counsel might have agreed to the particular fee structure in *IRS*, the District Court noted: "[W]hile the potential damages in both *Interest Rate Swaps* and this case are comparable, the potential settlement values are not." SA8. Keeping in mind the view is *ex ante*, it is highly relevant that "two similar antitrust

cases brought against financial institutions" settled just before *IRS*, for $1.8 billion and $2 billion respectively. *Id.*

By contrast, antitrust actions involving the food industry had not generated settlements of that size. Class Counsel presented evidence, uncontradicted by Andren, that the largest antitrust settlement against food industry defendants *when IRS was negotiated* was $303 million. *Id.*; *see* SuppA46–47. Given the reality that few antitrust class actions go to trial, anticipated settlement values are not just a relevant difference but, as the District Court found, an important one. SA8–9. Moreover, while the banking defendants in *IRS* clearly had the resources to pay billion-dollar judgments, it was not at all clear that the defendants in this case could pay even a modest recovery. Pilgrim's declared bankruptcy before the End User Consumer Plaintiffs' complaint was filed, and other chicken processors declared bankruptcy from 2010 through 2012. The "defendant's ability to pay a settlement is a much stronger indicator of the value of case than are the potential damages available from a trial verdict." SA9. And "financial institutions generally have greater assets than food producers to pay larger settlements." *Id.*

Again, Andren does not entirely disagree. "In real *ex ante* agreements, clients bring something to the table: the expected value of their claims."

AOB at 22. He adds: "If there were a cakewalk lawsuit ripe to produce a billion dollar settlement, in a functioning *ex ante* market, attorneys would bid down the cost of representation so that they could secure the profitable opportunity no matter what fees a judge might later permit." *Id.* Andren's emphasis on settlement values supports affirmance, not reversal.

Andren contends that *IRS* was actually a difficult case. *Id.* at 32. But this assertion rests improperly on hindsight and *ex post* events. To be sure, "[t]he *IRS* defendants fought for seven hard years" before any settled, but the circumstances at the outset did not suggest this trajectory. *Id.*

The District Court took into account the relevant differences, and the weight given especially to contrasting settlement values. As this Court admonished, "the appropriateness of a declining fee scale award structure may depend on the particulars of the case." *Broiler I*, 80 F.4th at 803. Andren identifies nothing undermining the District Court's conclusion that, in light of the risks and possible upside apparent at the beginning of this litigation, "it is unlikely that Co-Counsel would have negotiated the *Interest Rate Swaps* fee schedule in this case." SA9.[8]

---

[8] Andren says *Payment Card* has been applied to cases involving "parking heaters and air cargo shipping," without citing or discussing the relevance of those cases. AOB at 32. Rather, both here and elsewhere in the opening brief, Andren improperly cites his district court memoranda to

**B.    Acting within its discretion, the District Court gave appropriate weight to Ninth Circuit decisions bearing on the *ex ante* fee determination.**

In the first appeal, this Court held that the District Court "should not have categorically assigned less weight to Ninth Circuit cases in which counsel was awarded fees under a megafund rule." *Broiler I*, 80 F.4th at 804. On remand, it did not do so. Balancing the similarities and the differences, the District Court assigned Ninth Circuit fee awards an appropriate weight. It found that Ninth Circuit awards are "relevant data regarding the functioning of the market for this kind of legal services," but, on the other hand, not "particularly good indicators of what the market would bear in this case." SA6.

Not seriously arguing otherwise, Andren fixates on semantics and the meaning of "market rate." He takes issue with the District Court's statement that "'[i]f 25% was the market rate, there would not be a need for

---

elaborate on his arguments. His opening brief is already at the word limit. AOB at 47. This expansive approach disregards that "to prevent evasion of the limits ... the incorporation of arguments by reference in an appellate brief is forbidden." *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012) (collecting cases). Moreover, as Plaintiffs explained in the District Court, *In re Parking Heaters Antitrust Litigation* does not apply the *Payment Card* scale; it awards counsel a one-third fee and simply cites *Payment Card*. No. 15-mc-0940, 2019 WL 8137325, at *7 (E.D.N.Y. Aug. 15, 2019). Similarly, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775, merely cites *Payment Card* and does not endorse its scale.

the Ninth Circuit to artificially control the price by setting that rate by fiat.'" AOB at 21 (quoting Fee Order). Andren spends several pages criticizing this comment, but his criticisms are misplaced. *Id.* at 21–23.

As an initial matter, it is not clear how Andren's argument, even if correct, could move the needle. On remand, the District Court did not categorically discount awards from Ninth Circuit cases, and still concluded that the average size of relevant fee awards was "just below 30%, with the median just above 30%." SA11. Thus, regardless of whether Ninth Circuit awards correctly reflect market rates in that part of the country, the District Court took Ninth Circuit rates into account and still found that the overall market rate for counsel's services was 30%.

Moreover, Andren's arguments are flawed. The Ninth Circuit is a prominent jurisdiction for antitrust class actions. So the District Court was correct that the Ninth Circuit's megafund rule, which "generally caps fee awards on large recoveries at 25%," provides insight on market rates. SA4. A cap is a form of price control when, without the cap, the market rate could be higher. Andren does not dispute that fee awards in the Ninth Circuit *would* be higher without a megafund rule. As this Court recognized, this is what a cap does: "A megafund rule caps fees when the recovery exceeds a given value." *Broiler I*, 80 F.4th at 804 n.5.

Andren's view of "market rate" must yield to law of the case. The District Court followed, not disregarded, this Court's opinion: "[A]s the Seventh Circuit noted, class counsel that 'seek to represent plaintiffs in the Ninth Circuit,' must 'assess the risk of being awarded fees *below the market rate.*'" SA5 (quoting *Broiler I*, 80 F.4th at 804).

According to Andren, "[w]ere the expected value of fees within the Ninth Circuit 'below market,' counsel bringing nationwide cases would institute litigation elsewhere." AOB at 42. His logic is unsound. Even if compensation in the Ninth Circuit is below market rate, rational attorneys could (and do) still take cases there if the risks are slim enough, the potential payouts are high enough, and personal jurisdiction rules prevent counsel from filing elsewhere. Nonetheless, as the District Court recognized, plaintiffs' lawyers, including Class Counsel here, "would likely not bargain for such a rate outside the Ninth Circuit, because they know that judges outside the Ninth Circuit are not bound by a megafund rule and it appears that the market is able to bear a higher price." SA5–6. That is particularly true in cases like this one, where the *ex ante* risks were far from slim and the likely payout at the end was far from staggering.

**C.    The District Court properly considered other evidence bearing on the market rate.**

In determining suitable compensation from the settlements here, the District Court, as directed, considered additional "market evidence" bearing on the award. *Broiler I*, 80 F.4th at 802. Andren seeks to circumscribe (if not exclude) this evidence, but "information from other cases" has always been relevant to the *ex ante* fee inquiry. *In re Stericycle Sec. Litig.*, 35 F.4th 555, 560 (7th Cir. 2022); *see also Synthroid I*, 264 F.3d at 719. Andren does not show any error, much less abuse of discretion, in the District Court's conclusions.

**1.    The District Court correctly assessed *ex post* fee orders.**

Andren would exclude *ex post* awards altogether because the evidence also includes three bids and the *IRS* fee agreement. As he sees it, the latter crowd out the former, as a matter of law. He argues that "[t]his Court consistently finds *ex post* fee awards helpful *only* absent market signals." AOB at 19 (emphasis added).

This again misreads Seventh Circuit precedent. In its seminal decision establishing the "market-mimicking approach," this Court instructed that "similar bargains" provide a "starting point," not the end point. *Synthroid I*, 264 F.3d at 719. Andren disregards the relevant considerations established over two decades ago: "The market rate for legal

fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Id.* at 721.

In the first appeal, this Court also rejected Andren's categorical position. Declining to exclude *ex post* fee awards from the analysis, this Court held they are entitled to "less weight"—not zero weight—than bids and fee agreements "around the time this litigation began." *Broiler I*, 80 F.4th at 802, 804. It makes sense to accord some weight to *ex post* awards because those awards reflect other courts' careful assessments of the bargain counsel would have struck *ex ante*, perhaps in more closely analogous cases than those with bids and fee agreements.

Andren nonetheless pushes a "dilution" rationale for finding reversible error in the District Court's consideration of *ex post* awards. In his view, the problem was including *ex ante* and *ex post* information in the same spreadsheet: "[I]ncluding the only *ex ante* fee agreement into a spreadsheet with 83 fee awards does not give the agreement greater weight—it dilutes it in favor of *ex post* fee awards." AOB at 26–27.

There was no error here. The District Court considered both and gave appropriate weight to both. As a matter of process, nothing in *Broiler*

suggests the District Court, when considering the bids and *IRS* agreement, was required to wall them off from other relevant evidence. All the evidence discussed here was entitled to some weight, of varying degrees. So there is no basis for arbitrarily sidelining any part of it, as Andren proposes. *See Broiler I*, 80 F.4th at 802–04.

The only sensible approach was to analyze the evidence holistically. Considering 49 awards, given varying degrees of weight as discussed above, the District Court calculated an average rate at "just below 30%, with the median just above 30%. This is the best evidence of the market rate that is before the Court." SA11. Reflecting the salience of *IRS*—just as Andren urged—the District Court gave the *IRS* agreement ample weight with a 10x multiplier amounting to 20% of the total weight in the spreadsheet. SA10. Nothing here constitutes any abuse of discretion.

Under this standard, as confirmed by recent authority, reversal is proper "only if 'the record contains no evidence upon which the court could have rationally based its decision.'" *Federal Trade Commission v. Day Pacer LLC*, No. 23-3310, 2025 WL 25217, at *10 (7th Cir. Jan. 3, 2025) (Brennan, J.) (quoting *S.E.C. v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019)). There is ample evidence; so Andren fails to show any excess of discretion.

With the evidence more than adequate, Andren pivots to attacking the District Court's rationale for giving weight to the *ex post* awards. "[T]he order wrongly assumes," Andren asserts, "that *ex post* awards *are* the market." AOB at 23. He quarrels, in particular, with the District Court's finding that "the sheer volume of *ex post* awards, relative to the minimal number of *ex ante* agreements, has a substantial impact on the expectations of class counsel" in the hypothetical *ex ante* calculus. *Id.*

Rather than erring, the District Court was correct that "clients and counsel, to the extent they bargain *ex ante*, do so in the context of the market shaped by *ex post* awards." SA14. This is not "negotiat[ing] in the shadow [of] the law," as Andren frames it. AOB at 23. It is negotiating against the backdrop of real-world market conditions: at the outset of any case, counsel estimates the award they might receive *ex post*, and that estimate is generally guided by *ex post* awards in similar cases.

Here again, Andren does not entirely disagree with the District Court's analysis. As he recognizes: "'The judge, in other words, is trying to mimic the market in legal services.'" AOB at 19 (quoting *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998)). By Andren's own account, "[p]utative lead counsel assess their risk and price their services accordingly based on their time investment in similar class actions and their broader litigation

experience." AOB at 38. He is exactly right.

Hence, if Class Counsel were negotiating an *ex ante* fee in 2016, they would unavoidably take heed of a market where, it is uncontested, the "prevalence of awards" is "at least 30%." SA14.

On *ex post* awards, Andren did not carry his burden to present evidence supporting his proposal for a lower percentage award. As the District Court stated: "Notably, Andren did not present the Court with his own examples of *ex post* awards to support his contention that a rate between 20% and 26.6% would be appropriate here." SA14.

Accusing the District Court of relying on "cherry-picked" fee awards, Andren asserts he "certainly could have cited examples" of *ex post* orders supporting a lower award. AOB at 27. In doing so, he ignores the District Court's comprehensive assessment of relevant data.

Secondary sources collecting information on fee awards also support the reasonableness of the District Court's decision to award 30% of the settlement fund. Examining awards between 2009–2022, a study cited by Class Counsel "found the median award rate to be 30% for recoveries between $100 and $249 million." SA12. The District Court found this study "most persuasive" because it had a "longer and more recent range." SA13. Again not entirely disagreeing, Andren identifies supportive evidence

himself: "[O]ne treatise showed the fee award rate for recoveries in the *Seventh Circuit* from 2006-2011 was 31.6% and a more recent study from 2009 to 2022 found the median award rate to be 30% for recoveries between $100 and $249 million." AOB at 16. Keeping in mind the District Court had a zone of discretion, it was "entitled to determine the probative value" of these submissions and did not clearly err in the findings made. *Batt*, 241 F.3d at 895.

Discretion is not abused when the appellant, charged with demonstrating reversible error, identifies awards "*above* the range of the Court's calculation" and, therefore, "contrary to Andren's argument that the Court's calculated range is too high." SA12 (emphasis added). Having identified no methodological or evidentiary flaws, Andren's "cherry picking" argument is an invitation to engage in disfavored "appellate micromanagement" of fee determinations. *Fox v. Vice*, 563 U.S. 826, 838 (2011).

**2. A quick look at the lodestar, and additional Seventh Circuit law, fortify the award.**

Andren hints at, but does not develop, an argument based on a lodestar cross-check. AOB at 43 n.12. It was not required. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011). Although the End User Class sought the award based on a percentage, a quick look at

a cross-check confirms reasonableness. The multiplier, had one been awarded, was just 1.8—well within reason on the record in this case. R. 5161 at 15–17; R. 7309.

Seventh Circuit law has long recognized that fee awards in class actions must account for contingent risk. "The need for such an adjustment is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *Matter of Continental Illinois Secs. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992).

Andren makes this appellate review more complicated than necessary. To return to percentage-based awards, in *Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005), this Court affirmed a 30% class action fee award calculated under an *ex ante* analysis. *Id.* at 598, 600. The common fund was much smaller—$7.25 million, certainly a relevant difference—but there are similarities. *Id.* at 598. It was enough that the fee application "contained an analysis of the strength of the class's case, data on fees awarded in other class actions in the jurisdiction, and evidence of the quality of legal services rendered—the same type of evidence needed to mimic the market per *Synthroid I*." *Id.* at 600. On remand here, and in their initial application, Class Counsel covered this ground and much more

as legal and factual support for their fee request. A115; SuppA17, 43, 57; R. 5161.

In *Taubenfeld*, the lower court "considered awards made by courts in other class actions" in the Northern District of Illinois "where counsel was awarded fees amounting to 30-39% of the settlement fund." *Taubenfeld*, 415 F.3d at 600. There was "a significant degree of risk of nonpayment" because, akin to this case, "an SEC investigation essentially cleared [the defendant] of any perceived wrongdoing." *Id.* Emphasizing the deferential standard of review, this Court held: "[I]t cannot be said that there is no evidence supporting the attorneys' fees granted in this case or that the district court abused its discretion in making the award." *Id.*

Because the same is true here, this Court should affirm. *See also Day Pacer*, 2025 WL 25217, at *10 (recently reiterating this standard of review).

## D. Andren disregards the limited scope of the remand.

As Andren asserts, of course the law of the case doctrine applies. AOB at 19. But he ignores its full effect and its companion doctrine: the "scope of the remand." *U.S. v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996). Under these principles, especially in combination, there is no relitigating *all* issues resolved in the first appeal.

Contrary to Andren's assumption, the basic background facts bearing on Class Counsel's performance cannot be revisited. AOB at 4–11, 36–37, 38 n.9 (brushing aside End User Class as litigating, for years, a "follow-on" action). If this Court is "unable to accept" findings in support of a fee award, it says so. *Continental*, 962 F.2d at 568. The *Broiler* panel did not disturb the District Court's findings on the caliber of Class Counsel's work, the risk assumed, and other familiar considerations to achieve $181 million in settlements. A-72–73, 76–78. This is evident "from the [*Broiler*] opinion as a whole" and this Court's remand of "certain issues exclusive of all others." *U.S. v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002) (discussing scope of remand doctrine).

So the District Court's findings on Class Counsel's performance, fully supported by the record then and now, stand unblemished. If this is not explicit from *Broiler*, it is implicit and that is enough. *Id.* Phrased in terms of law of the case, "when an issue is once litigated and decided, that should be the end of the matter." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 912 (7th Cir. 2005).

Another limitation ensures finality of issues here. A renewed appeal "brings up for revision nothing but the proceedings subsequent to the mandate." *Roberts v. Cooper*, 61 U.S. 467, 481 (1857). This applies to class

action objections. *See, e.g.*, *In re Wawa, Inc. Data Security Litig.*, No. CV 19-6019, 2024 WL 1557366, at *19, 23 (E.D. Pa. Apr. 9, 2024) (on remand, "re-examining the reasonableness of the requested fee award in light of the concerns explained by the Third Circuit" and rejecting objections as "unconvincing").

The new Fee Order thus properly takes the background facts as established. SA2. Class Counsel's performance *during* the litigation was not the reason for the remand. It has no nexus to "the bargain the parties would have struck *ex ante*"—the only point remanded. *Broiler I*, 80 F.4th at 805. It is now settled, as this Court accepted in the first appeal, that Class Counsel's work was "exemplary." *Id.* at 801; SA2; A-78.

Andren does not entirely disagree. He describes Class Counsel as "some of the most skillful antitrust attorneys in the country" practicing at the "best antitrust plaintiffs firms." AOB at 20, 37. The District Court did not clearly err by concluding that "top-notch counsel" in the field did top-level work. *Id.* at 42. In any event, to further finality and judicial economy, "litigation should come to an end" on this issue and others already decided. *Creek v. Village of Westhaven*, 144 F.3d 441, 446 (7th Cir. 1998).

**E. Andren's additional challenges to the District Court's process are groundless.**

Andren floats a number of diversionary arguments. Two, both concerning the spreadsheet, warrant a brief rejoinder.

**1. The District Court did not improperly rely on expert declarations.**

In the first appeal, this Court also remanded to allow possible discovery from two experts for the direct purchaser class who submitted declarations concerning attorney fees. *Broiler I*, 80 F.4th at 802. To simplify the remand, in their renewed fee application, Class Counsel did not rely on those expert reports or opinions. A115; SuppA17, 43, 57; R. 6910, 6911. The new Fee Order does not rely on them either. SA1–15. Tying up the loose ends, the District Court concluded that "no discovery is warranted" and denied Andren's motion to strike the expert evidence "as moot." SA15.

Andren now contests this ruling, but his challenge is a stretch. He argues that the accompanying spreadsheet blindsided him by "including tables drawn from non-representative fee awards *listed in one of the declarations.*" AOB at 13 (emphasis added); R. 7309 at 16–18. Putting aside whether the cited awards were "representative," Andren cites no authority for his theory that the District Court could *not* rely on public information— the terms of the fee awards—simply because it also appears in someone's declaration.

Contrary to Andren's suggestion, the awards were not "submitted by an expert" as though the data would not otherwise exist. *Id.* at 27. Andren does not contend the District Court mischaracterized the terms or that he was unaware of those awards as part of the legal landscape on attorney fees. At the motion hearing on remand, Andren's counsel told the District Court: "I don't think we have a strong -- an argument here, Your Honor, to be candid." A-217.

So there was no sandbagging. Even more pertinent to appellate review, Andren must demonstrate that the District Court's process impacted his "substantial rights"—meaning, prejudiced him. Fed. R. Civ. P. 61 (harmless error). He makes no showing that a different process in citing the fee awards would, or even might, have led to a different result. This is no reason to reverse.

### 2. The spreadsheet was not required to break down all 49 fee awards based on the stage of the litigation.

Andren faults the District Court's spreadsheet because it lacked "information about the stage at which the case settled"—that is, every case in the spreadsheet. AOB at 36. The District Court would have been within its discretion to include even more details on each award, but, as a matter of Seventh Circuit law, Andren fails to show this was mandatory.

The fine-tuning has reached the point of diminishing returns. Since Andren first objected to Class Counsel's fee request, the gap on what each side sees as reasonable has narrowed to 3%—the difference between 27% and 30%. *Compare* AOB at 44 *with* SA15. Especially against this backdrop, there is no need for another layer of calculation requiring district courts, when examining a *collection* of relevant fee awards, to isolate each based on stages of litigation. Trial judges are not "green-eyeshade accountants" expected to spend valuable judicial time categorizing every variable, for each comparator award, and giving each its own weight. *Fox*, 563 U.S. at 838.

Andren is also mistaken that Seventh Circuit law compels his suggestion. In class actions, just as in other actions, "the risk of loss varies over the life of a case." *Continental*, 962 F.2d at 569. This is "a refinement a district judge may or may not want to take into account," without being put "into a straitjacket." *Id.* If anything, "failure to make any provision for risk of loss," as Andren claims occurred here, "may result in systematic *undercompensation* of plaintiffs' counsel in a class action"—not overcompensation. *Id.* (emphasis added).

As a tool to sharpen the fee amount, Andren's proposed rewrite of the spreadsheet offers conjectural benefits at most. This is no reason to send

the case back for another go on fees. *See Webb v. Board of Educ.*, 471 U.S. 234, 243 n.19 (1985) (discouraging litigation "not likely to affect the amount of the final fee").

In addition to challenging the spreadsheet, Andren appears to argue that the District Court did not consider the stage of litigation in *this* case, in particular. AOB at 3, 15, 36. This is incorrect. The District Court recited those background facts in its first fee ruling. A-77–78. After this Court did not take issue with the point in *Broiler*, the District Court soundly assumed familiarity and moved on: "The Court's task on remand is to determine how the Seventh Circuit's instructions, and the *Payment Card* fee award and *Interest Rate Swaps* fee agreement, change the Court's calculus." SA2–3. Following this Court's mandate is not reversible error.

Andren's final issue for review fares no better. In his Statement of Issues, he lays the groundwork to argue that the District Court "err[ed] in determining that *ex ante* bids in cases involving prior government investigations merely set a 'floor' of the market price range." AOB at 3. But he never follows up. This argument "is so little developed in [his] opening brief in this court that it must be deemed waived." *Jones Motor Co., Inc. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1192 (7th Cir. 1999); *see also* Fed. R. App. P. 28(a)(8)(A).

**F.    This Court may set the fee but it should affirm.**

In the first appeal, this Court did not reverse any aspect of the District Court's initial Fee Order. Instead, it vacated and remanded for "greater explanation and consideration." *Broiler I*, 80 F.4th at 805. As fee appeals go, this disposition is common. It often occurs, as here, when the law on class action fee awards is clarified. *See, e.g., Stericycle*, 35 F.4th at 572. This Court's opinion did not call the District Court's good faith, and "fine job" of managing this complex litigation, into question. *Broiler I*, 80 F.4th at 802.

Andren nonetheless asks the Court to "set a reasonable fee in lieu of remand." AOB at 43. Appellate courts have the authority to do that. *See* 28 U.S.C. § 2106. But this exceptional step is unwarranted in a case where the appellant concedes the award could be as high as $47.2 million, or nearly 27% of the common fund. AOB at 44. For all the ink devoted to Class Counsel's fee award, this now presents a gap of just 3% compared to the District Court's 30% award. SA15. Class members are not being fleeced. The $4.46 million awarded above Andren's proposed number is 2.5% of the $181 million in settlements recovered for them.

Andren admits the line can be drawn at 26.6% only if "this Court finds the Chicago Teachers' agreement conclusive." AOB at 44. *IRS* is a

relevant data point—given tenfold weight in the spreadsheet—but, for the reasons already discussed, it is far from conclusive.

The sum of the record supports the District Court's discretionary determination to award 30% from the common fund. This amount falls "within a broad range" of reasonableness. *Broiler I*, 80 F.4th at 802. Framed in terms of Andren's unusual request for relief, the District Court's findings on remand easily bridge the 3% gap.[9]

## VI.   CONCLUSION

The new Fee Order should be affirmed.

---

[9] On reply, to the extent Andren tries to walk back his position, the turnabout comes too late. Under the party presentation rule, "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008).

DATED: January 15, 2025      Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
      STEVE W. BERMAN

Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
shanas@hbsslaw.com

Kevin K. Green
HAGENS BERMAN SOBOL SHAPIRO LLP
533 F Street, Suite 207
San Diego, CA 92101
Telephone: (619) 929-3340
keving@hbsslaw.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison Deich
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue NW
Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Counsel for Plaintiff-Appellee End User
Consumer Plaintiff Class*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This document complies with the type-volume limitation of Cir. R. 32(c) because it contains 10,132 words, excluding the parts exempted by Fed. R. App. P. 32(f), as calculated by the word processing system used to prepare the document.

2.     This document further complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and Cir. R. 32(b) because it has been prepared in a proportionately spaced typeface of 14 points or more.

DATED: January 15, 2025

*/s/ Steve W. Berman*
STEVE W. BERMAN

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Steve W. Berman*

STEVE W. BERMAN
