No. 24-2387

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

IN RE: BROILER CHICKEN ANTITRUST LITIGATION

END USER CONSUMER PLAINTIFF CLASS,
*Plaintiff-Appellee*

v.

TYSON FOODS, INC.,
*Defendants*

APPEAL OF: JOHN ANDREN, *Objector*

U.S. District Court for the Northern District of Illinois, Eastern Division
The Honorable Thomas M. Durkin / No. 1:16-cv-08637

## SUPPLEMENTAL APPENDIX OF PLAINTIFF-APPELLEE
## END USER CONSUMER PLAINTIFF CLASS
### (Pages SuppA1 – SuppA64)

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue
Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Brent W. Johnson
COHEN MILSTEIN SELLERS &
TOLL, PLLC
1100 New York Avenue NW
Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com

*Counsel for Plaintiff-Appellee End User Consumer Plaintiff Class*

# TABLE OF CONTENTS

Order, filed Dec. 14, 2016 (ECF 248) ....................................................SuppA1

Declaration of Shana Scarlett in Support of Memorandum
in Support of End-User Consumer Plaintiffs' Motion
for Attorney's Fees, Expenses, and Class Representative
Awards, filed Oct. 27, 2021 (ECF No. 5161-1) ................................ SuppA4

Reply in Support of End-User Consumer Plaintiffs'
Renewed Motion for Attorneys' Fees, filed Nov. 3, 2023
(ECF 7032) ...................................................................................SuppA17

Supplemental Memorandum in Support of End-User
Consumer Plaintiffs' Renewed Motion for Attorneys'
Fees, filed Apr. 9, 2024 (ECF 7202) ............................................ SuppA43

Reply in Support of Supplemental Memorandum in Support
of End-User Consumer Plaintiffs' Renewed Motion for
Attorneys' Fees, filed Apr. 30, 2024 (ECF 7231) ......................... SuppA57

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MAPLEVALE FARMS, INC., individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| KOCH FOODS, INC., JCG FOODS OF ALABAMA, LLC, JCG FOODS OF GEORGIA, LLC, KOCH MEATS CO., INC. TYSON FOODS, INC., TYSON CHICKEN, INC., TYSON BREEDERS, INC., TYSON POULTRY, INC., PILGRIM'S PRIDE CORPORATION, PERDUE FARMS, INC., SANDERSON FARMS, INC., SANDERSON FARMS, INC. (FOODS DIVISION), SANDERSON FARMS, INC. (PRODUCTION DIVISION), SANDERSON FARMS, INC. (PROCESSING DIVISION), WAYNE FARMS, LLC, MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS, LLC, MOUNTAIRE FARMS OF DELAWARE, INC., PECO FOODS, INC., FOSTER FARMS, LLC, HOUSE OF RAEFORD FARMS, INC., SIMMONS FOODS, INC., FIELDALE FARMS CORPORATION, GEORGE'S, INC., GEORGE'S FARMS, INC., O.K. FOODS, INC., O.K. FARMS, INC., and O.K. INDUSTRIES, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 16-CV-8637<br><br>and Related Cases<br>16-CV-8737; 16-CV-8851;<br>16-CV-8931; 16-CV-9007;<br>16-CV-9421; 16-CV-9490<br>16-CV-9589; 16-CV-9684<br><br><br><br><br>Judge Thomas M. Durkin |
| *Defendants.* | ) | |

**ORDER**

For reasons set forth orally at the status conference of December 9, 2016, the

Court is now convinced that end-purchaser consumer plaintiffs require separate

interim class counsel. The Court believes that interim class counsel for direct and

**SuppA1**

indirect purchasers have a conflict of interest because of the tension that exists as to how much of any alleged price increase was passed on by the direct and indirect purchasers to the end-purchaser consumer plaintiffs.

Before the Court are the applications for appointment as interim class counsel for end-purchaser consumer plaintiffs from Hagens Berman Sobol Shapiro LLP and Wolf Haldenstein Adler Freeman & Herz LLP. The Court has carefully reviewed the submissions and consulted with other judges who have familiarity with the two law firms. Both firms are well qualified based on experience and have adequate size and resources to competently represent the end-purchaser consumer plaintiffs. Moreover, both firms have local offices, so there is no need for the appointment of separate liaison counsel.

The Court appoints Hagens Berman as interim class counsel for the end-purchaser consumer plaintiffs, in large part because of their aggressive and independent advocacy relating to the conflict that the Court earlier identified. Although the Court in its previous order dated October 14, 2016 (R. 144[1]) thought there was simply a "potential" for a conflict, the Hagens Berman submission renewing their request for appointment of separate counsel (R. 218) convinced the Court to reverse its earlier decision. In the Court's view, Hagens Berman is in the best position to advocate for the end-purchaser consumer plaintiffs.

---

[1] Citations are to the docket in the lead case, 16-CV-8637.

**SuppA2**

In its submission, Hagens Berman represents that it can and will work cooperatively and efficiently with other interim class counsel. The Court believes Hagens Berman will be able to do so, and will expect nothing less.

For the foregoing reasons, the Application of Wolf Haldenstein Adler Freeman & Merz LLP For Appointment As Interim Class Counsel For End User Consumer Plaintiffs, R. 246, is denied and the Application For Appointment Of Hagens Berman Sobeol Shapiro LLP As Interim Class Counsel For End Purchaser Consumer Plaintiffs, R. 247, is granted.

**ENTERED:**

_____
               Honorable Thomas M. Durkin
               United States District Judge

Dated: December 14, 2016

**SuppA3**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 1:16-cv-08637 |
| This Document Relates To: | Honorable Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | |

**DECLARATION OF SHANA SCARLETT IN SUPPORT OF MEMORANDUM**
**IN SUPPORT OF END-USER CONSUMER PLAINTIFFS' MOTION**
**FOR ATTORNEY'S FEES, EXPENSES, AND**
**<u>CLASS REPRESENTATIVE AWARDS</u>**

I, Shana E. Scarlett, state under oath, as follows:

1.　　　I am a partner at Hagens Berman Sobol Shapiro LLP (Hagens Berman). I am admitted to this Court *pro hac vice* and am one of the Interim Lead Counsel appointed by the Court for the End-User Consumer Purchaser Plaintiffs (EUCPs). I submit this declaration in support of the EUCPs' Plaintiffs' Motion for an Award of Attorney's Fees, Expenses and Class Representative Awards. I have full knowledge of the matters stated herein and would testify to these facts if called upon.

2.　　　From the outset of this case, Hagens Berman and Cohen Milstein Sellers & Toll PLLC (Cohen Milstein) have worked together to ensure that the EUCPs' interests are vigorously represented. Hagens Berman and Cohen Milstein were the first to raise the issue that having the commercial indirect class also represent consumers' interests would lead to a conflict of interest. In raising this issue, Hagens Berman and Cohen Milstein conducted an independent investigation

**SuppA4**

into the consumer channel, retained expert economists to evaluate and explain the different channels, and provided the Court with a legal ethicist's expert opinion – even though there was no certainty they would be appointed as lead counsel.

3.      Hagens Berman and Cohen Milstein have taken this case on contingency, meaning that they have not yet been paid. They have also split the significant out-of-pocket expenses associated with retaining experts and hosting defendants' documents.

4.      Like many antitrust cases, this case has been lengthy, complex, and – at times – hotly contested. But even when compared to other antitrust cases, this case in particular has been especially challenging. For one thing, there are many defendants in this case. Each of them has hired well-known and well-respected antitrust counsel. Conducting discovery and negotiating with counsel from many different firms multiplies the challenge and risk of litigating.

5.      For example, at the beginning of this case, EUCPs overcame multiple joint and individual motions to dismiss and one motion to reconsider the Court's order denying the motions to dismiss. The first round of motions to dismiss occurred in 2017. The second round occurred in 2018, once EUCPs had developed enough evidence to add Agri Stats as a defendant. EUCPs were the only class at the time to add Agri Stats as a defendant, and to add a rule of reason claim for defendants' information exchange of sensitive business information.

6.      Despite this case's complexity, EUCPs have sought to avoid duplication by coordinating discovery assignments with the other classes. For example, the classes jointly negotiated the discovery protocols for this case and conducted a coordinated, joint review of the millions of documents that were produced in the litigation. Where possible, classes have also split costs jointly, such as splitting the cost of hosting Defendants' voluminous document productions. The classes' joint review team sifted through more than 13 million documents while

building this case from the ground up. For an extended period of time, experienced staff attorneys and one non-attorney reviewer worked full-time on behalf of EUCPs participated in the joint document review, identifying critical documents and helping to prepare for depositions. Counsel also worked together to negotiate search terms, ensure the completeness of discovery, and to schedule more than 180 depositions.

7. Defendants have also vigorously litigated this case. Defendants have noticed over 230 depositions of class plaintiffs, opt-out plaintiffs, and third parties. In short, more than 400 depositions have occurred in this case to date. There have been many weeks where three or more depositions have occurred on the same day and back to back each week.

8. Even with this incredible workload, EUCPs have worked to keep their team of lawyers lean and efficient – for example, EUCPs attended the opt-out depositions that were in the EUCP distribution channel, rather than attending every deposition. This allowed EUCPs to efficiently pursue testimony from channel participants confirming their economic measurements of overcharges. Because of the intense deposition schedule, some attorneys have worked full-time on this case while forgoing other opportunities. Many of these opt-out depositions were attended via video or telephone to reduce the travel expenses for the class and the time expended by attorneys. Due to time differences and the volume of depositions, EUCPs attorneys often began their day at 6:00 A.M. by appearing at deposition, and then worked into the late afternoon or evening preparing for the next day's deposition. Many of these depositions occurred during the height of the pandemic.

9. EUCPs have also taken lead on some portions of the classes' pursuit in this case. EUCPs took lead on every Agri Stats deposition in this case, and took lead at depositions questioning employees of Pilgrim's, Perdue, and Tyson. In total, EUCPs' core team of six

attorneys led questioning at approximately 40 depositions of defendant-employees. EUCPs also took lead on questioning some third parties, such as USDA witnesses. Preparing for these depositions takes significant time and effort. To help the classes prepare for these difficult depositions, experienced staff attorneys in the antitrust groups of Hagens Berman and Cohen Milstein devoted their full time to identifying and selecting documents used at depositions from amongst the 13 million documents produced by the Defendants.

10. EUCPs also worked with the other classes to conduct significant written discovery, including serving document requests, interrogatories, and requests for admission. In addition, EUCPs individually served and negotiated subpoenas on dozens of third parties in the distribution chain to seek documents and structured data that would be used to show to pass-through. At times, this document discovery was highly contentious, with multiple parties filing protective orders. These motions required additional time for meet-and-confers, briefing, and hearing preparation. EUCPs have taken lead on drafting some of the responses to these motions.

11. For example, when Agri Stats sought a protective order to limit its document production to a two-year period, EUCPs (as the only class who had named Agri Stats as a defendant), opposed. Magistrate Judge Gilbert adopted EUCP's reasoning and denied the request for the protective order. As a result, Agri Stats produced a full set of documents and all three classes used these Agri Stats documents in support of their motions for class certification.

12. This case was also challenging because of the class plaintiffs developed the evidence on their own, without the benefit of the prior Department of Justice investigation. When the Department of Justice intervened in this case and sought a stay, the civil plaintiffs had already spent over two years litigating their claims. They had negotiated and received significant document productions from Defendants and deposed more than 80 defendant witnesses. The

proposed stay increased the risk to EUCPs because it halted all discovery into Defendants' misconduct, while leaving Defendants open to continue discovery on third parties and plaintiffs, including deposing named plaintiffs. EUCPs were the only class to oppose the stay – resulting, in part, in the Court entering a much narrower stay than originally requested.

13.     As part of its investigation, the government subpoenaed the class plaintiffs and requested Defendants' document productions. Now that there are criminal charges, the government is using documents negotiated by class counsel in its criminal trial.

14.     To prove that the overcharge caused by Defendants' misconduct passed through to the consumer class, Class Counsel negotiated discovery with dozens of distributors and grocery stores. As a result of these subpoenas, Class Counsel received troves of data reflecting actual purchases and sales through the distribution chain, which Plaintiffs' experts were able to use to prove systemic, class-wide pass through of the overcharge. In addition, Class Counsel has participated in more than 100 depositions of opt-out distributors and retailers, using these defendant-noticed depositions as an opportunity to solidify the pass-through evidence for the consumer class.

15.     Plaintiffs worked closely with their experts to develop this case. In support of Plaintiffs' motion for class certification, Plaintiffs' experts submitted five reports – totaling over 200 pages. Defendants had an opportunity to depose each of Plaintiffs' experts after they submitted these reports, and EUCPs defended these depositions. Plaintiffs' experts also submitted reply reports addressing the errors with the criticisms launched by Defendants' economic expert. Defendants responded by noticing a second deposition of Dr. Sunding, which EUCPs again defended. In addition to these reports, Plaintiffs have also served Defendants with

their experts' merits reports, totaling 329 pages, in accordance with the Court's Scheduling Order.

16.     The named plaintiffs have also expended significant time and effort to bring this case. In response to Defendants' interrogatories and requests for production, some class representatives' personal email accounts were searched. Defendants used these documents to ask questions tangentially related to the claims, including questions on what cooked food products a class representative bought at his church's fundraiser. Class representatives sat through more 97 hours of depositions, which lasted an average of four hours – with some going up to seven hours. All of these depositions were attended by multiple defense counsel, and at some depositions, named partners – some of whom have more than 30 years of litigation experience – led the questioning. The named plaintiffs previously submitted declarations in support of the settlement that summarize the time they spent on this case.

17.     Through June 2021, counsel for EUCPs has invested more than 67,522 hours litigating this case. The firms who have conducted work on behalf of EUCPs have each submitted a declaration attesting to their time and expenses. The vast majority of the time has been expended by a core team of lawyers at Hagens Berman and Cohen Milstein. Less than 1% of hours have been billed by outside firms. Most of the work performed by outside counsel has involved communicating with the class representatives. The following table compares the time expended by Hagens Berman, Cohen Millstein, and other firms representing the EUCP class:

| Hours Expended on Behalf of the Class | | |
|---|---|---|
| **Firm** | **Hours Expended** | **Lodestar** |
| Hagens Berman | 43,505.9 | $18,958,660 |
| Cohen Millstein | 23,250.9 | $13,354,794 |
| All Other Firms | 765.4 | $540,348 |
| **TOTAL** | **67,522.2** | **$32,853,802** |

18.     Despite the size and complexity of this case, Class Counsel has worked hard to keep the team relatively small. This staffing strategy means that fewer attorneys spent a larger proportion of their time litigating this case. As a result, they have deeper institutional knowledge of the facts, law and theory, produce better work product and litigate more efficiently. Our small team knows the case well and understands the complexity and nuances of the litigation.

19.     The total number of hours reasonably expended on this litigation by my firm, Hagens Berman, from inception through June 30, 2021 is 43,505.90. The total lodestar for my firm at current rates is $18,958,660. Expense items are billed separately and are not duplicated in my firm's lodestar. A detailed breakdown of the hours expended by each employee at my firm and their hourly rate is attached hereto as **Exhibit A.**

20.     The time records submitted to Hagens Berman by Cohen Milstein, Shindler, Anderson, Goplerud & Weese, P.C., the Saunders Law Firm, Wolf Haldenstein Adler Freeman & Herz, LLP, and Burns Charest, LLP demonstrate that counsel for the EUCPs have worked for nearly five years and years and devoted 67,522.2 hours to this litigation (through June 30, 2021). Applying the rates customarily charged by those attorneys and legal professionals to the hours expended yields a lodestar of $32,853,802 (through June 30, 2021).

21.     The following table provides an aggregated summary of the lodestar for EUCPs through June 30, 2021:

| Lodestar of Proposed Co-Lead Counsel | | | |
|---|---|---|---|
| **Category of Timekeeper** | **Total Hours** | **Mean Hourly Rate** | **Lodestar** |
| Partner | 13,640.70 | $777 | $10,610,774 |
| Of Counsel | 1274.5 | $638 | $813,458 |
| Investigator | 105.2 | $525 | $55,230 |
| Associate | 8,749.00 | $523 | $4,577,458 |
| Discovery Counsel | 5,941.00 | $523 | $3,108,650.00 |
| Contract Attorney | 2,629.60 | $405 | $1,065,349 |
| Staff Attorney | 25,021.50 | $385 | $9,650,784 |
| Paralegal | 4,932.70 | $333 | $1,647,292 |
| Summer Associate | 53.5 | $240 | $12,868 |
| Legal Assistant | 250.3 | $175 | $43,802 |
| Non-Attorney Reviewer | 4158.8 | $175 | $727,790 |
| All Non-Lead Firms | 765.4 | $705 | $540,348 |
| **TOTAL** | **67,522.2** | | **$32,853,803** |

22.      Counsel for the EUCPs has invested significant resources into this case, including by dedicating thousands of attorney and staff hours to this litigation. These attorneys and staff have devoted their time to this case even when they could have worked on other cases.

23.      Counsel has worked to maximize efficiency and minimize unnecessary or duplicative billing. All firms who have performed work on behalf of the EUCPs have been instructed by Interim Lead Counsel to keep detailed time and expense records, including what time would be considered for reimbursement and how expense requests must be recorded.

24.      In addition to the hours expended, counsel for the counsel for EUCPs have incurred a total of $9,007,062.95 in expenses associated with this litigation. Each firm has provided a summary describing these expenses. Counsel for EUCPs do not seek full reimbursement for their expenses at this time. Rather, they seek to reimburse a portion – $8.75 million – of the costs incurred to date. Counsel for EUCPs will seek reimbursement for the remaining $257,062.95 if the class recovers additional funds, in addition to any additional expenses incurred during further litigation.

25.     Hagens Berman and Cohen Milstein established a litigation fund used to pay certain large expenses in this case. Hagens Berman has maintained that fund and recorded and documented all expenses. From the inception of this case through October 21, 2021 a total of $8,765,432.86 has been, or is in the process of being paid from that fund. These payments are included in the total above. A detailed breakdown of these expenses paid from the litigation fund is attached hereto as **Exhibit B**. All of these expenses were incurred on behalf of the EUCP class without any guarantee they would ultimately be recovered. Most of those expenses are associated with hosting the documents in this case in an online database and the cost of the economic experts. Some costs have also been incurred to obtain structured data and making that data usable for our experts.

26.     My firm, Hagens Berman, has advanced and incurred an additional $154,601.26 in unreimbursed litigation costs since the inception of this case through September 2021. These are reasonable litigation costs that were incurred in this case for the benefit of the settlement class members. A detailed breakdown of these expenses paid from the common fund is attached hereto as **Exhibit C**. The $154,601.26 is included in the total costs above.

27.     A significant portion of Class Counsel's expenses ($7,064,226) relate to the work Plaintiffs' economic experts performed on behalf of the class. Class Counsel's other expenses are common expenses in litigation of this size. Before the COVID-19 pandemic Class Counsel traveled to hearings and depositions, resulting in expenses of $109,958.98. Another large expense ($952,113.64) for Class Counsel was hosting Defendants documents (a significant cost, even after being split among the classes) and hosting Plaintiffs' discovery documents.

28.     The class noticed published for this settlement has informed class members that counsel would seek: (1) no more than 33.3% of the settlement fund or $60,273,000 (2) costs not

to exceed $8.75 million; and (3) service awards of up to $2,000 for each named plaintiff. As of the date of this declaration, no class members have yet objected to this settlement.

29.     Class Counsel is filing this Motion ahead of the opt-out deadline and will make these briefs available on the settlement website (www.overchargedforchicken.com) so that interested class members will have an opportunity to review and comment.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: October 27, 2021

　　　　　　　　　　　　　　　　___/s/ Shana E. Scarlett_____
　　　　　　　　　　　　　　　　SHANA E. SCARLETT

**EXHIBIT A**

**HAGENS BERMAN SOBOL SHAPIRO, LLP**

**Reported Hours and Lodestar**
Inception through June 30, 2021

| Timekeeper | Professional Status | Hours | Current Rate | Lodestar |
|---|---|---|---|---|
| Steve Berman | P | 196.5 | $1125 | $221,062 |
| Elaine Byszewski | P | 58.5 | $700 | $40,950 |
| Elizabeth Fegan | P | 760.6 | $750 | $570,450 |
| Daniel Kurowski | P | 307.3 | $650 | $199,745 |
| Barbara Mahoney | P | 69.5 | $625 | $43,437 |
| Chris O'Hara | P | 72.0 | $675 | $48,600 |
| Jerrod Peterson | P | 77.8 | $625 | $48,625 |
| Rio Pierce | P | 1,754.5 | $700 | $1,228,150 |
| Shana Scarlett | P | 3,716.7 | $800 | $2,973,360 |
| Craig Spiegel | P | 100.5 | $800 | $80,400 |
| Jason Zweig | P | 78.7 | $725 | $57,057 |
| Jeannie Evans | OC | 1,044.8 | $625 | $653,000 |
| Benjamin Siegel | OC | 92.5 | $600 | $55,500 |
| Hannah Brennan | A | 21.2 | $500 | $10,600 |
| Andrew Gordon | A | 32.8 | $350 | $11,480 |
| Breanna Van Engelen | A | 4,343.2 | $500 | $2,171,600 |
| Jongguk Choi | SA | 7,732.5 | $350 | $2,706,375 |
| Helen Hsu | SA | 6,163.7 | $350 | $2,157,295 |
| Jeff Lang | SA | 3,912.5 | $500 | $1,956,250 |
| Patrick Ryan | SA | 4,659.6 | $350 | $1,630,860 |
| Jennifer Conte | PL | 20.5 | $300 | $6,150 |
| Jeaneth Decena | PL | 1,890.2 | $350 | $661,570 |
| Carrie Flexer | PL | 15.3 | $325 | $4,972 |
| Chavay Jones | PL | 363.8 | $250 | $90,950 |
| Megan Meyers | PL | 13.4 | $275 | $3,685 |
| Brian Miller | PL | 1,580.5 | $350 | $553,175 |
| Amy Elder | R | 4158.8 | $175 | $727,790 |
| Chan Lovell | LA | 250.3 | $175 | $43,802 |
| Stephanie Verdoia | SUM | 17.7 | $100 | $1,770 |
| **TOTAL** | | **43505.9** | | **$18,958,660** |

**Role Legend**

| | | | |
|---|---|---|---|
| P | Partner | SUM | Summer Associate |
| OC | Of Counsel | PL | Paralegal |
| A | Associate | LA | Legal Assistant |
| SA | Staff Attorney | R | Non-Attorney Reviewer |

**EXHIBIT B – LITIGATION FUND**
**EXPENSES SUMMARY**

Firm: Common Fund
      Established by Cohen Millstein Sellers & Toll, PLLP
      And Hagens Berman Sobol Shapiro, LLP

Reporting Period: Inception to October 22, 2021.

| Expense | Amount |
|---|---|
| Service Process | $5,183.14 |
| Mediation | $116,500.31 |
| Transcripts | $154,168.61 |
| Structured Data Collection & Cleanup | $512,966.32 |
| Document Hosting | $952,113.64 |
| Experts, Consultants, & Special Master Fees | $7,024,500.84 |
| **TOTAL** | **$8,765,432.86** |

**EXHIBIT C – HAGENS BERMAN**
**EXPENSES SUMMARY**

Firm: Hagens Berman Sobol Shapiro, LLP
Reporting Period: Inception through September 30, 2021

| Expense | Amount |
|---|---|
| Travel (airfare, lodging, meals, transportation) | $67,554.38 |
| Printing & Copying | $5,093.28 |
| Shipping & Postage | $11,499.00 |
| Court Reporter/Transcripts | $404.50 |
| Legal Research (e.g. PACER, Westlaw) | $25,710.37 |
| Experts, Consultants & Special Master Fees | $39,725.24 |
| Service Process | $3,189.48 |
| Court Fees | $1,000.00 |
| Teleconference Fees | $425.01 |
| **TOTAL** | **$154,601.26** |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE BROILER CHICKEN ANTITRUST
LITIGATION

No. 1:16-cv-08637-TMD-JG

Honorable Thomas M. Durkin
Magistrate Judge Jeffrey T. Gilbert

This Document Relates To:

*All End-User Consumer Plaintiff Actions*

**REPLY IN SUPPORT OF END-USER CONSUMER PLAINTIFFS' RENEWED**
**MOTION FOR ATTORNEYS' FEES**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................ 1

II.   ARGUMENT ................................................................................................................... 2

    a.   Objector Andren Ignores the Overwhelming Number of Cases in Which Class Counsel Did Not Make Bids and Sought a One-Third Award. ....................................... 2

    b.   Class Counsel Would Have Negotiated a Higher Fee *Ex Ante* Than the Fees in *IRS*, *ODD*, *Batteries*, and *Resistors*. ............................................................................. 6

       i.   Class Counsel Would Have Negotiated a Higher Fee Than the Fee Schedule in *IRS*..... 6

       ii.  *ODD*, *Batteries*, and *Resistors* Were Far Less Risky Than Broilers. ............................... 10

       iii.  Class Counsel's Behavior In This Case Confirms They Would Have Sought a 33 Percent Fee. ................................................................................................. 16

    c.   *Ex Post* Fee Awards Confirm That 33 Percent Is the Market Rate. ................................. 18

III.  CONCLUSION ............................................................................................................. 20

i

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                       **Page(s)**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015)..............................................................................9

*In re Auto. Parts Antitrust Litig.*,
    2018 WL 11260510 (E.D. Mich. Nov. 7, 2018).....................................................................19

*In re Broiler Chicken Antitrust Litig.*,
    80 F.4th 797 (7th Cir. 2023) .......................................................................... *passim*

*In re Continental Illinois Securities Litig.,*
    962 F.2d 566, 569 (7th Cir. 1992) ................................................................................11, 12

*Dial Corp. v. News Corp.*,
    317 F.R.D. 426 (S.D.N.Y. 2016) ......................................................................................9

*In re Domestic Drywall Antitrust Litig.*,
    2018 WL 3439454 (E.D. Pa. July 17, 2018)......................................................................4

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018)......................................................................9

*Fox v. Vice*,
    563 U.S. 826 (2011).........................................................................................................8

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ........................................................................................................9

*Kleen Prods. LLC v. Int'l Paper Co.*,
    2017 WL 5247928 (N.D. Ill. Oct. 17, 2017).....................................................................19

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)..................................................................11

*In re Lithium Ion Batteries Antitrust Litig.*,
    2022 WL 16959377 (9th Cir. Nov. 16, 2022)...................................................................12

*In re Parking Heaters Antitrust Litig.*,
    2019 WL 8137325 (E.D.N.Y. Aug. 15, 2019)....................................................................9

*In re Payment Card Interchange Fee Merchant Discount Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ..........................................................................6, 7

*In re Peanut Farmers Antitrust Litig.*,
    2021 WL 9494033 (E.D. Va. Aug. 10, 2021)...................................................................13

ii

**SuppA19**

*Poppino v. Jones Store Co.,*
   1 F.R.D. 215 (W.D. Mo. 1940) ................................................................................8

*In re Pork Antitrust Litig.,*
   2022 WL 18959155 (D. Minn. Oct. 19, 2022) ........................................................3

*In re Potash Antitrust Litig.,*
   2013 WL 12470850 (N.D. Ill. June 12, 2013) ......................................................19

*Silverman v. Motorola Solutions, Inc.,*
   739 F.3d 956 (7th Cir. 2013) ................................................................................11

*Standard Iron Works v. ArcelorMittal,*
   2014 WL 7781572 (N.D. Ill. Oct. 22, 2014).....................................................19, 20

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
   2005 WL 1213926 (E.D. Pa. May 19, 2005) ........................................................13

*In re Synthroid Mktg. Litig.,*
   264 F.3d 712 (7th Cir. 2001) ..................................................................... *passim*

*In re Synthroid Mktg. Litig.,*
   325 F.3d 974 (7th Cir. 2003) ..................................................................3, 11, 12, 20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
   396 F.3d 96 (2d Cir. 2005)......................................................................................3

**Other Authorities**

Fed. R. Civ. P. 23(h)(2)....................................................................................................8

**SuppA20**

## I.  INTRODUCTION

In its initial opinion, this Court applied the correct methodology for determining the End-User Consumer Plaintiffs (EUCP)'s Class Counsel's fees: approximating the market rate for legal services that counsel would have negotiated at the beginning of the case.[1] That inquiry required the Court to "weigh the available market evidence, and assess the amount of work involved, the risks of non-payment, and the quality of representation."[2] The Seventh Circuit dictated only two alterations to the Court's approach on remand: (1) the Court cannot hold that "bids with declining fee structures should *categorically* be given little weight"; and (2) the Court cannot "*categorically* assign[] less weight to Ninth Circuit cases in which counsel was awarded fees under the megafund rule."[3] Objector Andren misreads this holding as a *mandate* that the fee award here cannot exceed the declining fee structures Class Counsel used in a few outlier cases.[4]

Andren's misreading is inconsistent with longstanding Seventh Circuit precedent that "[t]he market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."[5] As this Court recognized (and as the Seventh Circuit did not dispute), Class Counsel made "a massive investment of time and money" in this case, despite the "high risk of non-payment"—a gamble that "few" other firms were interested in taking.[6] Under these circumstances, it makes sense that Class Counsel would have negotiated at the outset a fee *above* their 30 percent median fee award from 2016 through 2022.

---

[1] *In re Broiler Chicken Antitrust Litig.* ("*Broilers*"), 80 F.4th 797, 801-02 (7th Cir. 2023).
[2] *Id.* at 802 (cleaned up).
[3] *Id.* at 803-04 (emphases added).
[4] Objector John Andren's Opp'n to EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6990 (Oct. 20, 2023) ("Opp.") at 4, 12, 25.
[5] *In re Synthroid Mktg. Litig.* ("*Synthroid I*"), 264 F.3d 712, 721 (7th Cir. 2001).
[6] *Broilers*, No. 16-cv-08637, 2022 WL 6124787, at *3-4 (N.D. Ill. Oct. 7, 2022), *vacated*, 80 F.4th 797 (7th Cir. 2023).

1

Andren ignores a bevy of evidence supporting this conclusion, including: (1) the vast majority of cases where Class Counsel would *not* agree to use declining fee scales; (2) the 2021 fee study by Brian Fitzpatrick that examined the rates sophisticated parties in antitrust contingency cases negotiate; and (3) the 13 years of fee award data from all jurisdictions painstakingly compiled in the *2022 Antitrust Annual Report*. In lieu of this evidence, Andren asks the Court to rely on his own opinions and speculations. But Andren (and Hamilton Law Institute) are not themselves practitioners in the field: They are not antitrust litigators nor class action counsel. And Andren has not supported his opposition to the renewed motion for fees with expert analysis, industry-wide data, or support from industry practitioners.

By contrast, Class Counsel, who are seasoned antitrust firms, have carefully explained why the risks and benefits of representing the EUCPs were materially different from the risks and benefits in *IRS*, *ODD*, *Batteries*, and *Resistors*.[7] In light of these differences, those four cases are "poor indicators of what bargain would have been struck *ex ante*" in this case.[8] Taken as a whole, the available market evidence proves Class Counsel would have negotiated a flat 33 percent at the outset of this case—in line with the median award for antitrust cases of this size.

## II. ARGUMENT

### a. Objector Andren Ignores the Overwhelming Number of Cases in Which Class Counsel Did Not Make Bids and Sought a One-Third Award.

The Seventh Circuit has instructed district courts to evaluate available market evidence when determining the hypothetical bargain class counsel and plaintiffs would have struck at the

---

[7] "*IRS*" refers to *In re Interest Rate Swaps Antitrust Litigation*, No. 1:16-md-02704 (S.D.N.Y.). "*ODD*" refers to *In Re Optical Disk Drive Products Antitrust Litigation*, No. 3:10-md-02143 (N.D. Cal.). "*Batteries*" refers to *In Re Lithium Ion Batteries Antitrust Litigation*, No. 4:13-md-02420 (N.D. Cal.). "*Resistors*" refers to *In Re Resistors Antitrust Litigation*, No. 3:15-cv-03820 (N.D. Cal.).
[8] *Broilers*, 80 F.4th at 803.

outset of a case.[9] Here, that market evidence includes the declining fee schedule that Cohen Milstein agreed to follow in *IRS*, and three below-market auction bids Hagens Berman made in *ODD*, *Batteries*, and *Resistors*. But it also includes the nearly 200 other cases where Class Counsel chose not to bid to preserve their ability to seek a 33 percent fee.

In nearly all cases close in time to *Broilers*, Class Counsel determined that the risks and costs of litigation were too high to warrant a bid or predetermined fee schedule, especially one with a declining fee scale. Counsel has identified only *one* bid and only *one* fee schedule in 196 antitrust cases and 51 leadership applications from cases filed between 2013 and 2019 (three years preceding and following the filing of this case).[10] That is no surprise. Antitrust cases are "complicated, lengthy and bitterly fought," "inherently expensive and complex," and present significant risks to Class Counsel who pay upfront litigation costs and the pre-litigation investigation.[11] As Andren himself states, "[p]utative lead counsel are well positioned to assess their risk and price their services accordingly based on their lodestar in similar class actions and their broader litigation experience."[12] In risky, complex cases like *Broilers*, they "would propose a larger percentage of the recovery . . . to compensate [them] for that risk."[13]

Class Counsel follow this practice even when they negotiate with "sophisticated" plaintiffs—precisely the negotiations Andren urges the Court to reference.[14] Look no further than *In re Domestic Drywall Antitrust Litigation*, which Class Counsel cited in their opening brief but

---

[9] *Id.* at 801-02.
[10] *See* Decl. of Steve W. Berman in Supp. of EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6911-1 (Sept. 29, 2023) at Exs. 1-2 ("Ex." refers to exhibits found in the Declaration of Steve Berman in Support of End-User Consumer Plaintiffs' Renewed Motion for Attorneys' Fees, ECF No. 6911-1).
[11] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005); *In re Pork Antitrust Litig.*, No. CV 18-1776, 2022 WL 18959155, at *3 (D. Minn. Oct. 19, 2022).
[12] Opp. at 10.
[13] *Id.*
[14] *Id.* at 1-2. *See also In re Synthroid Mktg. Litig.* ("*Synthroid II*"), 325 F.3d 974, 976 (7th Cir. 2003) (referencing agreements with sophisticated clients reached "through arms'-length negotiations").

Andren ignores.[15] The named plaintiffs in *Drywall* were sophisticated direct purchasers. As with *Broilers*, *Drywall* involved no government investigation, significant risk of nonpayment, sophisticated defense counsel, and other firms seeking leadership.[16] It is thus a precise example of what Class Counsel likely would have negotiated with a sophisticated client here. Unsurprisingly, in *Drywall*, Cohen Milstein refused to enter a bid and negotiated a retainer that allowed it to seek a 33 percent fee. (After class counsel recovered $190 million for the class, Cohen Milstein and their co-counsel moved for and were awarded 33 percent of the recovery.)[17]

Andren ignores this market evidence. His rationale for why one fee schedule and three below-market bids should be weighed *more* than every case in which Class Counsel chose *not* to bid is that "the 'market' does not award attorneys' fees at the end of litigation."[18] But Class Counsel have identified nearly 200 cases where they chose *not* to bid at the *beginning* of litigation. As rational participants in the national market for litigation, Class Counsel understand that each time they file a case, they forgo the opportunity to take on other cases. Litigators face the highest opportunity costs on contingency cases that are especially time consuming, expensive, complex, or risky.[19] For that reason, in most instances, Class Counsel and their clients agree to retainers in which Class Counsel seek a flat percent of the fund at the end of litigation—like the *Drywall* plaintiffs who agreed to let their attorneys seek up to 33 percent.[20] Indeed, there are "actual

---

[15] Mem. of Law in Supp. of EUCPs' Renewed Mot. for Attorneys' Fees, ECF No. 6911 (Sept. 29, 2023) ("Mot.") at 24 (citing *In re Domestic Drywall Antitrust Litig.*, No. 2:13-md-2437 (E.D. Pa.)).
[16] *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2018 WL 3439454, at *18-19 (E.D. Pa. July 17, 2018).
[17] *Id.* at *18-20.
[18] Opp. at 19.
[19] *Broilers*, 2022 WL 6124787, at *3-4.
[20] *See* Ex. 3, ECF No. 6911-1 at 1161-62 (explaining that "all" of the available retainer agreements in the studied antitrust cases with sophisticated clients "called for a fixed percentage of one-third").

agreements" in this case where Class Counsel indicated they would seek up to 33 percent of the fund.[21]

Instead of focusing on these many examples, Andren spends the first eight pages of his brief arguing that the *IRS* fee schedule is the "best evidence" because it involves an arm's-length negotiation with a sophisticated plaintiff.[22] But focusing on one data point alone is irreconcilable with the Seventh Circuit's instructions to "weigh[] the available market evidence."[23] Andren is silent about Professor Brian Fitzpatrick's 2021 study that surveys "antitrust cases in the pharmaceutical industry where large corporations sue each other," which finds that "the corporations in these cases appear perfectly happy with the percentage method and perfectly happy with the same fixed percentage of one-third."[24] Instead, Andren focuses on a single case, *Capital One TCPA*, to assert that "on the rare occasions non-securities attorneys negotiate price *ex ante*, they agree to fees less than 33%."[25] But *Capital One TCPA* focuses mainly on securities cases—which generally have just one defendant and are thus very different from antitrust cases. And the Court has already rejected the two non-securities cases *Capital One* cites as "outdated, none being less than 20 years old."[26] It is hard to square Andren's insistence that negotiations with sophisticated plaintiffs are the best market-rate evidence with his complete dismissal of the best antitrust data on the topic.

---

[21] EUCPs' Report in Resp. to the Court's Oct. 3, 2022 Order, ECF No. 5835 (Oct. 5, 2022) at 1-2. *See also Synthroid I*, 264 F.3d at 719.

[22] Opp. at 2.

[23] *Broilers*, 80 F.4th at 802 (quoting *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011)).

[24] Ex. 3, ECF No. 6911-1 at 1161-62 (explaining that, in study of thirty-three antitrust class action cases in the pharmaceutical industry where large corporations sue each other, a one-third fixed fee "*heavily dominated*").

[25] Opp. at 22-23 (citing *Capital One TCPA*, 80 F. Supp. 3d 781, 803 (N.D. Ill. 2015)).

[26] *Broilers*, 2022 WL 6124787, at *3 (citing *Capital One TCPA*, 80 F. Supp. 3d at 802-03).

**SuppA25**

Andren also misunderstands the incentives for sophisticated plaintiffs to accept flat 33 percent rates. He repeatedly argues that fee rates must decrease as settlements get larger and increase for each stage of the litigation because of economies of scale and increased risks that accompany each step of a case.[27] This ignores the data, however, including in Professor Fitzpatrick's 2021 study, that sophisticated antitrust plaintiffs generally negotiate *flat fees* to avoid "create[ing] declining marginal returns to legal work."[28] Andren's two arguments are also at odds with each other. While increasing fee rates as litigation progresses may encourage attorneys to litigate vigorously through trial, a declining fee scale promotes the opposite by providing lower fees for large, late-stage recoveries. Market data confirm sophisticated clients do not want to give their attorneys this financial disincentive to litigate vigorously near the finish line.

b. **Class Counsel Would Have Negotiated a Higher Fee *Ex Ante* Than the Fees in *IRS, ODD, Batteries, and Resistors*.**

Andren advocates applying the *IRS* fee schedule, which would result in a higher award than applying any of the bids. In the alternative, Andren argues that the market rate should be determined by bids made by Hagens Berman in *ODD*, *Batteries*, and *Resistors*. But neither the fee schedule nor the bids reflect the market rate for Class Counsel's legal services; each are "poor indicators of what bargain would have been struck ex ante."[29] The market rate is the fee that Class Counsel and most sophisticated clients negotiate in complex antitrust cases: 33 percent.

i. *Class Counsel Would Have Negotiated a Higher Fee Than the Fee Schedule in* IRS.

Andren argues that the Court should "apply a similar schedule" to the one in *IRS*, which incorporates the declining fee scale from *In re Payment Card Interchange Fee Merchant Discount*

---

[27] Opp. at 4-6.
[28] *Synthroid I*, 264 F.3d at 721.
[29] *Broilers*, 80 F.4th at 803.

**SuppA26**

*Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014) and would amount to $44 million for the $181 million settlement here—approximately 26 percent of the net settlement.[30] Andren claims that data from prior suits with "large investors" as clients are the best available benchmark for determining *ex ante* rates, so the Court should import the fee schedule from *IRS*.[31] But the Seventh Circuit's market-based approach is not a formulaic application of one piece of information. Instead, this Court must look at the similarities and differences between *IRS* and *Broilers* to determine whether they had the same *ex ante* risks.

Andren fundamentally oversells the importance of the *IRS* fee schedule. Andren argues that the *IRS* fee schedule is representative because "sophisticated clients" agree to "fees that marginally decline as the size of the fund increases."[32] But he ignores evidence-based research that demonstrates sophisticated clients in antitrust cases typically negotiate a flat 33 percent fee award.[33] Determining the market rate from one case—while ignoring the remainder of the data— is bad economics. Andren also claims that private parties agree to fees that "rise based on the stage of litigation."[34] But that also is not true. The best available data shows corporate antitrust plaintiffs generally choose flat contingency fees—not declining fee scales, and not fees that change based on the stage of litigation when the settlement was entered.[35]

That includes *IRS*. Andren's hypothesis that the *IRS* fee schedule might have included lower fee rates for early-stage settlements is wrong: Cohen Milstein's *IRS* fee agreement expressly follows the *Payment Card* scale and does not include lower rates for earlier-stage settlements. In other words, all the relevant information about the fee agreement in *IRS* is available in Cohen

---

[30] Opp. at 2; Mot. at 21.
[31] Opp. at 2 (quoting *Synthroid I*, 264 F.3d at 720).
[32] *Id.* at 4.
[33] Ex. 3, ECF No. 6911-1 at 1161.
[34] Opp. at 4 (quoting *Synthroid I*, 264 F.3d at 722).
[35] Ex. 3, ECF No. 6911-1 at 1153-54, 1161-63.

Milstein's publicly filed leadership application. Given this, the Court should not and need not require Cohen Milstein to produce its fee agreement (embedded in its retainer) with Chicago Teachers Pension Fund. Andren has not met his burden to show this discovery is necessary and the information is not in the possession of the named Plaintiffs (who only have access to their own legal files).[36] Further, requiring the production of unrelated fee agreements improperly threatens to turn fee disputes into "second major litigation," something heavily disfavored by the courts.[37]

Regardless, looking at the "aspects of the case[]" as the Seventh Circuit has instructed,[38] Class Counsel would not have negotiated the *IRS* fee schedule here.

*First,* the estimated size of recovery at the outset of *IRS* was significantly higher than in *Broilers*, as indicated by the trillion-dollar financial market at issue in *IRS* and the *billion*-dollar settlements in similar banking cases.[39] A declining fee scale in *IRS* was appropriate based on a particularly large, expected recovery. Andren suggests this is inaccurate because a document in *IRS* states that a "rough calculation of damages" in that case is $4.5 billion,[40] and Dr. Sunding's estimation of damages to the end-user class is $3.916 billion.[41] Dr. Sunding's pre-summary-judgment damages estimate (using Defendants' volume of commerce) was $3.4 billion—over a billion dollars less than the supposed estimated damages in *IRS*.[42] In any event, as Andren stresses, the relevant question is how Class Counsel would have estimated damages at the *outset* of *Broilers*

---

[36] *See* Fed. R. Civ. P. 23(h)(2) Advisory Committee's note to 2003 amendment ("the burden should be on the objector to justify discovery to obtain further information"); *Poppino v. Jones Store Co.*, 1 F.R.D. 215, 219 (W.D. Mo. 1940) ("The mere fact, however, that the attorney for a party has possession of a document does not make his possession of the document the possession of the party.").

[37] *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

[38] *Broilers*, 80 F.4th at 803.

[39] Mot. at 21-22.

[40] Expert Report of Mark Grinblatt at iii, 104, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-md-2704 (S.D.N.Y. Mar. 7, 2019), ECF No. 725-1.

[41] Opp. at 8.

[42] Dr. Sunding Merits Rebuttal Report, ECF No. 6226-6 (Jan. 26, 2023) at Tbl. 12.

compared to the *outset* of *IRS*—not the damages numbers that are based on the discovery. Given the trillion-dollar financial market in *IRS* and the exceptionally large settlement in similar banking cases, counsel expected a much smaller recovery at the outset of *Broilers* than in *IRS*.

In fact, the declining fee scale endorsed in *In re Payment Card* and incorporated in *IRS* has mostly applied to cases with much larger expected and actual settlement funds than the one here. Andren does not point to *any* case in which the scale was applied to a fund under $244 million.[43] The one case he claims does, *In re Parking Heaters Antitrust Litigation*, does not apply the scale; it awards counsel a one-third fee and simply cites *Payment Card*.[44] The fact the *Payment Card* scale has historically applied to much larger settlements also confirms that the *ex ante* expected recovery for *IRS* was much larger than the damages here.

**Second**, unlike in *IRS*, Class Counsel here represent indirect purchasers, who face more litigation risks while typically recovering less.[45] Andren asserts that "most direct purchasers have a mirror image challenge [to indirect purchasers]: proving that all of the cartel's price increases *were not* passed through."[46] Not so: It is blackletter law that it is not a defense to a direct purchaser action under the Sherman Act that plaintiffs passed on the overcharge they incurred to their customers.[47] The *IRS* plaintiffs did not need to address pass-through as a matter of law or fact.

Andren misunderstands why direct purchasers generally recover more than indirect purchasers.[48] Under *Illinois Brick*, indirect purchasers can only seek antitrust damages when

---

[43] *See* Opp. at 7.

[44] *In re Parking Heaters Antitrust Litig.*, No. 15-mc-0940, 2019 WL 8137325, at *7 (E.D.N.Y. Aug. 15, 2019). In fact, the other cases Andren cites as crediting the *Payment Card* scale—*Dial Corp. v. News Corp.*, 317 F.R.D. 426, 436 (S.D.N.Y. 2016), *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775, 2015 WL 5918273, at *6 (E.D.N.Y. Oct. 9, 2015), and *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *4 (S.D.N.Y. Nov. 8, 2018)—merely cite the case and do not endorse its scale.

[45] Mot. at 22-24.

[46] Opp. at 1.

[47] *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968).

[48] Opp. at 16.

9

**SuppA29**

permitted by state law, and only a subset of states provide this permission. So, for example, EUCP Class Counsel knew that they could only seek damages for the roughly 50 percent of chicken purchasers who live in states that allow indirect purchaser suits. Unique state-law requirements and pass-through issues in indirect purchaser cases also heighten the risk of dismissal on the pleadings and denial of class certification. It is therefore no surprise that indirect purchasers made up 46 percent of the settlements in the *2022 Annual Antitrust Report* but accounted for only 21 percent of the recoveries.[49] Andren's assertion that indirect-purchaser issues only arise in "a few states where the scope of unfair competition laws remains ambiguous" vastly underestimates the expertise and effort required to litigate an indirect purchaser case.[50]

*ii.*  ODD*,* Batteries*, and* Resistors *Were Far Less Risky Than Broilers.*

Although Andren urges the Court to follow the *IRS* fee schedule, he repeatedly references bids submitted by Hagens Berman in *ODD*, *Batteries*, and *Resistors*. These below-market bids would not have been submitted in a case as risky as *Broilers*. Indeed, the fee scale in *Batteries* (predictably) would have amounted to a *significantly negative* lodestar multiplier here.[51] And Andren's assertion that the bids reflect the only cases in which Class Counsel faced price competition is wrong: Andren simply ignores that Hagens Berman and Cohen Milstein submitted *only one* bid in 51 antitrust leadership applications in cases filed from 2013 through 2019 (the three years before and after this case was filed).[52]

Andren also contends that "if the [Seventh Circuit's] *Broiler Chicken* mandate stands for anything, courts should not discount rare examples of skilled parties assessing *ex ante* attorneys'

---

[49] Ex. 4, ECF No. 6911-1 at 17.
[50] Opp. at 15.
[51] *See Id.* at 12 (explaining *Batteries* scale would amount to $25.4 million in fees here, substantially less than Class Counsel's $32.8 million lodestar).
[52] *See* Ex. 2, ECF No. 6911-1.

**SuppA30**

fees."[53] But this mischaracterizes the Seventh Circuit's holding. The court held that "it was error to suggest that this court has cast doubt on the consideration of declining fee scale bids in *all* cases."[54] The court cautioned that whether rare auction bids are good evidence of the *ex ante* rate "depend[s] on the particulars," and "[o]ther aspects of the cases in which the bids were made may show the bids to be poor indicators of what bargain would have been struck *ex ante*."[55] That makes sense given previous Seventh Circuit cases explaining the potential pitfalls of relying on auction bids from one case to estimate the *ex ante* fee in another.[56] Far from mandating the application of the fee bid rates, the Seventh Circuit remanded for this Court to decide whether the auction bids are useful evidence here.

They are not. Andren effectively admits that *Broilers* was riskier than the bid cases *ex ante*, arguing only that the bid cases are not "*so dissimilar* as to be useless."[57] But the three bids were made under rare circumstances not present here. As Hagens Berman stated in its sworn declaration, the bids "were vastly below market."[58] Andren cannot contest this fact: had the court in *Batteries* accepted the bid, it would have resulted in a significantly negative multiplier on Hagens Berman's loadstar for the case.[59] As Judge Posner observed in *In re Continental Illinois Securities Litigation*, because contingency litigation involves serious risks of nonpayment, it would be irrational for

---

[53] Opp. at 10.

[54] *Broilers*, 80 F.4th at 803-04 (emphasis added).

[55] *Id.* at 803.

[56] *See Synthroid I*, 264 F.3d at 721 ("declining marginal percentages are [not] always best" because they "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery"); *Synthroid II*, 325 F.3d at 979 (explaining potential issues with auctions for legal services); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (same).

[57] Opp. at 13-14 (emphasis added).

[58] Decl. of Steve W. Berman in Supp. of EUCPs' Mot. for Final Approval, ECF No. 5250 (Dec. 6, 2021) ¶ 19.

[59] *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *19 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

class counsel to accept a market rate below lodestar.[60] No surprise that the Ninth Circuit found that Hagens Berman's failed *Batteries* bid "offer[ed] little insight into market rates."[61]

As Plaintiffs explained in their opening brief, these below-market bids were offered because Hagens Berman was attempting to secure leadership of litigation that was less risky than *Broilers* for five reasons. Andren does not rebut any of them. Because the bid cases "present[ed] less risk to the plaintiff class" than *Broilers* did, "it is unsound to use a contingent fee appropriate to the former as the measure in the latter."[62]

***First***, in all three bid cases raised, the Department of Justice had announced an investigation into antitrust misconduct before the complaints were filed, mitigating the risk of a defense win on the pleadings.[63] Andren does not dispute that cases following on the heels of government investigations are more likely to pass the pleading stage and thus involve less risk of nonpayment than other cases.[64] Because of that lower risk of nonpayment, counsel in those cases may have more willingness to take a lower fee. So, on this point alone, Class Counsel would have negotiated a higher rate than in the bid cases.

Andren argues that government investigations might not mean much, however, because the Department of Justice did not end up issuing indictments in *Resistors* and the plaintiffs in *ODD* noted that the government's related criminal proceedings took a narrower view of the conspiracy than the civil plaintiffs' case.[65] But this misses the point. At the *outset* of the three bid cases, counsel would reasonably have recognized that the government investigations lowered the risk of

---

[60] *See* 962 F.2d 566, 569 (7th Cir. 1992) (explaining that the need for a "risk multiplier" above lodestar is necessary because "[t]he lawyers for the class receive no fee if the suit fails").
[61] *In re Lithium Ion Batteries Antitrust Litig.*, No. 21-15120, 2022 WL 16959377, at *1 (9th Cir. Nov. 16, 2022).
[62] *Synthroid II*, 325 F.3d at 979.
[63] Mot. at 14-15.
[64] Opp. at 13-14.
[65] *Id.* at 13.

**SuppA32**

nonpayment by making it more likely the case would survive critical stages.[66] The district court's reference to the defendants' guilty pleas in its order granting class certification in *ODD* reflect as much.[67] That counsel in *Resistors* argued that their case, where the government closed its investigation before discovery began, was "more challenging than in other cases *where defendants have been found criminally liable*" does not refute that the lack of any governmental investigation at the outset of a case makes it much more challenging.[68] When Class Counsel filed this case, there was no government investigation. That *ex ante* perspective did not change just because the government *later* opened a criminal investigation. *Broilers* was riskier than the bid cases *ex ante*.

**Second**, *Broilers* was riskier at the outset because it involved significantly more defendants than any of the bid cases and involved a much less consolidated industry—increasing the amount of work and cost that would be necessary at every stage of the litigation and increasing the likelihood that additional defendants would be named.[69] This anticipated work bore out: Class Counsel took three times the depositions in this case compared to *Batteries*.

Andren concedes that the additional defendants in *Broilers* militate in favor of more *ex ante* risk, but argues this is a "difference of degree, not kind" because Plaintiffs could "pick off a cooperating defendant" early in the case.[70] But differences in degree (for both expenses and risk of non-payment) matter to rational parties striking fee bargains. When filing their complaints, Class Counsel recognized that the number of defendants and the complexity of the case would result in a high number of depositions, above-average time on document review and deposition

---

[66] *See, e.g.*, *Stop & Shop Supermarket Co. v, SmithKline Beecham Corp.*, No. 03-cv-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005); *In re Peanut Farmers Antitrust Litig.*, No. 2:19-CV-00463, 2021 WL 9494033, at *4 (E.D. Va. Aug. 10, 2021).
[67] Mot. at 15.
[68] Opp. at 13 (emphasis added).
[69] Mot. at 17-18.
[70] Opp. at 16.

preparation, substantial dispositive briefing, significant litigation and expert costs, and high levels of involvement from senior attorneys.[71] Class Counsel was right on every point. And putting aside that an early settlement with a smaller producer was far from certain given the lack of preceding government investigation, such a settlement also would not have offset these case-long costs.

**Third**, the bid cases are poor indicators because Class Counsel understood at the outset that proving pass-through would be much more complicated than in the bid cases. Unlike in the bid cases which involved infrequent purchases of expensive electronic items, chicken purchasers often buy chicken weekly. Class Counsel investigated the retail chain before filing their complaint, and anticipated extreme discovery and expert costs related to obtaining transactional data reflecting hundreds of thousands of millions pounds of chicken purchases and the pass-through of those purchases.[72] In response to this, Andren simply asserts that the risks for an indirect purchaser case are not "categorically" increased from direct purchasers.[73] But this overlooks the many indirect purchaser cases dismissed due to the inability to show pass-through. And it ignores that Class Counsel's predictions came to bear, as an enormous amount of work went into the EUCP expert reports that was entirely absent from those of the direct purchasers. EUCP attorneys negotiated data and document productions from dozens of third parties—and reviewed hundreds of thousands of documents—to support Dr. Sunding's pass-through analysis. EUCP attorneys attended every deposition of a DAP who participated in the retail channel and questioned on pass-through issues where witnesses had relevant information. The direct purchaser class did not have to undertake **any** of this burden. That EUCPs anticipated this work would be necessary *in addition to* demonstrating liability should not be ignored.

---

[71] Mot. at 18-19.
[72] *Id.* at 19-20.
[73] Opp. at 15.

**Fourth**, Andren contends that the complexity that results from a supply reduction conspiracy dealing with live animals is not meaningfully different than one involving widgets. Andren suggests that in *Batteries* the plaintiffs had to show pass-through based on only a component of the good, whereas a chicken is "the entire product."[74] Andren misunderstands the point. What was obvious at the outset of the case was that at the level of liability, a conspiracy to restrain the supply and increase the price of a live animal is more complicated than a cartel controlling the cost and supply of a battery. In *Broilers*, Defendants had many levers to affect the core supply restriction in the case: they could kill breeders, decrease bird weights, etc. To restrain the supply of batteries, on the other hand, the *Batteries* defendants had one option: make fewer batteries. Additional difficulties resounded on pass-through. To even get to class certification, EUCP counsel had to identify the parts of chickens most frequently sold in the U.S. (it turns out, American consumers eat white meat from the front half of the chicken). From there, each part of the chicken was examined both for the overcharge model and to look at pass-through. After obtaining extraordinary amounts of data, EUCPs excluded processed products, examined levels of seasoning or marination that might impact the pass-through of the overcharge, and excluded wings from the class given the inconsistencies in pass-through to end-users. Only after all this data retrieval, expert work, and review of market conditions did the EUCPs arrive at their proposed class. The need for all of this work was evident at the outset of the case. As experienced Class Counsel, it was evident from the start, that live animals are not the same as widgets.

**Fifth**, Andren argues that the Pilgrim's bankruptcy is "just the fact-bound version of a question that every antitrust plaintiff must prove: when did the conspiracy begin, and who committed anticompetitive acts."[75] But this is another example of Andren's gambit: Fee awards

---

[74] *Id.* at 17.
[75] *Id.*

are a fact-bound inquiry that depend on the *ex ante* peculiarities of the case, but every fact is a distinction without a difference. At the time of filing, Plaintiffs anticipated that Defendants would point to the Pilgrim's bankruptcy *in addition to* the "million other potential innocent explanations for apparent collusion" that Andren suggests.[76] The bankruptcy, *together with the other risk factors*, suggests Class Counsel would have negotiated an above-median fee here.

**Finally**, Andren finally finds a factual difference that he deems important: that the bid cases involved foreign defendants.[77] Andren argues counsel incurred additional costs by litigating against such defendants—*e.g.*, to advances costs of translating documents—which are not costs counsel had to incur here. While counsel in the bid cases did incur costs to translate documents and compel discovery from multinational companies, these were unexpected issues. In *Batteries*, for instance, the plaintiffs had to seek discovery from a non-defendant about its parent company *after* class certification (which the plaintiffs did not anticipate *ex ante*).[78] And the issue in *ODD* where a John Doe attempted to quash an important subpoena was quite literally "not contemplated" and "unforeseen at the outset of this litigation."[79] These examples actually *illustrate* why the fee bids in those cases were below market and why Hagens Berman chose not to engage in them again.

iii. *Class Counsel's Behavior in This Case Confirms They Would Have Sought a 33 Percent Fee.*

Class Counsel's behavior here confirms that one-third of the recovery is the market rate. Firms did not "clamor[]" for appointment as lead counsel for the EUCPs.[80] To the contrary, Class Counsel "invested massive resources of time and money when few other counsel expressed

---

[76] *Id.*
[77] Opp. at 18.
[78] *See Batteries*, No. 4:13-md-02420, ECF No. 2588 (N.D. Cal. Mar. 9, 2020) at 6 (explaining plaintiffs "subpoenaed packer Simplo USA to produce data from its overseas parent Simplo Taiwan" *after* class certification).
[79] *ODD*, No. 3:10-md-02143, ECF No. 2942 (N.D. Cal. Sept. 28, 2020) at 13.
[80] Opp. at 20.

16

**SuppA36**

interest."[81] Only one other firm besides Class Counsel submitted a leadership application for EUCPs. And Andren is incorrect that two firms vying for appointment as lead counsel somehow suggests Class Counsel would have sought a low *ex ante* rate. Class Counsel determined that there was a conflict between their clients' interests as end-users and the commercial indirect purchasers—a point on which Andren agrees[82]—and sought to remedy that irrespective of financial considerations. And on the economics, firms file cases and seek leadership positions on the presumption that they will be paid market price. Andren's argument is the equivalent of saying that if two construction firms seek a new project, the price of construction work must be low.

Andren employs the same false logic when he argues that Class Counsel would not have retained an economic expert pre-appointment nor sought discovery during motion to dismiss briefing if the case did not present a non-risky opportunity.[83] But Andren agrees that proceeding with discovery "favor[ed] plaintiffs," so Class Counsel had a fiduciary duty to pursue that action no matter how it would impact their fee.[84] In any event, the point remains the same: That Class Counsel felt compelled to take expensive, preemptive action in a risky case is evidence *for*, not against, the proposition that they would have negotiated a 33 percent rate *ex ante*.

Nor does the number of opt-out defendants suggest the market rate for legal services was below 33 percent.[85] Over 3,500 direct purchasers remain—including many sophisticated, well-capitalized corporations—and none objected to the Direct Purchasers' counsel's 33 percent fee. If the market rate for attorneys' fees is far below 33 percent, as Andren suggests, why didn't these corporations object? Moreover, because opt-outs can wait until class certification is granted or

---

[81] *Broilers*, 2022 WL 6124787, at *3-4.
[82] Opp. at 20.
[83] *Id.* at 21.
[84] *Id.*
[85] *See Id.*

17

denied before deciding whether to remain in the class,[86] they "identify a market mid-way through the case."[87] They do not indicate what the market-rate fee was at the outset.

In short, the precise risks that Class Counsel foresaw when they filed this case have come to pass. The motions to dismiss were a close call, meaning Class Counsel almost went home with nothing after paying pre-discovery experts.[88] Defendants were well-resourced and represented by some of the most sophisticated defense counsel in the country.[89] Several defendants were dismissed from the case on summary judgment. Another defendant just achieved a defense verdict at trial. The foreseeable risk of nonrecovery was real, as this Court knows from experience. Class Counsel would have negotiated a market rate of 33 percent at the start to mitigate it.

### c. *Ex Post* Fee Awards Confirm That 33 Percent Is the Market Rate.

Class Counsel's fee agreements in this case and fee awards granted to Class Counsel throughout the country further confirm that 33 percent is the correct market rate. This case is similar to cases in which Class Counsel did not bid and expressly reserved their right to receive one-third of the recovery—like *Domestic Drywall*. Looking at Class Counsel's fee agreements and nationwide cases in which counsel received fee awards both confirm a one-third market rate.

***First***, the Seventh Circuit took no issue with the Court crediting Class Counsel's agreements with the named Plaintiffs, which permit that Hagens Berman "will take a percentage of any recovery as determined by the Court" and Cohen Milstein's "fees will not exceed one-third of the gross monetary recovery."[90] Andren ignores this entirely.

---

[86] *See* Direct Purchaser Pls.' Resp. to Restaurant DAPS' Mot. to Confirm, ECF No. 6864 (Sept. 12, 2023) at 3; Minute Entry, ECF No. 6872 (Sept. 14, 2023).
[87] *Synthoid I*, 264 F.3d at 720.
[88] *Broilers*, 2022 WL 6124787, at *3-4.
[89] *Id.*
[90] *Broilers*, 2022 WL 6124787, at *3; ECF No. 5835 at 1-2 (cleaned up). *See also Synthroid I*, 264 F.3d at 719.

18

**Second**, independent studies of fee awards and Class Counsel's prior nationwide awards both support a 33 percent rate. The *2022 Antitrust Annual Report* demonstrates that the median award for fees in all Circuits nationwide from 2009 and 2022 was 30 percent, and this remained true for settlements between $100 and $249 million.[91] Class Counsel's nationwide fee awards in antitrust cases from 2016 through 2022 confirm this finding: the median fee award was also 30 percent.[92] It makes sense that a fee for a case with above-average risk would be above this median.

Andren nitpicks that Class Counsel's median past fee award should not be applied here because (1) Class Counsel's median fee award for funds between $100 and $500 million have a median of 25 percent, and (2) Class Counsel had a lower lodestar multiplier in some cases where they were awarded 30 percent or more in fees.[93] Andren again simply ignores the data he does not like. Andren has no response to the *2022 Antitrust Annual Report* showing that the median attorneys' fees in antitrust class actions across the country with settlements between $100 and $249 million is 30 percent. Nor does he dispute that courts within this district—estimating the *ex ante* rate counsel would have negotiated—regularly grant 30 to 33 percent flat fees in antitrust cases.[94]

---

[91] Ex. 4, ECF No. 6911-1 at 32-33.

[92] Mot. at 28-29 & n.96. Andren accuses Class Counsel of inflating their past fee awards by including many awards from *In re Automotive Parts Litigation*. Opp. at 23-24 n.6. Andren is mistaken. Cohen Milstein represented direct purchasers in *Automotive Parts*, and Hagens Berman represented end payors. The twenty-one "smaller funds" that Andren refers to are direct purchaser settlements, and they amount to over $100 million in fee awards. *See* Sealed Ex. 9, ECF No. 6911-1 at 3-6, 11. Separately, the end-payors received an overall fee award from the litigation of 22.06%, based on three awards that were entirely distinct from the direct purchaser awards that almost exclusively granted fees at 30 percent or higher. *See In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2018 WL 11260510, at *4 (E.D. Mich. Nov. 7, 2018) (explaining end payors had only three rounds of settlements). Exhibit 9 correctly reflects these facts. Regardless, even if Class Counsel removed all the *Automotive Parts* fee awards from Exhibit 9, their median award would still be 30 percent.

[93] Opp. at 24-25.

[94] *See, e.g., Kleen Prods. LLC v. Int'l Paper Co.*, No. 1:10-cv-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) (awarding class counsel 30% of $354 million common fund); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding class counsel 33% of $163.9 million common fund); *In re Potash Antitrust Litig.*, No. MDL 1996, 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013) (awarding class counsel 33% of $90 million common fund).

Instead, he gerrymanders Class Counsel's data by looking only at settlements for funds between $100 and $500 million. He points to the *mode* for such fee awards, but it is immaterial that in that gerrymandered set there are four 20 percent fee awards, when *eight* awards are between 30 and 33.33 percent.[95] More importantly, if Andren had limited the settlement funds to those of $100 to $249 million like the *2022 Antitrust Annual Report*, the median award would have been approximately 29 percent—essentially the same as the overall median.

Finally, the 1.8 lodestar multiplier that Class Counsel request is well within the norm for similar cases.[96] Andren argues a 1.8 multiplier is too high because certain fee awards in other cases amounted in fractional recoveries—awards that are *less* than the lodestar.[97] But this *hurts* Andren's point. That Class Counsel have received 30 percent or above fee awards that do not cover their hourly services further reveals why Class Counsel would not negotiate an even *lower* fee rate here.[98] And if Class Counsel's lodestar is less than in other cases, that is because they litigated the case efficiently; that efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."[99]

## III.   CONCLUSION

For all these reasons, the Court should award $56,760,000, or 33 percent of the net settlement, reject Andren's objections, and deny Andren's request to compel discovery of the retainer agreement in *IRS*.

---

[95] *See* Sealed Ex. 9, ECF No. 6911-1.
[96] *See, e.g.*, *Standard Iron Works*, 2014 WL 7781572, at *2 (awarding 33 percent of a $163.9 million common fund and noting that the 1.97 lodestar multiplier was "well within the range of reasonable multipliers awarded in similar contingent cases").
[97] Opp. at 23 n.6.
[98] *See Synthroid II*, 325 F.3d at 979 (explaining that value of contingency cases is that where counsel is inefficient with their time, "the loss falls on counsel themselves").
[99] *See Synthroid II*, 325 F.3d at 979-980. Plaintiffs' Exhibit 9 is not "squirrely," as Andren accuses, in its estimation of lodestar, but instead reflects the lodestar data in the fee petitions cited therein. Opp. at 23 n.6.

**SuppA40**

DATED: November 3, 2023                    Respectfully submitted,

*/s/ Shana E. Scarlett*
Shana E. Scarlett
Rio R. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7291
steve@hbsslaw.com
breannav@hbsslaw.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison S. Deich
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Lead Counsel for End-User Consumer Indirect*
*Purchaser End User Class*

21

**SuppA41**

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on November 3rd, 2023 a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

*s/ Shana E. Scarlett*
SHANA E. SCARLETT

**SuppA42**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 1:16-cv-08637-TMD-JG |
| This Document Relates To: | Hon. Judge Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | Magistrate Judge Jeffrey T. Gilbert |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF END-USER CONSUMER
PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES**

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION ................................................................................................. 1

    A.    *Broilers* and *IRS* involve different considerations *ex ante*..................................... 3

          1.    *IRS* had potential to be a gargantuan case.................................................... 4

          2.    *IRS* involved defendants "too big to fail," or big enough to pay any judgment. ....................................................................................... 6

          3.    The plaintiffs in *IRS* wouldn't face attacks and risks common in indirect purchaser cases. ......................................................... 7

    B.    Class Counsel properly disclosed *IRS*.................................................................... 7

II.    CONCLUSION .................................................................................................... 9

**TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*In re Broiler Chicken Antitrust Litig.*,
   80 F.4th 797 (7th Cir. 2023) ....................................................................... *passim*

*In re Credit Default Swaps Litig.*,
   Case No. 1:13-md-02476 ....................................................................................2, 4

*In re: Foreign Exchange Benchmark Rates Antitrust Litig.*,
   Case No. 1:13-cv-07789 ......................................................................................2, 4

*In re Interest Rate Swaps Antitrust Litig.*,
   Case No. 1:16-md-02704 .........................................................................................1

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   991 F. Supp. 2d 437 (E.D.N.Y. 2014) ................................................................2, 4

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   Case No. 1:05-md-01720 ..........................................................................................4

*In re Se. Milk Antitrust Litig.*,
   2012 WL 12875983 (E.D. Tenn. July 11, 2012) .....................................................5

*In re Se. Milk Antitrust Litig.*,
   2013 WL 2155387 (E.D. Tenn. May 17, 2013) .......................................................5

**SuppA45**

## I.    INTRODUCTION

The Court has asked End-User Consumer Plaintiffs' (EUCP's) Class Counsel to provide this supplemental memorandum addressing the negotiated fee rate in *IRS*.[1] The fee rate for *IRS* provides one data point among many, and the Seventh Circuit suggested that the Court should weigh *all* data.[2] Doing so confirms one fact: firms that bring antitrust cases on contingency almost never agree *ex ante* to cap their fees below the median rate of 30 percent.[3] Between 2013 and 2019, Hagens Berman Sobol Shapiro LLP (Hagens Berman) and Cohen Milstein Sellers & Toll PLLC (Cohen Milstein) filed nearly 196 antitrust cases and submitted more than 50 leadership applications.[4] Just two involved *ex ante* offers below median rate awarded *ex post*.[5]

Firms rarely agree to *ex ante* rates that depart from the median *ex post* award—and when they do, it is because the case appears to be so big or so strong (or both), that the departure seems worth the risk. So it was with *IRS*; as explained below, *IRS* was a potentially gargantuan case against banking institutions with virtually unlimited resources.[6] Bank of America, Citigroup, Barclays, Goldman Sachs, and JPMorgan were named as defendants.[7] All these defendants have

---

[1] "*IRS*" refers to *In re Interest Rate Swaps Antitrust Litig.*, Case No. 1:16-md-02704.

[2] *See In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 804 (7th Cir. 2023) (instructing the Court to give "appropriate weight to fees awarded in out-of-circuit litigation").

[3] *See, e.g.,* Berman Decl., Ex. 4 (ECF No. 6911-1) (showing the median award for fees in antitrust cases was 30 percent for antitrust cases between 2009 and 2022), Ex. 9 (ECF No. 6911-1) (showing Class Counsel's median fee award is 30 percent for all antitrust cases awarded between 2016 and 2022); Ex. 3 (ECF No. 6911-1) (study showing that the fixed fee percentage of one-third heavily dominates in studies examining data for *ex ante* rates for antitrust cases).

[4] *See* Renewed Mot. for Attorneys' Fees, ECF No. 6911 (Sept. 9, 2023) at 2.

[5] The two are *Resistors* (2015) and *IRS* (2016). EUCP Class Counsel has discussed at length the aspects of *Resistors* that make it a poor indicator of what bargain would have been struck *ex ante* in this litigation. *See* Mem. of Law in Supp. of End-User Consumer Pls.' Renewed Mot. for Attorneys' Fees, ECF No. 6911 at 14-20 (Sept. 29, 2023). And so at the request of the Court, this memorandum focuses only on *IRS*.

[6] Decl. of Brent W. Johnson in Supp. of Supplemental Memo. in Supp. of End-User Consumer Pls.' Renewed Mot. for Attorneys' Fees ("Johnson Decl.") ¶ 8, filed concurrently herewith.

[7] *Id.* ¶ 3.

broken records repeatedly by paying out some of the largest antirust settlements in United States history. Shortly before *IRS* was filed in 2015, these banks agreed to pay out more than $1.8 billion to resolve *In re Credit Default Swaps Litig.*, Case No. 1:13-md-02476 ("*CDS*"), and another $2 billion to settle *In re: Foreign Exchange Benchmark Rates Antitrust Litig.*, Case No. 1:13-cv-07789 ("*ForEx*").[8] There was also virtually no risk that these defendants would be unable to pay a judgment in the *IRS* case; they are too big to fail. And so Cohen Milstein offered an *ex ante* rate below the median, but in line with the fee schedule set out by Judge Gleeson for these other very large banking cases pending in the Second Circuit.[9]

Antitrust litigation against food producers has not had the same historic success as these banking cases. The largest food commodity antitrust settlement over the past decade, *In re Southeastern Milk Antitrust Litig.*, settled for just over $303 million.[10] That is no small amount, but it is mathematically closer to zero than it is to $2 billion. And unlike banks that are too big to fail, this case was brought against chicken producers. Some of these companies are large, but others operate just a few plants. Many of them faced significant financial distress—a constant theme the defense has emphasized from the beginning. There was no guarantee *ex ante* that these defendants would be able to pay a multi-billion-dollar judgment, even if it was won. And so *Broilers* was

---

[8] Pete Brush, *Big Banks Near $1.9B Deal in CDS Antitrust Case*, LAW360 (Sept. 11, 2015), https://www.law360.com/articles/701789; Evan Weinberger, *Barclays to Pay $384M, HSBC $285M in Forex Case*, LAW360 (Oct. 22, 2015), https://www.law360.com/articles/716988. *See also* Johnson Decl. ¶¶ 4–7.

[9] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014). More than two years later in the litigation after the initial fee agreement and well after leadership was settled, Cohen Milstein agreed to the same exact fee schedule with an additional named plaintiff in *IRS*, the Los Angeles County Employees Retirement Association. This rate was not set *ex ante* and certainly was not a bid, but regardless counsel disclose it here. If the Court would like to confirm that the retainer uses the exact same language, counsel can provide it for *in camera* review as they did with the retainer with the Chicago Teachers union.

[10] *See* Berman Decl., Ex. 4 (ECF No. 6911-1) at 27 (ECF page 72) (showing table of largest antitrust settlements, with *Southeastern Milk* as number 29).

different at the outset—its risks were in line with, or potentially even greater than, the typical antitrust case.

This is reflected in the fight for leadership over the EUCP class—even though leadership was hotly contested, with four firms asking to be appointed as lead, no firm offered *ex ante* to litigate the case at a rate below median.[11] Cohen Milstein and Hagens Berman had offered rates below median to secure leadership in *IRS* and *Resistors* in 2015, yet they were not willing to do so here. If the *IRS* schedule or other bids had been the market rate, one of the firms vying for leadership would have offered that rate in an attempt to differentiate themselves from the competition. But they did not do so, confirming that *IRS* and *Resistors* are atypical data points and not an accurate reflection of what a firm would accept for an average antitrust class action *ex ante*. Or to borrow the phrase from the Seventh Circuit, aspects of these cases make them "poor indicators" of the market rate.[12]

### A. *Broilers* and *IRS* involve different considerations *ex ante*.

The Seventh Circuit has cautioned courts not to dismiss bids outright as "bids would ordinarily be good predictors of what ex ante bargain would have been negotiated."[13] But the appellate court also observed that "aspects of the cases in which the bids were made may show the

---

[11] *See* Application for Appointment of Steve W. Berman of Hagens Berman Sobol Shapiro LLPO and Kit A. Pierson of Cohen Milstein Sellers & Toll PLLC as Co-Lead Counsel for the Indirect Purchaser Consumer Class, ECF No. 117 (October 7, 2016); Renewed Motion to Appoint Separate Interim Class Counsel for Indirect Purchaser Consumers, ECF No. 218 (November 30, 2016); Indirect Purchaser Plaintiffs' Response in Opposition to Renewed Motion to Appoint Sperate Interim Class Counsel for Indirect Purchaser Consumers, ECF No. 238 (December 7, 2016); Application of Wolf Haldenstein Alder Freemen & Herz LLP For Appointment as Interim Class Counsel for End User Consumer Plaintiffs, ECF No. 246 (December 13, 2016); *and* Application for Appointment of Hagens Berman Sobol Shapiro LLP as Interim Class Counsel for End Purchaser Consumer Plaintiffs, ECF No. 247 (December 13, 2016).

[12] *In re Broiler Chicken Antitrust Litig*., 80 F.4th 797, 803 (7th Cir. 2023).

[13] *Id.*

bids to be poor indicators of what bargain would have been struck ex ante."[14] So the Court must compare the risks present at the outset of *IRS*, as well as the potential for recovery, to determine whether it is a good indicator of the market rate here. There are three reasons why it is not.

### 1. *IRS* had potential to be a gargantuan case.

First, it is difficult to overstate the potential damages and potential recovery for antitrust banking cases like *IRS*. *IRS* was filed in November 2015.[15] Just a month before this case was filed, the same defendant banks had announced historic settlements to resolve cases alleging other antitrust misconduct: $1.8 billion for *CDS* and $2 billion for *ForEx*.[16] The largest antitrust settlement ever reached—$7 billion—was also a case brought against banks, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, Case No. 1:05-md-01720.

In *IRS* the lead plaintiff and Cohen Milstein agreed to adopt the same fee schedule that Judge Gleeson created for this $7 billion settlement achieved in *Payment Card*.[17] In other words, at the outset of *IRS*, comparable antitrust cases involving the same (or similar) defendants factored into *ex ante* rate.[18]

In contrast, *Broilers* did not involve potential trillions in damages and billions in settlements. The largest food commodity antitrust case in that past decade, *Southeastern Milk*

---

[14] *Id.*

[15] Johnson Decl. ¶ 2.

[16] *See* Press Release, Quinn Emanuel Urquhart & Sullivan and Pearson, Simon & Warshaw Announce Nearly $1.9 Billion Settlement in Antitrust Action (October 1, 2015), https://www.law360.com/articles/709722/attachments/0; *see also* Evan Weinberger, *Barclays to Pay $384M, HSBC $285M in Forex Case*, LAW360 (Oct. 22, 2015), https://www.law360.com/articles/716988. *See also* Johnson Decl. ¶¶ 4–7.

[17] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014). *See also* Johnson Decl. ¶ 12.

[18] It is worth noting that the court in IRS has recently denied class certification, illustrating the risk and uncertainty in the *ex ante* analysis of even what seems to be the most promising of cases. *See IRS*, No. 1:16-md-02704, ECF No. 1054.

**SuppA49**

*Antitrust Litigation*, settled for just over $303 million in 2013.[19] Although these are also large numbers, they are nowhere near similar in size and scope of potential recovery (and fees awards), as the chart below illustrates.



Unlike *IRS*, this case was not believed to have such a large potential recovery that a firm would have offered a rate less than median—*i.e.* less than counsel would have received from a different, typical antitrust case. And there lies the problem with using market rates from outlier

---

[19] Counsel in *Southeastern Milk* were awarded one third of the settlement. *See In re Se. Milk Antitrust Litig.*, No. 2:07-cv 208, 2012 WL 12875983, at *1 (E.D. Tenn. July 11, 2012); *In re Se. Milk Antitrust Litig.*, No. 2:07-cv 208, 2013 WL 2155387, at *1 (E.D. Tenn. May 17, 2013).

**SuppA50**

cases: atypical prices from atypical cases do not approximate typical market prices. Or to borrow language from the Seventh Circuit, there are aspects of these atypical cases that render them "poor indicators of what bargain would have been struck *ex ante*" in this case.[20]

### 2. *IRS* involved defendants "too big to fail," or big enough to pay any judgment.

Second, *IRS* involved defendants who would certainly pay a judgment. One critical defendant, JPMorgan Chase, has a market capitalization of almost $500 billion and holds more than $3 trillion in assets. While litigation was pending, there was virtually no risk that one of the defendants would declare bankruptcy and stay the antitrust litigation.[21] The plaintiffs in *IRS* sued defendants who could pay almost any judgment.[22] Here, in contrast, defendants raised the specter of financial distress from the start. Some almost certainly could not pay in full the damages they may face at trial. Most of the defendants are small, privately held companies. Their financial health was not public, and counsel took a risk bringing this litigation not knowing if they would have the ability to pay at all—or if they might declare bankruptcy during the long, protracted, expensive litigation. Even the largest defendants were known to not be immune from financial distress: as counsel knew when they filed their first complaint in 2016, defendant Pilgrim's (one of the largest producers) declared bankruptcy in 2008.[23]

---

[20] *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 803 (7th Cir. 2023).

[21] Johnson Decl. ¶ 10.

[22] *Id.* ¶ 9.

[23] *See* Indirect Purchaser Plaintiffs' Consolidated Amended Complaint, ECF No. 179 at ¶ 48.

### 3. The plaintiffs in *IRS* wouldn't face attacks and risks common in indirect purchaser cases.

*IRS* is also a poor indicator of the market rate for *Broilers* because it is not an indirect purchaser case.[24] Indirect purchasers must be ready to defend against common attacks that direct purchasers do not face and can only bring damages claims for a portion of the United States. For example, indirect purchasers can expect defendants to challenge indirect purchasers' standing under the state law statutes. Courts sometimes dismiss state law claims as a result, decreasing the total damages consumers can recover. Defendants also challenge indirect purchasers at class certification—arguing that manageability of litigating the state law claims is too difficult or implying there is insufficient proof of passthrough. Here, EUCP Class Counsel knew they would have to invest time and resources into completing additional discovery to measure the passthrough to courter the inevitable arguments defendants would make. And they did; but it was a significant undertaking—one that direct purchasers and the plaintiffs in *IRS* do not face. That should factor in to the *ex ante* negotiated rate.

### B. Class Counsel properly disclosed *IRS*.

Finally, Objector Andren has implied that Class Counsel hid the truth by failing to disclose *IRS* during the first round of briefing.[25] That is false. In response to Objector Andren's request for interrogatories,[26] the Court ordered EUCP Class Counsel to produce every antitrust fee bid or award that was "submitted to, or ordered by, a court from September 2, 2016 (which is the date

---

[24] Johnson Decl. ¶ 11.

[25] *See* Objector Andren's Opp. to End-User Consumer Pls.' Renewed Mot. for Attorneys' Fees, ECF No. 6990 (Oct. 20, 2023) at 6.

[26] *See* Objector Andren's Supplemental Brief in Supp. of Mot. to Continue Final Approval Hearing with Respect to Attorneys' Fees and to Compel Interrogatory Responses, ECF No. 5308 (Dec. 23, 2021).

this case was filed) to the present."[27] There is no centralized database with this information. And so EUCP Class Counsel began conducting a manual search for all information within the date parameters set by the Court. EUCP Class Counsel identified three cases where awards had been issued after September 2, 2016 that involved a bid for legal services—*ODD*, *Batteries*, and *Resistors*.[28] These were properly disclosed. On appeal, the Seventh Circuit clarified that bids made "around the time this litigation began in September 2016 would ordinarily be good predictors of what *ex ante* bargain would have been negotiated."[29]

And so EUCP Class Counsel took initiative to go beyond the Court's August 30, 2022 order and conduct a broader search. On their own initiative, EUCP Class Counsel made their best efforts to review every leadership application and antitrust award issued to EUCPs from 2013 to 2019—three years before and after the litigation was filed.[30] (Again, there is no central repository for this information at either Hagens Berman or Cohen Milstein.) Because *IRS* is one of those cases, it was disclosed in EUCP Class Counsel's renewed brief, and the facts were discussed and distinguished.[31] Class Counsel has maintained during this process that *IRS* is one relevant point of data under the Seventh Circuit's framework. And it should be examined as such. But it is not the only data point that is relevant and the Court must look at all the evidence of the market rate before arriving at its number. The vast majority of the data—including prior fee awards issued to Class

---

[27] *See* Order, ECF No. 5798 (Aug. 30, 2022).

[28] *See* End-User Consumer Pls.' Resp. to the Court's August 30, 2022 Order (ECF No. 5818) (Sept. 23, 2022).

[29] *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 802 (7th Cir. 2023).

[30] *See* Mem. of Law in Supp. of End-User Consumer Pls.' Renewed Mot. for Attorneys' Fees, ECF No. 6911 (Sep. 9, 2023) at 2.

[31] *Id.* at 21–22.

Counsel, data about fee awards for similar cases of this size, and scholarly articles—suggest that the *ex ante* rate is about one third of the settlement.

## II.     CONCLUSION

The Seventh Circuit instructed this Court to evaluate "bids made by class counsel in auctions" and "out-of-circuit decisions" to determine what the appropriate fee award for this case.[32] When examining *all* of this data, a clear picture emerges—the median fee award is about 30 percent. Here, the parties would not have agreed to a higher rate *ex ante*—and did not—despite it being a contested leadership battle. Unlike *IRS*, this was not a case so big or so certain where the parties would have negotiated a rate lower than median.

DATED: April 9, 2024                            HAGENS BERMAN SOBOL SHAPIRO LLP

                                                By:  */s/ Steve W. Berman*
                                                     STEVE W. BERMAN
                                                Breanna Van Engelen
                                                1301 Second Avenue, Suite 2000
                                                Seattle, WA 98101
                                                Tel: (206) 623-7292
                                                steve@hbsslaw.com
                                                breannav@hbsslaw.com

                                                Shana E. Scarlett
                                                Rio S. Pierce
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                715 Hearst Avenue, Suite 300
                                                Berkeley, CA 94710
                                                Tel: (510) 725-3000
                                                shanas@hbsslaw.com
                                                riop@hbsslaw.com

---

[32] *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 802 (7th Cir. 2023).

**SuppA54**

DATED: April 9, 2024          COHEN MILSTEIN SELLERS & TOLL PLLC

By: */s/ Brent W. Johnson*
     BRENT W. JOHNSON
Benjamin D. Brown
Daniel H. Silverman
Alison S. Deich
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com

*Lead Counsel for End-User Consumer Indirect Purchaser Plaintiffs Class*

## **CERTIFICATE OF SERVICE**

The undersigned attorney of record hereby certifies that on April 9, 2024, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF system, which will cause notice and a copy of this filing to be sent to all counsel of record.

Dated: April 9, 2024

/s/ Steve W. Berman
STEVE W. BERMAN

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 1:16-cv-08637-TMD-JG |
| This Document Relates To: | Hon. Judge Thomas M. Durkin |
| *All End-User Consumer Plaintiff Actions* | Magistrate Judge Jeffrey T. Gilbert |

**REPLY IN SUPPORT OF SUPPLEMENTAL MEMORANDUM IN SUPPORT OF END-
USER CONSUMER PLAINTIFFS' RENEWED MOTION FOR ATTORNEYS' FEES**

## I. INTRODUCTION

The Court ordered Class Counsel and Objector Andren to file supplemental briefs about how *IRS* illuminates the terms "private plaintiffs would have negotiated with [Class Counsel], had bargaining occurred at the outset of the case."[1] In the few pages he devotes to this question, Andren ignores crucial differences between *Broilers* and *IRS*. He also ignores how *IRS* fits into a broader data set showing that sophisticated private plaintiffs generally negotiate a one-third fee *ex ante*.[2] Instead, Andren devotes most of his brief to inaccurate generalizations about plaintiffs' counsel in class actions and discussions of outlier cases. None of Andren's assertions undermine the conclusion that Class Counsel would have negotiated a 33% fee here.[3]

### A. Class Counsel Would Have Negotiated a Higher Fee in *Broilers* than *IRS*.

Andren offers no serious argument for why Class Counsel would have negotiated a lower rate in *Broilers* than in *IRS*, but asks the Court to use a lower rate regardless.[4] This is illustrative of Andren's approach. He focuses not on the rate that Class Counsel would have bargained for, but the lowest possible rate supported by any outlier data. So, he entirely ignores the best evidence

---

[1] *In re Broiler Chicken Antitrust Litig.* ("*Broilers*"), 80 F.4th 797, 801-02 (7th Cir. 2023). "*IRS*" refers to *In re Int. Rate Swaps Antitrust Litig.*, Case No. 1:16-md-02704 (S.D.N.Y.).

[2] Berman Decl., Ex. 3 at 1161-62 (ECF No. 6911-1) (Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021)) ("Fitzpatrick Study") (2021 study of available fee agreements, which showed that "sophisticated corporate clients" in "antitrust cases in the pharmaceutical industry where large corporations sue each other" negotiated a fixed one-third rate).

[3] Andren continues to question whether the negotiated fee arrangement in *IRS* strictly follows the *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014) fee scale or also imposes lesser rates for early-stage recoveries. Obj. Andren's Suppl. Obj. to EUCP's Renewed Mot. for Att'ys' Fees at 7 n.4 & 11-12 (ECF No. 7208) ("Andren Suppl. Opp."). As Class Counsel stated in open court and demonstrated through *in camera* submission, the *IRS* agreement expressly follows the *scale*—and only the scale—in *Payment Card*.

[4] Andren previously argued that the Court should apply a "similar schedule" to *IRS*, Obj. Andren's Opp'n to EUCP's Renewed Mot. for Att'ys' Fees at 2 (ECF No. 6990) ("Andren Opp."), but now advocates for an even lower award in line with Hagens' bids in *In re Optical Disk Drive Prods. Antitrust Litig.* ("*ODD*"), No. 10-md-02143, *In re Lithium Ion Batteries Antitrust Litig.* ("*Batteries*"), No. 4:13-md-02420, and *In re Resistors Antitrust Litig.* ("*Resistors*"), No. 15-cv-03820. *See* Andren Suppl. Opp. at 7. EUCP Class Counsel have already explained why the *ODD*, *Resistors*, and *Batteries* bids are poor indicators of what the bargained-for rate would have been here. *See* Mem. of Law in Supp. of End-User Consumer Pls.' Renewed Mot. for Att'ys' Fees at 14-20 (ECF No. 6911) ("EUCP Renewed Fee Pet."); Reply in Supp. of End-User Consumer Pls.' Renewed Mot. for Att'ys' Fees, at 10-16 (ECF No. 7032) ("EUCP Renewed Reply"). It is also irrelevant that the *IRS* schedule leads to a higher fee award than in *In re Synthroid Mktg. Litig.* ("*Synthroid II*"), where the court used a fee agreement between other parties in that case as a "benchmark" for setting the fees for the consumer class. 325 F.3d 974, 976-80 (7th Cir. 2003). There is no reason that benchmark would apply here.

**SuppA58**

of what "private plaintiffs would have negotiated with their lawyers"[5]: a 2021 study showing sophisticated antitrust plaintiffs negotiate one-third flat rates at the outset of their cases.[6] That provides critical context for *IRS*. A close look at the differences between *IRS* and *Broilers* confirms Class Counsel would have negotiated the market rate here.

First, *IRS* had a realistic chance of a huge recovery in a different stratosphere than *Broilers*. At the time *IRS* was filed, its banking defendants had just settled two similar financial cartel cases for *billions* of dollars.[7] *IRS* lead counsel reasonably predicted a similar recovery, not based on the fanciful notion that "*every* 'financial' antitrust action would result in a billion-dollar settlement,"[8] but rather on significant and critical similarities between *IRS* and the settled cases. *IRS* centered on defendant banks colluding in the trillion-dollar interest rate swap market beginning in 2008. *CDS*[9]—which settled for $1.8 billion right before *IRS* was filed—involved the same defendants colluding in the trillion-dollar *credit default swap* market beginning the same year.[10] Some of *IRS*'s co-lead counsel were also co-lead counsel in *CDS*, putting them in a particularly strong position to judge the similarities of the cases.[11] Meanwhile, in the past decade, the highest recovery for a food commodity antitrust case was just over $300 million.[12] Class Counsel knew all this *ex ante*.[13]

---

[5] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (citations and quotations omitted).

[6] Fitzpatrick Study at 1161-62 ("[T]he corporations in these [antitrust] cases appear perfectly happy with the percentage method and perfectly happy with the . . . fixed percentage of one-third."). The study also shows Andren is wrong that sophisticated parties would negotiate declining fee scales. Andren Suppl. Opp. at 10-12. In fact, they reject them to avoid "creat[ing] declining marginal returns to legal work." *Synthroid*, 264 F.3d at 721. *See also* EUCP Renewed Reply at 6.

[7] Suppl. Mem. In Supp. of End-User Consumer Pls.' Renewed Mot. for Att'ys' Fees at 4-5 (ECF No. 7202) ("EUCP Suppl. Mem.").

[8] Andren Suppl. Opp. at 8.

[9] *CDS* refers to *In re Credit Default Swaps Litig.*, No. 1:13-md-02476 (S.D.N.Y.).

[10] Pete Brush, *Big Banks Near $1.9B Deal in CDS Antitrust Case*, LAW360 (Sept. 11, 2015), https://www.law360.com/articles/701789.

[11] The leadership application in *IRS* highlighted these similarities with *CDS*. Application to Appoint Interim Co-Lead Counsel at 11, *In re Interest Rates Swaps Antitrust Litig.*, No. 16-md-2704-JPO (S.D.N.Y. July 22, 2016), ECF No. 74 ("Because the CDS case is effectively over, the same team that achieved this impressive result for the class of CDS investors is poised to jump into action on this case . . . .").

[12] EUCP Suppl. Mem. at 4-5.

[13] The estimated damages in *Broilers* were also about *$1 billion* less than in *IRS*, which Andren characterizes as a "small difference." Andren Suppl. Opp. at 9; Expert Report of Mark Grinblatt at iii, 104, *In re Interest Rate Swaps Antitrust Litig.*, No. 16-md-2704 (S.D.N.Y. Mar. 7, 2019), ECF No. 725-1 (providing $4.5 billion "rough calculation of damages"); Dr. Sunding Merits Rebuttal Report (Jan. 26, 2023) at Tbl. 12 (ECF No. 6226-6) (providing $3.4 billion estimated damages using Defendants' volume of commerce).

Second, the likely *ex ante* recovery in *IRS* was significantly higher than in *Broilers* because the *IRS* banking defendants could pay any judgment, while the *Broilers* defendants faced significant financial turmoil. Pilgrim's declared bankruptcy before the EUCP Complaint was filed, and other chicken processors declared bankruptcy from 2010 through 2012. The prospect that one or more defendants might declare bankruptcy during the litigation drastically increased the *ex ante* risk. Any bankrupt defendant might become judgment proof and the litigation would be stayed, preventing discovery and limiting the value of claims against all defendants. Andren ignores this entirely, and instead posits that well-resourced defendants are less likely to settle, so the *IRS* defendants' resources cut both ways. Not so. While the *Broilers* Defendants did not have limitless resources, they had enough to mount a vigorous defense. More fundamentally, Andren mixes up *willingness* to pay with *ability* to pay. Defendants who are able but reluctant to pay can be fought and defeated in Court.[14] But even if plaintiffs defeated the *Broilers* Defendants, those Defendants likely could not pay above a certain amount, creating a damages cap not present in *IRS*.

Finally, Andren concedes that indirect purchaser cases like *Broilers* carry significant risks and limitations that do not exist in direct purchaser cases like *IRS*. Indirect purchasers can bring claims on behalf of only half the country, for example, greatly limiting damages.[15] He then makes the unfounded suggestion that there must be commensurate or greater risks in direct purchaser cases.[16] For instance, he suggests, indirect purchasers "don't have to worry about passthrough."[17] But anyone who has litigated an indirect purchaser case knows it is the indirect purchasers' burden to prove pass-through—requiring substantial discovery and expert costs; by contrast, *direct* purchasers do not have to show either pass-through or the absence of it.[18]

---

[14] *See, e.g.*, *In re Urethane Antitrust Litig.*, No. 04-1616, 2016 WL 4060156, at *1-2 (D. Kan. July 29, 2016) (plaintiffs settled with Dow Chemical for $835 million after winning at trial).

[15] *Cf.* Berman Decl., Ex. 4 at 17 (ECF No. 6911-1) (Joshua Davis and Rose Kohles Clark, *2022 Antitrust Annual Report: Class Actions in Federal Court*, Center for Litigation & Courts at UC Law SF & Huntington National Bank (September 2023)) (direct purchasers "recovered almost four times as much" as indirect purchasers in antitrust class actions from 2009 to 2022).

[16] Andren Suppl. Opp. 9-10.

[17] *Id.* at 10.

[18] *Compare In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2022 WL 1720468, at *18 (N.D. Ill. May 27, 2022) ("[T]he Indirects must show that these increased prices were passed on to them."); *with Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968).

- 3 -

In sum, given the substantial differences between *Broilers* and *IRS*, Class Counsel in *Broilers* would not accept the below-market rate accepted by counsel in *IRS*.[19]

**B.    Objector Andren's Alternative Arguments Do Not Change the Market Rate.**

Andren spends most of his filing far afield from the Court's request for briefing on *IRS*. None of his extraneous arguments disturb the point that EUCP Class Counsel would have negotiated a one-third flat rate before filing this case.

First, Class Counsel are highly incentivized to bid to fend off leadership applications from competing firms. Class Counsel almost never do so because they would rather lose leadership than offer below-market rates. Andren argues these lack of bids are irrelevant because named plaintiffs are not incentivized to negotiate fee agreements.[20] But regardless of whether named plaintiffs negotiate fee rates, *Class Counsel* are incentivized to bid to win leadership. That Class Counsel almost never submit bids in complex antitrust cases—despite their frequent participation in highly competitive leadership battles—shows that the market rate for such cases is actually the award that counsel reasonably expect to receive in the absence of a bid (roughly 33%).[21] In other words, the lack of bids confirms the 2021 Fitzpatrick Study is accurate: The market rate is around one-third.[22] If it were lower, Class Counsel and competing firms would enter lower bids to increase their likelihood of being appointed lead counsel.[23] Class Counsel and other firms do not—not because

---

[19] Moreover, the *Payment Card* scale used in *IRS* has mostly been applied to large settlements. Andren has not pointed to *any* case in which the scale has been applied to a fund under $244 million. Nonetheless, Andren oddly argues that Class Counsel "cannot contest" that the *IRS* fee schedule "has been applied to small settlements." Andren Suppl. Opp. at 10-11. As Class Counsel have explained, the cases Andren references merely cite *Payment Card* without endorsing or applying its scale. EUCP Renewed Reply at 9.

[20] Andren Suppl. Opp. at 1.

[21] Berman Decl., Ex. 9 at 10 (ECF No. 6911-1) (Class Counsel submitted one bid out of 51 leadership applications submitted in antitrust cases between 2013 and 2019); Berman Decl., Exs. 1-2 (ECF No. 6911-1) (Class Counsel submitted only one bid out of 196 antitrust cases filed between 2013 and 2019—three years before and after the start of *Broilers*).

[22] Fitzpatrick Study at 1161-62.

[23] Andren's argument plaintiffs' firms do not actually compete is wrong and has been rejected by the Seventh Circuit. *Synthroid II*, 325 F.3d at 979 (rejecting argument that "the market in legal services is uncompetitive"). Andren's example of the fee bid in the single-defendant, data privacy case *23andMe, Inc. Consumer Data Security Breach Litig.*, No. 24-cv-487 (N.D. Cal.), does not disturb this point; Andren admits it does not bear on the *ex ante* market price for this antitrust case. Nor does Andren contradict Steve Berman's declaration explaining Hagens' bid in *ODD* was used to get Hagens' foot into that case but turned out to be "vastly below market." Berman Decl. ¶ 19 (ECF No. 5250).

- 4 -

**SuppA61**

they lack incentive, but because complex antitrust cases carry exceptional costs and risks of nonpayment that require preserving the ability to seek a one-third fee.[24]

Second, EUCP Class Counsel's participation in Ninth Circuit litigation does not imply they would have negotiated a below-33% rate in *Broilers*. Andren suggests that the Ninth Circuit effectively caps attorneys' fees at 25%.[25] In fact, the Ninth Circuit's 25% standard is merely a benchmark that courts routinely override.[26] Between 2016 and the present alone, EUCP Class Counsel were awarded fees over 25% in the Ninth Circuit eight times, more than they were awarded fees under 25%.[27] These data confirm that Class Counsel expect to be paid the market rate, not 25%, for their services in Ninth Circuit cases.[28]

In fact, Andren's focus on the fee in *Nitsch v. DreamWorks Animation SKG Inc.* ("*Animation*"), actually illustrates why Class Counsel would have negotiated a one-third fee rate here.[29] *Animation* was an outlier where the court applied the lodestar method rather than the percent-of-recovery method—bucking the 25% Ninth Circuit benchmark entirely. The Court used a 2.0 multiplier.[30] Here, Class Counsel's 33% request multiplies their fees by just 1.8.[31] This again demonstrates the flaw with Andren's the-fee-should-always-be-lower approach: data driven analysis shows that the lowest ever fees are not always the market rate.[32]

## II.     CONCLUSION

Class Counsel here would have bargained for the market rate that sophisticated parties negotiate in complex antitrust cases: 33% of the net settlement.

---

[24] *See* EUCP Renewed Fee Pet. at 10-11.
[25] Andren Suppl. Opp. at 12.
[26] *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738-39 (9th Cir. 2016).
[27] *See* Berman Decl., Ex. 9 (ECF No. 6911-1).
[28] *Broilers*, 80 F.4th at 804.
[29] No. 14-CV-4062-LHK, 2017 WL 2423161 (N.D. Cal. June 5, 2017).
[30] *Id.* at *10.
[31] EUCP Renewed Reply at 20. This multiplier would be much lower if it included work since the original fee petition in October 2021. *See* End-User Consumer Pls.' Mot. for Att'ys' Fees (ECF No. 5160).
[32] Illustrating the point, Andren's request for fees at or below $31.5 million would result in a *negative* multiplier, suggesting Class Counsel would have negotiated an *ex ante* fee that did not even cover their own hourly rates. *See* Scarlett Decl. ¶ 17 (ECF No. 5161-1). Andren Suppl. Opp. at 7. That cannot be right.

- 5 -

DATED: April 30, 2024                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By: */s/ Steve W. Berman*
                                                STEVE W. BERMAN
                                         Breanna Van Engelen
                                         1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
                                         Tel: (206) 623-7292
                                         steve@hbsslaw.com
                                         breannav@hbsslaw.com

                                         Shana E. Scarlett
                                         Rio S. Pierce
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 300
                                         Berkeley, CA 94710
                                         Tel: (510) 725-3000
                                         shanas@hbsslaw.com
                                         riop@hbsslaw.com

DATED: April 30, 2024                    COHEN MILSTEIN SELLERS & TOLL PLLC

                                         By: */s/ Brent W. Johnson*
                                                BRENT W. JOHNSON
                                         Benjamin D. Brown
                                         Daniel H. Silverman
                                         Alison S. Deich
                                         COHEN MILSTEIN SELLERS & TOLL PLLC
                                         1100 New York Avenue NW
                                         Suite 500, West Tower
                                         Washington, DC 20005
                                         Tel: (202) 408-4600
                                         bjohnson@cohenmilstein.com
                                         bbrown@cohenmilstein.com
                                         dsilverman@cohenmilstein.com
                                         adeich@cohenmilstein.com

                                         *Lead Counsel for End-User Consumer Indirect*
                                         *Purchaser Plaintiffs Class*

- 6 -

**SuppA63**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record hereby certifies that on April 30, 2024, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF system, which will cause notice and a copy of this filing to be sent to all counsel of record.

Dated: April 30, 2024          */s/ Steve W. Berman*
                              STEVE W. BERMAN

**SuppA64**